1

**MICHAELSON, SUSI & MICHAELSON**

A Professional Corporation

2
ATTORNEYS AT LAW

SEVEN WEST FIGUEROA STREET, SECOND FLOOR

3
SANTA BARBARA, CALIFORNIA 93101-3191

Telephone:  (805) 965-1011

4
Facsimile:   (805) 965-7351

Peter Susi, Bar No. 62957

5

6   Attorneys for Debtor and Debtor-in-Possession

(SPACE BELOW FOR FILING STAMP ONLY)

7

8                    **UNITED STATES BANKRUPTCY COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

10

| | |
|---|---|
| In re | BK No. ND 09-12311-RR |
| HOLLYWOOD MOTION PICTURE AND TELEVISION MUSEUM, a California Non-Profit Corporation, | Chapter 11 |
| | DEBTOR'S DISCLOSURE STATEMENT RE CHAPTER 11 PLAN OF REORGANIZATION |
| Debtor. | DISCLOSURE STATEMENT HEARING |
| | Date: |
| | Time: |
| | Place:  1415 State Street Courtroom 201 Santa Barbara, CA |

# TABLE OF CONTENTS

I.   INTRODUCTION  ............................................... 1

  A.  Purpose of This Document ................................. 2

  B.  Deadlines for Voting and Objecting; Date of Plan
     Confirmation Hearing .................................... 3

    1.  Time and Place of the Confirmation Hearing ........... 3
    2.  Deadline For Voting For or Against the Plan .......... 4
    3.  Deadline For Objecting to the
       Confirmation of the Plan ........................... 4
    4.  Identity of Person to Contact for More Information
       Regarding the Plan ................................. 4

  C.  Disclaimer .............................................. 4

II.  BACKGROUND ............................................... 6

  A.  History of the Museum ................................... 6

  B.  Orman's Loans to HMPM .................................. 9

    1.   September 4, 2002:  The Note ......................... 9
    2.   March 18, 2003:  The Amended Note .................... 9
    3.   September 15, 2003:  Default under the Amended Note ... 10
    4.   May 1, 2005:  Forebearance Agreement ................. 10

  C.  Orman's California State Court Action .................. 10

  D.  Orman's Kansas State Court Action, HMPM's
  Bankruptcy, and Judge Lungstrum's Order ................... 11

  E.  Trust and Selden's Bankruptcy Filings ................. 12

  F.  Management and Ownership of the Debtors ............... 12

i

III. SUMMARY OF THE PLAN OF REORGANIZATION ................... 13

  A. What Creditors and Interest Holders Will Receive Under the
     Plan ................................................. 13

  B. Unclassified Claims ................................... 13

    1.  Administrative Expenses ............................. 13

  C. Classified Claims and Interests ...................... 15

    1. Classes of Secured Claims ........................... 15
    2. Classes of Priority Unsecured Claims ................ 17
    3. Classes of General Unsecured Creditors .............. 17
    4. Class of Interest Holders ........................... 18

  D. Means of Performing Under the Plan ................... 19
  E. Disbursing Agent ..................................... 22

IV.  RISK FACTORS ........................................... 22

V. CONFIRMATION REQUIREMENTS AND PROCEDURES ................. 22

  A. Who May Vote or Object ............................... 23

    1. Who May Object to Confirmation of the Plan .......... 23
    2. Who May Vote to Accept/Reject the Plan .............. 23
    3. Who is Not Entitled to Vote ......................... 25
    4. Who Can Vote in More Than One Class ................. 25
    5. Votes Necessary to Confirm the Plan ................. 26
    6. Votes Necessary for a Class to Accept the Plan ...... 26
    7. Treatment of Nonaccepting Classes ................... 26

  B. Liquidation Analysis ................................. 27
  C. Feasibility .......................................... 28

1  VI.   EFFECT OF CONFIRMATION OF PLAN ......................... 28

2

3     A.  Discharge ......................................... 28
      B.  Revesting of Property in the Debtor ..................... 29
4     C.  Modification of Plan ................................. 29
      D.  Post-Confirmation Status Report ...................... 29
5     E.  Quarterly Fees .................................... 29
      F.  Post-Confirmation Conversion/Dismissal ................ 30
6     G.  Final Decree ...................................... 30

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*In re Entz-White Lumber & Supply, Inc.*
  850 F.2d 1338 (9th Cir. 1988) ...........................12, 16

**Statutes**

11 U.S.C. § 1112(b) .........................................29

11 U.S.C. § 1129(a)(8) ......................................26

11 U.S.C. § 1129(b) .........................................26

11 U.S.C. § 1141 ............................................28

28 U.S.C. § 1930(a)(6) ......................................29

11 U.S.C. § 1124(2) .........................................12

11 U.S.C. § 507(a) ..........................................17

11 U.S.C. §§ 507(a)(1), (a)(2), and (a)(8); .................25

11 U.S.C. §  503(b) .........................................13

11 U.S.C. §§ 507(a)(3), (4), (5), and (6) ...................17

**Rules**

Bankruptcy Rule 3022 ........................................30

# I.

## INTRODUCTION

Hollywood Motion Picture and Television Museum, (the "Museum" or "Debtor"), Selden Enterprises Limited Partnership ("Selden"), and Hollywood Motion Picture Trust ("Trust", and collectively, the "Debtors") are the debtors in three related Chapter 11 bankruptcy cases pending before this Court.

On June 12, 2009 the Museum commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code and on February 24, 2010 Selden and Trust commenced bankruptcy cases by filing voluntary Chapter 11 petitions.  The Debtors have operated and continue to operate their businesses and manage their affairs as debtors in possession as authorized by Bankruptcy Code Section 1107 and 1108 since the cases were filed.

Chapter 11 allows the debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  The Debtors have filed three substantively identical plans of reorganization in each of the three related cases.  The Museum is the party proposing the plan in this Chapter 11 case (the "Plan"), which is attached hereto as Exhibit "A".  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE MUSEUM'S PLAN.

This Plan provides two alternative scenarios for the payment of creditors:  (1) A reorganizing plan pursuant to

- 1 -

1  which creditors will be paid in full through the establishment

2  of a museum at Belle Island Village in Pigeon Forge, Tennessee,

3  or (2) a liquidating plan pursuant to which creditors will be

4  paid in full from the proceeds of an auction conducted by a

5  nationally known auction house of the Debtors' memorabilia

6  collection, or a private sale of the Debtors' memorabilia

7  collection to a third party purchaser.

8      As discussed in detail in this Disclosure Statement, under

9  either scenario, the Plan proposes to satisfy all of the

10  prepetition obligations of the Debtors.  The "Effective Date"

11  of the Plan is August 1, 2010.

12  **A.    Purpose of This Document**

13      This Disclosure Statement summarizes what is in the Plan,

14  and provides certain information relating to the Plan and the

15  process the Court follows in determining whether or not to

16  confirm the Plan.

17      **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

18  **KNOW ABOUT:**

19      (1)    WHO CAN VOTE OR OBJECT,

20      (2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your

21              claim will receive if the Plan is confirmed), AND HOW

22              THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD

23              RECEIVE IN LIQUIDATION,

24      (3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS

25              DURING THE BANKRUPTCY,

26      (4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER

27              OR NOT TO CONFIRM THE PLAN,

28      (5)    WHAT IS THE EFFECT OF CONFIRMATION, AND

1     (6)   WHETHER THIS PLAN IS FEASIBLE.

2     This Disclosure Statement cannot tell you everything about

3  your rights.  You should consider consulting your own lawyer to

4  obtain more specific advice on how this Plan will affect you

5  and what is the best course of action for you.  Be sure to read

6  the Plan as well as the Disclosure Statement.  If there are any

7  inconsistencies between the Plan and the Disclosure Statement,

8  the Plan provisions will govern.  This Disclosure Statement

9  uses some capitalized terms which are defined in the

10  Definitions Section of the Plan and you should refer there for

11  the meaning of the term.

12     The Code requires a Disclosure Statement to contain

13  "adequate information" concerning the Plan.  The Bankruptcy

14  Court ("Court") has approved this document as an adequate

15  Disclosure Statement, containing enough information to enable

16  parties affected by the Plan to make an informed judgment about

17  the Plan. Any party can now solicit votes for or against the

18  Plan.

19  **B.   Deadlines for Voting and Objecting; Date of Plan**

20     **Confirmation Hearing**

21     THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

22  DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN

23  ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER

24  CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR

25  AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

26     **1.   Time and Place of the Confirmation Hearing**

27     The hearing to confirm the Plan will take place on

28  _____, at _____ m., at the United States

- 3 -

1  Bankruptcy Court, 1415 State Street, Santa Barbara, California

2  93101.

3     **2.    Deadline For Voting For or Against the Plan**

4     If you are entitled to vote, it is in your best interest

5  to timely vote on the enclosed ballot and return the ballot in

6  the enclosed envelope to the Debtors' bankruptcy counsel, Peter

7  Susi, Michaelson, Susi & Michaelson at Seven West Figueroa

8  Street, Second Floor, Santa Barbara, California 93101.  Your

9  ballot must be received by _____, 2010 at 4 p.m.

10  (Pacific Time) or it will not be counted.

11     **3.    Deadline For Objecting to the Confirmation of the**

12          **Plan**

13     Objections to the confirmation of the Plan must be filed

14  with the Court and served upon Debtors' bankruptcy counsel,

15  Peter Susi, Michaelson, Susi & Michaelson at Seven West

16  Figueroa Street, Second Floor, Santa Barbara, California 93101

17  _____, 2010 at 4 p.m. (Pacific Time).

18     **4.    Identity of Person to Contact for More Information**

19          **Regarding the Plan**

20     Any interested party desiring further information about

21  the Plan should contact Peter Susi (peter@msmlaw.com) or

22  Jonathan Gura (jon@msmlaw.com) at Michaelson, Susi &

23  Michaelson, Seven West Figueroa Street, Second Floor, Santa

24  Barbara, California 93101, by email or telephone at (805) 965-

25  1011.

26  **C.  Disclaimer**

27     Please carefully read this document, the Plan, and the

28  attached Exhibits.  These documents explain who may object to

1 confirmation of the Plan, who is entitled to vote to accept or

2 reject the Plan, and the treatment that creditors and interest

3 holders can expect to receive if the Court confirms the Plan.

4 The statements and information contained in the Plan and

5 Disclosure Statement, however, do not constitute financial or

6 legal advice.  You should therefore consult your own advisors

7 if you have questions about the impact of the Plan on your

8 claims or interests.

9      The financial data relied upon in formulating the Plan was

10 prepared by the Debtors from information in their books and

11 records.  The information contained in this Disclosure

12 Statement is provided by Todd Fisher, the President of the

13 Museum, the general partner of Selden, and trustee of Trust.

14 The Debtors represent that everything stated in the Disclosure

15 Statement is true to the Debtors' best knowledge.  The Debtors'

16 professionals have not independently verified this information.

17 The Court has not yet determined whether the Plan is

18 confirmable and makes no recommendation as to whether you

19 should support or oppose the Plan.

20 **You may not rely on the Plan and Disclosure Statement for**

21 **any purpose other than to determine whether to vote to accept**

22 **or reject the Plan.  Nothing contained in the Plan or**

23 **Disclosure Statement constitutes an admission of any fact or**

24 **liability by any party or may be deemed to constitute evidence**

25 **of the tax or other legal effects that the Debtors'**

26 **reorganization may have on entities holding claims or**

27 **interests.**

28

1

## II.

2

### BACKGROUND

3  **A.   History of the Museum**

4       In the early 1970s, Hollywood studios began auctioning off

5  their extensive collections of costumes and props, and actress

6  Debbie Reynolds ("Reynolds") was the largest purchaser.   In

7  1972, Reynolds established the Museum, a non-profit

8  corporation, and over time donated portions of her Hollywood

9  memorabilia to the Museum.

10       Later Reynolds formed two other entities, Trust and

11  Selden, to own the portion of her memorabilia collection that

12  had not been donated to the Museum.   Reynolds' entire

13  collection of memorabilia was stored together in her Los

14  Angeles studio until 1993, when she acquired a hotel and casino

15  in Las Vegas called the Paddlewheel Hotel.

16       Reynolds reopened the hotel as the Debbie Reynolds

17  Hollywood Hotel and Casino and added a 10,000 square foot

18  museum to the hotel to display her memorabilia collection.

19  While the museum was profitable, the hotel and casino ran into

20  financial trouble and went out of business in 1997.   In 1998,

21  the memorabilia collections were moved to a 10,000 square foot,

22  climate controlled, custom warehouse in Creston, California,

23  built and owned by the Museum's CEO and Reynolds' son, Todd

24  Fisher ("Fisher").   To this day the bulk of the collections of

25  all three entities remains in Fisher's warehouse in Creston.

26       Within a year of moving the collections to Creston, Fisher

27  began negotiating a lease for a new Hollywood memorabilia

28  museum in the Hollywood & Highland Center - the entertainment,

1   retail and hotel complex in the heart of Hollywood, California,

2   that is home to the Academy Awards.  The Museum signed a lease

3   for 20,000 square feet on the top floor of the Hollywood &

4   Highland Center and was scheduled to open in 2004.

5       The Hollywood & Highland Center was developed by Trizec

6   Properties with funds from the City of Los Angeles' Community

7   Redevelopment Agency (the "CRA").  As part of the agreement,

8   the Museum was to receive a loan from the CRA to build out and

9   start up the museum.  However, before a formal loan commitment

10  from the CRA could be obtained, the Museum had to provide

11  architectural plans and a feasibility study to the CRA.  To

12  fund this pre-development work, the Museum obtained a $1

13  million "bridge loan" from Gregory Orman in September 2002.

14  This bridge loan was to be paid off with the CRA financing.

15      The Hollywood & Highland Center, which opened in 2001,

16  turned out to be a financial debacle for Trizec Properties and

17  Trizec and the City of Los Angeles ended up in litigation over

18  the project.  As a result, the CRA reneged on its commitments

19  to provide further financing for the project – including the

20  Museum's financing.  Accordingly, the Museum was unable to

21  repay Orman's bridge loan.

22      As the Hollywood & Highland Center agreement was falling

23  apart, Fisher was approached by Glen Bilbo ("Bilbo"), the

24  developer of Belle Island Village, a 26-acre, $114 million

25  mixed-use destination resort with retail, hospitality and

26  entertainment venues in Pigeon Forge, Tennessee, near Dolly

27  Parton's famed "Dollywood."  Bilbo, through his company

28  Southern Venue Development, LLC ("SVD"), offered to build the

- 7 -

1  Museum a brand new, 36,000 square foot facility designed

2  specifically for Reynolds' memorabilia collection.  In

3  addition, Bilbo agreed to assist the Museum in obtaining

4  financing to pay off Orman's loan.

5      In 2004, Fisher and Bilbo formed a joint venture and

6  construction on the Museum facility began.  The Debbie Reynolds

7  Hollywood Motion Picture Museum was to be the anchor tenant for

8  the Belle Island Village project, and more than $10 million has

9  already been spent on construction of the museum.  The

10  building, which is 30,000 square feet and now approximately 85%

11  complete, was specifically designed to house Reynolds'

12  memorabilia collection.

13      Unfortunately, SVD's take-out lender, Countrywide

14  Financial, collapsed and was acquired by Bank of America.  Bank

15  of America cancelled Countrywide's commitment to provide

16  permanent financing for the project, which resulted in a

17  default under the construction loan.  The construction lender,

18  Regions Bank, foreclosed on the project in September 2009.

19      On January 27, 2010 Regions Bank entered into an agreement

20  to sell the project for $19,500,000 to Tennessee Investment

21  Partners, LLC ("TIP"), a company owned partially by the

22  Tennessee-based real estate investment firm Matisse Capital,

23  LLC ("Matisse") and partially by SVD.  The transaction is

24  scheduled to close on or before March 31, 2010.

25      As described in more detail in Section III.D below, TIP

26  intends to install the Debbie Reynolds Hollywood Motion Picture

27  Museum as the project's feature tenant.  As part of any

28  agreement with the Museum, TIP understands and has agreed to

1  advance the Museum funds sufficient to pay off the Orman Claim

2  as set forth in the Plan.

3  **B.    Orman's Loans to HMPM**

4        **1.    September 4, 2002:   The Note**

5        To fund the predevelopment work needed in order to obtain

6  financing from the CRA, the Museum received a $1 million bridge

7  loan from Greg Orman in September 2002 pursuant to a Promissory

8  Note (the "Note") and Security Agreement dated September 4,

9  2002.

10       Orman charged the Museum a $100,000 "origination fee,"

11 which was added to the loan balance, resulting in a $1.1

12 million loan amount.   The non-default interest rate was 10% and

13 the default interest rate was 18%.   To secure the $1.1 million

14 loan, the Museum pledged its collection of costume memorabilia

15 worth more than $10.7 million.   The loan was due on February

16 28, 2003, but could be extended with the payment of another

17 $100,000 fee.

18       **2.    March 18, 2003:   The Amended Note**

19       On March 18, 2003 the parties entered into an Amended and

20 Restated Promissory Note (the "Amended Note") and an Amended

21 and Restated Security Agreement.   In connection with the

22 Amended Note, Orman loaned the Museum an additional $600,000,

23 bringing the total amount of loans from Orman to the Museum to

24 $1.6 million.   The face amount of the Amended Note reads

25 $2,373,764, the balance consisting of fees, default interest,

26 and a very short term $400,000 advance made at Orman's request

27 to help Orman with personal tax planning.   The $400,000 advance

28

1  was repaid immediately, leaving the total cash loaned to the

2  Museum at $1.6 million.

3      The non-default interest rate under the Amended Note is

4  10% and the default interest rate is 18%.  The Amended Note was

5  due on September 15, 2003.

6      To provide additional security for the Amended Note, the

7  Fisher-Reynolds family agreed to pledge the costume memorabilia

8  owned by Selden and Trust, valued at approximately $7.28

9  million and $5.26 million, respectively.  Trust and Selden each

10  executed a Security Agreement.  Neither Trust nor Selden signed

11  or guaranteed the Amended Note.

12      **3.    September 15, 2003:  Default under the Amended Note**

13      On September 15, 2003 the Amended Note became due and the

14  Museum failed to repay the Amended Note.

15      **4.    May 1, 2005:  Forebearance Agreement**

16      With the development of the Belle Island Village facility

17  underway, on May 1, 2005, Orman and Fisher executed a

18  Forebearance Agreement, extending the due date of the Amended

19  Note to July 15, 2005 and retroactively increasing the default

20  interest rate from 18% to 30%, beginning on the original

21  default date, September 16, 2003.

22  **C.    Orman's California State Court Action**

23      On June 27, 2007 Orman filed a collection action against

24  the Museum, Trust and Selden in Superior Court for the State of

25  California, County of San Luis Obispo ("California State

26  Court").  The defendants objected to the amount demanded on

27  grounds that the interest sought by Orman violated California's

28  usury laws.  Orman filed a summary judgment motion seeking an

1  order that Kansas law, which does not have a usury law,

2  governed the action.  The California State Court denied the

3  motion, finding there to be a triable issue of fact as to

4  whether California law or Kansas law applied.  The California

5  State Court set the matter for trial on December 15, 2008.

6  Orman then dismissed his California action.

7  **D.    Orman's Kansas State Court Action, the Museum's**

8  **Bankruptcy, and Judge Lungstrum's Order**

9       On July 30, 2008 Orman filed a new complaint in the

10  District Court of Johnson County, Kansas, Civil Court Division

11  ("Kansas State Court") against the Museum, Selden and Trust

12  seeking $4,919,930.08.  On June 8, 2009, three weeks before

13  trial was to begin, Orman notified the defendants that he was

14  amending his petition to seek compounded interest, thereby

15  increasing his damages claim to $8,663,916.00.  A few days

16  after receiving the increased demand, the Museum filed

17  bankruptcy.

18       The Museum then removed the action to the United States

19  District Court for the District of Kansas and sought to

20  transfer the action to this Court.  United States District

21  Judge Lungstrum denied the transfer motion and remanded the

22  action to the Kansas State Court.

23       The Museum then filed an adversary complaint in the

24  Bankruptcy Court to enjoin Orman from proceeding against Selden

25  and Trust in Kansas State Court.  Orman responded by filing a

26  motion to dismiss the adversary complaint and a motion for

27  relief from the automatic stay to proceed against all three

28  defendants in Kansas State Court.

1    In pleadings filed in opposition to the motion to dismiss

2  and motion for relief from stay, the Museum informed Orman and

3  the Court of its intention to file a plan of reorganization

4  which will cure Orman's secured claim by paying principal and

5  interest at the non-default rate, plus compensation for any

6  actual damages incurred by reason of the default under

7  Bankruptcy Code Section 1124(2) and the Ninth Circuit's holding

8  in In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th

9  Cir. 1988).

10    At a hearing on the two motions held on December 3, 2009,

11  this Court denied Orman's motion for relief from stay and

12  granted Orman's motion to dismiss the adversary complaint.   The

13  rulings permitted Orman to proceed in Kansas against Selden and

14  Trust but prevented litigation in Kansas against the Museum.

15  **E.     Trust and Selden's Bankruptcy Filings**

16    Selden and Trust filed bankruptcy on February 24, 2010.

17  The Debtors filed motions for joint administration of the three

18  cases which are now pending and will be heard by this Court on

19  March 31, 2010.

20  **F.     Management and Ownership of the Debtors**

21    1.    The Museum is a California non-profit corporation.

22  The shareholders of the Museum are Debbie Reynolds and her

23  children, Todd Fisher and Carrie Fisher.   Todd Fisher is the

24  Museum's President.

25    2.    Selden is a Nevada limited partnership.   The general

26  partner of Selden is Kelly Properties, Inc.   The President of

27  Kelly Properties, Inc. is Todd Fisher and the sole shareholder

28  of Kelly Properties, Inc. is Debbie Reynolds.   The limited

1  partners of Selden are the Museum, the Debbie Reynolds Trust

2  dated February 11, 1989 (Trustee:  Debbie Reynolds), and the

3  Debbie Reynolds Children's Trust dated February 28, 1995

4  (Trustee:  Margaret Duncan).

5        3.    Trust is a California trust.  The grantors of Trust

6  are Debbie Reynolds, Todd Fisher and Carrie Fisher.  The co-

7  trustees of Trust are Debbie Reynolds and Todd Fisher.

8                              **III.**

9              **SUMMARY OF THE PLAN OF REORGANIZATION**

10 **A.    What Creditors and Interest Holders Will Receive Under the**

11       **Plan**

12       As required by the Bankruptcy Code, the Plan classifies

13 claims and interests in various classes according to their

14 right to priority.  The Plan states whether each class of

15 claims or interests is impaired or unimpaired.  The Plan

16 provides the treatment each class will receive.

17 **B.    Unclassified Claims**

18       Certain types of claims are not placed into voting

19 classes; instead they are unclassified.  They are not

20 considered impaired and they do not vote on the Plan because

21 they are automatically entitled to specific treatment provided

22 for them in the Bankruptcy Code.  As such, the Debtors have not

23 placed the following claims in a class.

24       **1.    Administrative Expenses**

25       Administrative expenses are claims for costs or expenses

26 of administering the Debtor's Chapter 11 case, which are

27 allowed under section 503(b) of the Bankruptcy Code.  All

28 administrative claims will be paid on the Effective Date of the

1 | Plan, unless a particular claimant agrees to a different

2 | treatment.

3 |     The chart below lists all of the Debtors' known Section

4 | 503(b) administrative claims and their treatment under the

5 | Plan.

| **Claimant** | **Estimated Claim** |
|---|---|
| Michaelson, Susi & Michaelson | To Be Fixed By Court |
| Clerk's Office Fees | $500 or less |
| Office of U.S. Trustee Fees | $500 or less |

10 |     Court Approval of Fees Required:

11 |     For all fees except Clerk's Office fees and U.S. Trustee's

12 | fees, the professional in question must file and serve a

13 | properly noticed fee application and the Court must rule on the

14 | application.  Only the amount of fees allowed by the Court will

15 | be owed and required to be paid under this Plan.

16 |     The Debtor will pay the administrative claims listed above

17 | on the Effective Date unless the claimant has agreed to be paid

18 | later or the Court has not yet ruled on the claim.  As

19 | described elsewhere in this Disclosure Statement, the Debtors

20 | are working towards establishing a museum to display their

21 | memorabilia collection.  If the Debtors are successful in this

22 | endeavor, they anticipate receiving a payment (referred to as

23 | the "Museum Advance" in Section III.D. below) in connection

24 | with the establishment of the museum that will enable the

25 | Debtors to pay the administrative claims in full on the

26 | Effective Date.

27 |     If the Debtors do not receive the Museum Advance by July

28 | 31, 2010, they will immediately thereafter initiate the process

- 14 -

1   of selling the Memorabilia Collection in order to pay all

2   Allowed Claims.

3   **C.    Classified Claims and Interests**

4      **1.    Classes of Secured Claims**

5      Secured claims are claims secured by liens on property of

6   the estate.   Below is a summary of the sole Secured Claim and

7   its treatment under the Plan.

8            **a.    Class #1:   Secured Claim of Gregory Orman**

9      ***Classification:***   Class 1 consists of the Orman Claim under

10  the Amended Note executed by the Museum and secured by the

11  Hollywood memorabilia collections of the Debtors under the

12  security agreements executed by each of the Debtors.   This

13  claim is deemed to be fully secured in an amount to be fixed by

14  the Court or agreed upon by Orman and Debtor with Court

15  approval.

16     The principal balance of the Orman claim under the Amended

17  Note is $1,973,764 after applying the immediate $400,000

18  repayment to principal.   The annual interest rate under the

19  Amended Note is 10 percent.   Interest began accruing under the

20  Amended Note at a rate of 10 percent per year on March 18,

21  2003.   The total amount of interest due as of December 31, 2009

22  was $1,339,996.49.   Interest continues to accrue at a rate of

23  10 percent per year until the Amended Note is fully satisfied.

24  In addition, Orman is entitled to recover damages actually

25  incurred by reason of Museum's default.

26     ***Treatment:***   The principal balance, interest at the non-

27  default rate, and all actual damages resulting from Debtor's

28

1   default, will be reinstated and paid in full on the Effective

2   Date.[1]

3       The Debtors believe that Section 1124(2) of the Bankruptcy

4   Code and the Ninth Circuit Court of Appeals ruling in Entz-

5   White, 850 F.2d 1338 (9th Cir. 1988) permit the Debtors to cure

6   Orman's secured claim by paying principal and interest at the

7   non-default rate, plus compensation for any actual damages

8   incurred by reason of the default.

9       On the Confirmation Date, the Debtor will waive all

10  defenses previously raised in the Kansas Litigation including

11  (a) the usurious interest charged by Orman under the Amended

12  Note and (b) the Debtor's lack of authority to enter into the

13  loan documents and incur additional debt to Orman.

14      If Debtor does not receive the Museum Advance by the

15  Advance Deadline, Debtor will sell the Memorabilia Collection,

16  either privately or by auction to take place no later than

17  December 15, 2010, as described in more detail below.   Orman

18  will receive all net sales proceeds from sales of the

19  Memorabilia Collection up to the full amount of the Orman

20  Claim.   Payments will first be applied to interest and the

21  allowable costs portions of the Orman Claim, and last to the

22  principal amount of the Orman Claim.

23      This claim is unimpaired and does not vote.

24

25

26
_____

27  [1] Each Plan proposed by the three related Debtors calls for the reinstatement
    and payment in full of the Amended Note.  Notwithstanding the foregoing, the
    Amended Note is a single obligation and will be satisfied only once and will

28  not be separately paid by all three Debtors.

### 2.   Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), and (6) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.

As of the Petition Date, the Debtor's books and records reflected a $662,400 priority wage claim owed by the Museum to Todd Fisher.  The portion of this claim entitled to priority is $10,950.  The balance of Todd Fisher's wage claim is an Insider Unsecured Claim held by an Insider and classified as a Class 3 Claim.  The entire Fisher Claim will be unaffected by Plan Confirmation and will not be paid or discharged under the Plan.

### 3.   Classes of General Unsecured Creditors

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a).  The general unsecured non-priority claims held by non-insiders, as listed on the Debtor's schedules and the claims register, reflect the following amounts outstanding as of the Petition Date: $372,595.79.  See Exhibit "B" for detailed information about each non-priority, general unsecured claim.

### a.   Class #2:  Unsecured Claims (Non-Insiders)

**Classification**:  Class 2 consists of all non-priority, general unsecured claims asserted against the Debtors that are held by non-insiders.

**Treatment**:  Unless the person holding an allowed Class 2 claim and the Debtors agree otherwise, the person holding the

1  claim will receive cash equal to the amount of the allowed

2  Class 2 claim, plus post-petition interest on the face amount

3  of the Allowed Claim, to be paid as soon as practicable on or

4  after the Effective Date at such time as Debtor receives net

5  funds after payment of the Orman Claim from either (1) the

6  Museum Advance and/or (2) proceeds from sale of the Memorabilia

7  Collection sufficient to pay all Class 2 Claims.  To the extent

8  that the Museum Advance is not sufficient to pay all Allowed

9  Class 2 Claims in full, Allowed Class 2 Claims will be paid pro

10  rata from receipts of royalty payments from the Tennessee

11  Museum in the full amount of the Allowed Class 2 Claim plus

12  interest over a period not to exceed one year after the

13  Effective Date.

14       Class 2 is an impaired class entitled to vote on the Plan.

15            **b.    Class #3:  Unsecured Claims (Insiders)**

16       ***Classification:***  Class 3 consists of all non-priority,

17  general unsecured claims asserted against the Debtors that are

18  held by insiders.  Insiders include Todd Fisher, Hollywood

19  Motion Picture Experience LLC, Debbie Reynolds, and Freedom

20  Farms.

21       ***Treatment:***  Class 3 claims will receive no distribution

22  under the Plan, will be unaffected by Confirmation, and will

23  remain as Claims against the reorganized Debtors.

24            **4.    Class of Interest Holders**

25       Interest holders are the parties who hold ownership

26  interest (i.e., equity interest) in the debtor.  If the debtor

27  is a corporation, entities holding preferred or common stock in

28  the debtor are interest holders.  If the debtor is a

1  partnership, the interest holders include both general and

2  limited partners.  If the debtor is an individual, the debtor

3  is the interest holder.  The following section identifies the

4  Plan's treatment of the class of interest holders.

5      **Class #4 (Museum Common Stock)**

6      **_Classification_:**  Class 4 consists of Museum's existing

7  common stock.

8      **_Treatment_:**  Allowed Class 4 interests will be reinstated

9  under the Plan.  Class 4 is unimpaired and does not vote on the

10  Plan.

11 **D.   Means of Performing Under the Plan**

12     The Debtor's Plan provides for the full payment of the

13  Orman Claim from (a) an advance paid in connection with the

14  establishment of the Tennessee Museum prior to August 1, 2010,

15  or (b) from the proceeds of an auction of the Memorabilia

16  Collection or sale of the Memorabilia Collection directly to a

17  third party purchaser prior to December 31, 2010.  All other

18  Claims will be paid from funds available to Debtor from the

19  Museum Advance and subsequent royalty payments or from proceeds

20  of sale of the Memorabilia Collection as set forth above.

21     As described in the "Background" section above, Regions

22  Bank now owns Belle Island Village and has entered into an

23  agreement to sell the project to TIP.  The Reynolds Hollywood

24  Motion Picture Museum is intended to be the cornerstone and

25  anchor tenant of the Belle Island Village project.  TIP and

26  Fisher are currently negotiating a term sheet for the

27  establishment of the museum, and TIP understands that a key,

28  non-negotiable component of any agreement with the museum is an

1 | upfront payment in an amount sufficient to pay the Orman Claim

2 | (the "Museum Advance").

3 |     If the Museum Advance is not received by July 31, 2010,

4 | Debtor will immediately thereafter engage Christie's or such

5 | other nationally recognized auction house, to wit Julien's

6 | Auctions, Sotheby's, or Profiles in History, to conduct a

7 | series of auction sales of the memorabilia collection.   The

8 | identity of the auction house will be determined on or before

9 | the confirmation of the Plan.

10 |     The first auction will take place no later than December

11 | 15, 2010 and will include not less than $5 million in value of

12 | the Memorabilia Collection as determined by the auction house

13 | conducting the sale.   Subsequent auctions will occur at

14 | intervals of not more than six months and include not less than

15 | $5 million of remaining inventory of the Memorabilia Collection

16 | as determined by the auction house.

17 |     All net proceeds of the sale of the Memorabilia Collection

18 | will be paid first to Orman up to the full amount of the Orman

19 | Claim.   All other proceeds will be used to pay Allowed Claims

20 | in order of priority under the Code.

21 |     Notwithstanding the above, the Debtors may in their sole

22 | and reasonable discretion at any time sell all or a portion of

23 | the Memorabilia Collection directly to a third party purchaser

24 | provided that the net proceeds of the sale of the Memorabilia

25 | Collection are paid first to Orman up to the full amount of the

26 | Orman Claim and, provided further that such sale shall be (1)

27 | in an amount sufficient to pay all Allowed Claims, (2) at a

28 | price equal to or greater than the appraised value of the items

1  being sold as set forth on Exhibit "1" to the Plan, or (3) by

2  stipulation of Orman and Debtor.

3      If Debtor fails to perform according to the terms of the

4  Plan, Orman may immediately thereafter proceed to schedule the

5  sale of the Memorabilia Collection in any commercially

6  reasonable manner.  In such an event, Debtor will cooperate

7  with Orman's efforts to sell the Memorabilia Collection and

8  Orman will account for any surplus funds generated from the

9  sales in excess of the Orman Claim, plus costs incurred, and

10  turn over to Debtor any sales proceeds in excess of his Claim

11  along with any remaining unsold memorabilia.

12      The total value of the Debtors' collections is estimated

13  to exceed $20 million.  The charts below set forth an estimate

14  of the total amount of claims to be paid pursuant to the Plan.

15  The charts assume the Orman Claim is paid off in full at the

16  non-default rate of interest according to the Plan at the

17  specified dates.

18      **August 1, 2010 – The Advance Deadline**

19      Administrative claims:                  $  150,000.00

20      Class 1 (Oman's Secured Claim):         $3,428,401.03

21      Class 2 (General Unsecured Claims):     $  394,482.13

22      **Total Amount of Claims:**             **$3,972,883.16**

23

24      **December 15, 2010 – Auction Date #1**

25      Administrative claims:                  $  150,000.00

26      Class 1 (Oman's Secured Claim):         $3,502,484.77

27      Class 2 (General Unsecured Claims):     $  394,482.13

28      **Total Amount of Claims:**             **$4,046,966.90**

- 21 -

1 | **E.**     **Disbursing Agent**

2 |     The reorganized Debtor shall act as the Disbursing Agent

3 | for the purpose of making all distributions provided for under

4 | the Plan.

5 |     The Disbursing Agent, unless otherwise specified, will

6 | make all distributions required under the Plan.   The

7 | reorganized Debtor, as Disbursing Agent, will be vested with

8 | full authority to take any action or execute and document

9 | relating to a conveyance or other transfer that the Debtor

10 | could have taken or executed.

11 | **IV.**

12 | **RISK FACTORS**

13 |     Class 2 Unsecured Creditors face the risk that the

14 | Memorabilia Collateral will decline in value, cannot be sold at

15 | or near the appraised values or that any such sales will be

16 | unduly delayed beyond December 31, 2010.   Should Debtor fail to

17 | perform according to the Plan, Orman will liquidate the

18 | Memorabilia Collection, perhaps leaving little or nothing for

19 | Unsecured Creditors.

20 | **V.**

21 | **CONFIRMATION REQUIREMENTS AND PROCEDURES**

22 |     PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS

23 | PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

24 | CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.

25 |     The following discussion is intended solely for the

26 | purpose of alerting readers about basic confirmation issues,

27 | which they may wish to consider, as well as certain deadlines

28 | for filing claims. The proponent CANNOT and DOES NOT represent

1 │ that the discussion contained below is a complete summary of

2 │ the law on this topic.

3 │     Many requirements must be met before the Court can confirm

4 │ a Plan.  Some of the requirements include that the Plan must be

5 │ proposed in good faith, acceptance of the Plan, whether the

6 │ Plan pays creditors at least as much as creditors would receive

7 │ in a Chapter 7 liquidation, and whether the Plan is feasible.

8 │ These requirements are not the only requirements for

9 │ confirmation.

10 │ **A.    Who May Vote or Object**

11 │     **1.    Who May Object to Confirmation of the Plan**

12 │     Any party in interest may object to the confirmation of

13 │ the Plan, but as explained below not everyone is entitled to

14 │ vote to accept or reject the Plan.

15 │     **2.    Who May Vote to Accept/Reject the Plan**

16 │     A creditor or interest holder has a right to vote for or

17 │ against the Plan if that creditor or interest holder has a

18 │ claim which is both (1) allowed or allowed for voting purposes

19 │ and (2) classified in an impaired class.

20 │         **a.    What Is an Allowed Claim/Interest**

21 │     As noted above, a creditor or interest holder must first

22 │ have an allowed claim or interest to have the right to vote.

23 │ Generally, any proof of claim or interest will be allowed,

24 │ unless a party in interest brings a motion objecting to the

25 │ claim.  When an objection to a claim or interest is filed, the

26 │ creditor or interest holder holding the claim or interest

27 │ cannot vote unless the Court, after notice and hearing, either

28 │

1  overrules the objection or allows the claim or interest for

2  voting purposes.

3       THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MUSEUM

4  CASE WAS DECEMBER 15, 2009.  THE BAR DATES FOR FILING A PROOF

5  OF CLAIM IN THE SELDEN AND TRUST CASES HAS NOT YET BEEN SET BY

6  THE COURT.  A creditor or interest holder may have an allowed

7  claim or interest even if a proof of claim or interest was not

8  timely filed.  A claim is deemed allowed if (1) it is scheduled

9  on the Debtor's schedules and such claim is not scheduled as

10  disputed, contingent, or unliquidated, and (2) no party in

11  interest has objected to the claim.  An interest is deemed

12  allowed if it is scheduled and no party in interest has

13  objected to the interest.

14            **b.    What Is an Impaired Claim/Interest**

15       As noted above, an allowed claim or interest only has the

16  right to vote if it is in a class that is impaired under the

17  Plan.  A class is impaired if the Plan alters the legal,

18  equitable, or contractual rights of the members of that class.

19  For example, a class comprised of general unsecured claims is

20  impaired if the Plan fails to pay the members of that class

21  100% of what they are owed.

22       In this case, Debtor believes that Classes 2 (claims of

23  the Unsecured Creditors) and 3 (Unsecured Claims held by

24  Insiders) are impaired and that holders of claims in each of

25  these classes are therefore entitled to vote to accept or

26  reject the Plan.  Classes 1 (Orman Secured Claim) and 4 (equity

27  claims) are unimpaired and that holders of claims in each of

28  these classes therefore do not have the right to vote to accept

Main Document       Page 30 of 36

1  or reject the Plan.  Parties who dispute the Debtor's

2  characterization of their claim or interest as being impaired

3  or unimpaired may file an objection to the Plan contending that

4  the Debtors have incorrectly characterized the Class.

5       **3.  Who is Not Entitled to Vote**

6       The following four types of claims are <u>not</u> entitled to

7  vote: (1) claims that have been disallowed; (2) claims in

8  unimpaired classes; (3) claims entitled to priority pursuant to

9  Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in

10  classes that do not receive or retain any value under the Plan.

11  Claims in unimpaired classes are not entitled to vote because

12  such classes are deemed to have accepted the Plan.  Claims

13  entitled to priority pursuant to Code sections 507(a)(1),

14  (a)(2), and (a)(7) are not entitled to vote because such claims

15  are not placed in classes and they are required to receive

16  certain treatment specified by the Code.  Claims in classes

17  that do not receive or retain any value under the Plan do not

18  vote because such classes are deemed to have rejected the Plan.

19  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY

20  STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

21       **4.  Who Can Vote in More Than One Class**

22       A creditor whose claim has been allowed in part as a

23  secured claim and in part as an unsecured claim is entitled to

24  accept or reject a Plan in both capacities by casting one

25  ballot for the secured part of the claim and another ballot for

26  the unsecured claim.

27

28

1    **5.    Votes Necessary to Confirm the Plan**

2          If impaired classes exist, the Court cannot confirm the

3    Plan unless (1) at least one impaired class has accepted the

4    Plan without counting the votes of any insiders within that

5    class, and (2) all impaired classes have voted to accept the

6    Plan, unless the Plan is eligible to be confirmed by "cramdown"

7    on non-accepting classes, as discussed later in Section V.A.7.

8    **6.    Votes Necessary for a Class to Accept the Plan**

9          A class of claims is considered to have accepted the Plan

10   when more than one-half (1/2) in number and at least two-thirds

11   (2/3) in dollar amount of the claims which actually voted,

12   voted in favor of the Plan.  A class of interests is considered

13   to have accepted the Plan when at least two-thirds (2/3) in

14   amount of the interest-holders of such class which actually

15   voted, voted to accept the Plan.

16   **7.    Treatment of Nonaccepting Classes**

17         As noted above, even if <u>all</u> impaired classes do not accept

18   the proposed Plan, the Court may nonetheless confirm the Plan

19   if the nonaccepting classes are treated in the manner required

20   by the Code.   The process by which nonaccepting classes are

21   forced to be bound by the terms of the Plan is commonly

22   referred to as "cramdown."   The Code allows the Plan to be

23   "crammed down" on nonaccepting classes of claims or interests

24   if it meets all consensual requirements except the voting

25   requirements of 1129(a)(8) and if the Plan does not

26   "discriminate unfairly" and is "fair and equitable" toward each

27   impaired class that has not voted to accept the Plan as

28   referred to in 11 U.S.C. § 1129(b) and applicable case law.

1  **B.    Liquidation Analysis**

2         Another confirmation requirement is the "Best Interest

3  Test", which requires a liquidation analysis.  Under the Best

4  Interest Test, if a claimant or interest holder is in an

5  impaired class and that claimant or interest holder does not

6  vote to accept the Plan, then that claimant or interest holder

7  must receive or retain under the Plan property of a value not

8  less than the amount that such holder would receive or retain

9  if the Debtor were liquidated under Chapter 7 of the Bankruptcy

10  Code.

11         In a Chapter 7 case, the Debtor's assets are usually sold

12  by a Chapter 7 trustee. Secured creditors are paid first from

13  the sales proceeds of properties on which the secured creditor

14  has a lien.  Administrative claims are paid next.  Next,

15  unsecured creditors are paid from any remaining sales proceeds,

16  according to their rights to priority.  Unsecured creditors

17  with the same priority share in proportion to the amount of

18  their allowed claim in relationship to the amount of total

19  allowed unsecured claims. Finally, interest holders receive the

20  balance that remains after all creditors are paid, if any.

21         For the Court to be able to confirm this Plan, the Court

22  must find that all creditors and interest holders who do not

23  accept the Plan will receive at least as much under the Plan as

24  such holders would receive under a Chapter 7 liquidation.  The

25  Debtors maintain that this requirement is met here for the

26  following reasons:   (1) The Plan provides for the payment of

27  100% of all allowed secured, priority and general unsecured,

28  non-insider claims, and (2) the Plan provides that if the

1  Debtors are unable to secure a deal whereby all creditors are

2  paid in full in connection with the establishment of a museum,

3  the memorabilia collection will be auctioned off and all

4  creditors will be paid in full from the proceeds of the

5  auction.  Because the Plan has a liquidating plan component as

6  a "fall-back solution," creditors are ensured of receiving at

7  least as much under the Plan as they would receive under a

8  Chapter 7 liquidation.

9  **C.    Feasibility**

10      Another requirement for confirmation involves the

11  feasibility of the Plan, which means that confirmation of the

12  Plan is not likely to be followed by the liquidation, or the

13  need for further financial reorganization, of the Debtor or any

14  successor to the Debtor under the Plan, unless such liquidation

15  or reorganization is proposed in the Plan.  Because liquidation

16  by auction is the "fall-back solution" under the Plan, the

17  feasibility requirement is satisfied.

18                               **VI.**

19               **EFFECT OF CONFIRMATION OF PLAN**

20  **A.    Discharge**

21      This Plan provides that upon the Effective Date, the

22  Debtors shall be discharged of liability for payment of debts

23  incurred before confirmation of the Plan, to the extent

24  specified in 11 U.S.C. § 1141.  Any liability imposed by the

25  Plan will not be discharged.

26

27

28

1  **B.    Revesting of Property in the Debtor**

2       Except as provided in Section VI.E., and except as

3  provided elsewhere in the Plan, the confirmation of the Plan

4  revests all of the property of the estate in the Debtor.

5  **C.    Modification of Plan**

6       The Debtor may modify the Plan at any time before

7  confirmation.  However, the Court may require a new disclosure

8  statement and/or re-voting on the Plan.  The Debtor may also

9  seek to modify the Plan at any time after confirmation only if

10  (1) the Plan has not been substantially consummated and (2) the

11  Court authorizes the proposed modifications after notice and a

12  hearing.

13  **D.    Post-Confirmation Status Report**

14       Within 120 days of the entry of the order confirming the

15  Plan, the Debtor shall file a status report with the Court

16  explaining what progress has been made toward consummation of

17  the confirmed Plan.  The status report shall be served on the

18  United States Trustee, the twenty largest unsecured creditors,

19  and those parties who have requested special notice.  Further

20  status reports shall be filed every 120 days and served on the

21  same entities.

22  **E.    Quarterly Fees**

23       Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to

24  date of confirmation shall be paid to the United States Trustee

25  on or before the Effective Date of the plan.  Quarterly fees

26  accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall

27  be paid to the United States Trustee in accordance with 28

28

1 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of

2 an order of dismissal or conversion to chapter 7.

3 **F.    Post-Confirmation Conversion/Dismissal**

4 A creditor or party in interest may bring a motion to

5 convert or dismiss the case under § 1112(b), after the Plan is

6 confirmed, if there is a default in performing the Plan.  If

7 the Court orders, the case converted to Chapter 7 after the

8 Plan is confirmed, then all property that had been property of

9 the Chapter 11 estate, and that has not been disbursed pursuant

10 to the Plan, will revest in the Chapter 7, estate. The

11 automatic stay will be reimposed upon the revested property,

12 but only to the extent that relief from stay was not previously

13 authorized by the Court during this case.

14 The order confirming the Plan may also be revoked under

15 very limited circumstances. The Court may revoke the order if

16 the order of confirmation was procured by fraud and if the

17 party in interest brings an adversary proceeding to revoke

18 confirmation within 180 days after the entry of the order of

19 confirmation.

20 **G.    Final Decree**

21 Once the estate has been fully administered as referred to

22 in Bankruptcy Rule 3022, the Debtors, or other party as the

23 Court shall designate in the Plan Confirmation Order, shall

24 ///

25 ///

26 ///

27 ///

28 ///

- 30 -

1 | file a motion with the Court to obtain a final decree to close

2 | the case.

3 |     DATED:  March 22, 2010.

4 |                         HOLLYWOOD MOTION PICTURE AND
                            TELEVISION MUSEUM,

5 |

6 |                         By _____

7 |                            TODD FISHER, President

8 |

9 | MICHAELSON, SUSI & MICHAELSON,
    A Professional Corporation,

10 |

11 |

12 | By _____
       PETER SUSI, Attorneys for

13 |    Debtor and Debtor-in-
       Possession

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

- 31 -