David Y. Farmer
State Bar No. 47764
**FARMER & READY**
A LAW CORPORATION
1254 Marsh Street
Post Office Box 1443
San Luis Obispo, CA 93406
Telephone: (805) 541-1626
Facsimile: (805) 541-0769

Mark A. Shaiken
Pro hac vice admission
**STINSON MORRISON HECKER LLP**
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3204
Facsimile: (816) 691-3495

Attorneys for Creditor,
Gregory J. Orman

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>HOLLYWOOD MOTION PICTURE AND TELEVISION MUSEUM,<br><br>Debtor. | Case No. 9:09-bk-12311-RR<br>Chapter 11<br><br>**DISCLOSURE STATEMENT WITH RESPECT TO CREDITOR'S PLAN OF LIQUIDATION (MARCH 26, 2010)**<br><br>Date:<br>Time:<br>Place: 1415 State Street<br>Room 201<br>Santa Barbara, CA |

# Table of Contents

I. INTRODUCTION .................................................................................................. 1

II. DISCLAIMER ...................................................................................................... 2

III. HISTORY OF THE DEBTOR ............................................................................ 3
    A.    Background ..................................................................................................... 3
    B.    The Secured Debt ........................................................................................... 5
    C.    Prebankruptcy Litigation ................................................................................ 7
        **1.**    California Litigation .............................................................................. 7
        **2.**    Kansas Litigation .................................................................................. 7

IV. POST-FILING DEVELOPMENTS .................................................................... 8

V. CURRENT FINANCIAL INFORMATION ........................................................ 9
    A.    Description and Value of Significant Assets ................................................. 9
    B.    Other Assets ................................................................................................... 9

VI. DISCUSSION OF CLAIMS, CLASSIFICATION AND IMPAIRMENT ......... 9
    A.    Administrative Claims and Priority Claims – Class 1 Claims ..................... 10
    B.    The Allowed Orman Claim – Class 2 Claim ............................................... 10
    C.    Unsecured Claims – Class 3 Claims ............................................................ 11
    D.    Unsecured Claims of Insider Creditors – Class 4 Claims ........................... 11
    E.    Interest of the Debtor's owners – Class 5 Claims ....................................... 11

VII. THE PLAN SUMMARY ................................................................................. 11
    A.    Plan Overview ............................................................................................. 11
    B.    The Bar Date ............................................................................................... 12

VIII. MEANS OF EFFECTUATING THE PLAN ................................................. 12
    A.    Auctioneer ................................................................................................... 12
    B.    Auction Process .......................................................................................... 15
    C.    Payment Agent and Payment of Claims ..................................................... 16

IX. EXECUTORY CONTRACTS .......................................................................... 18

X. CASH REQUIREMENTS AND ADMINISTRATIVE EXPENSES ................ 19

XI. CHAPTER 7 LIQUIDATION ANALYSIS ................................................................. 19

XII. INSIDER AND AFFILIATE CLAIMS .................................................................... 20

XIII. INSIDER COMPENSATION ................................................................................. 20

XIV. ACCEPTANCE OF THE PLAN ............................................................................. 20

XV. MISCELLANEOUS PLAN PROVISIONS AND EFFECT ..................................... 20

XVI. TAX CONSEQUENCES ......................................................................................... 22

XVII. CAUSES OF ACTION ........................................................................................... 22

# Table of Authorities

Statutes

11 U.S.C. § 1124 .................................................................................................................. 20
11 U.S.C. § 1125(b) ............................................................................................................... 1
11 U.S.C. § 1126(f) ............................................................................................................... 20
11 U.S.C. § 1129(b) .............................................................................................................. 20
11 U.S.C. § 1129(b)(2)(B) .................................................................................................... 20
11 U.S.C. § 1141 ................................................................................................................... 21
11 U.S.C. § 363(k) ................................................................................................................ 15
11 U.S.C. § 365 ..................................................................................................................... 18
11 U.S.C. § 507(a)(4) ............................................................................................................ 10
11 U.S.C. § 507(a)(8) ............................................................................................................ 10
11 U.S.C. § 524(f) ................................................................................................................. 21
11 U.S.C. §§ 507(a) (3), (4), (5), and (6) .............................................................................. 10

Gregory J. Orman, a creditor in this case, hereby submits this Disclosure Statement with respect to his Plan of Liquidation (March 26, 2010).

## I. **INTRODUCTION**

Gregory J. Orman has prepared this Disclosure Statement[1] (the "Disclosure Statement") pursuant to the terms of the United States Bankruptcy Code to distribute to Creditors and other parties in interest in order to disclose what Mr. Orman believes is relevant for Creditors to make an informed judgment in exercising their right to vote on the Creditor's Plan of Liquidation Dated March 26, 2010, (the "Plan") filed in conjunction herewith, and attached hereto as Exhibit "A". The definitions contained in the Plan apply to this Disclosure Statement. The reader should thoroughly review the Plan before reading this Disclosure Statement.

Pursuant to 11 U.S.C § 1125(b) of the Bankruptcy Code, the Bankruptcy Court has approved this Disclosure Statement, after notice and a hearing. The Court's approval of the Disclosure Statement does not constitute an endorsement or recommendation of the Plan.

The Bankruptcy Court has set _____, at ____:00 a.m., before the Honorable Robin Riblet, United States Bankruptcy Judge, Courtroom 201, 1415 State Street, Santa Barbara, California, for a hearing on confirmation of the Plan. If you are entitled to vote, it is in your best interest to timely vote by completing the enclosed ballot and returning the ballot in the enclosed envelope to David Y. Farmer, Farmer & Ready, P.O. Box 1443, San Luis Obispo, CA 93406. Your ballot must be received by _____, 2010 at 4:00 p.m., Pacific Time to be counted. Additionally, you may object to the Plan if you choose to do so.

Any party in interest wishing to object to confirmation of the Plan shall file their written objections with the Court by the electronic court filing system, and shall serve a copy thereof on David Y. Farmer of Farmer & Ready at the address set forth above on or before _____. Objections not properly and timely filed, and timely served may be deemed

---

[1] Capitalized terms set forth herein that are not otherwise defined shall have the same meaning as set forth in the Plan. To the extent of any discrepancies between this Disclosure Statement and the Plan, the Plan shall govern.

1

1  waived Mr Orman's response to any objections to confirmation and a confirmation
2  memorandum must be filed and served on or before _____.
3  No representations concerning the Debtor and the Plan other than as set forth in this
4  Disclosure Statement are authorized or approved by the Court. Any representation or
5  inducement made to secure your acceptance or rejection of the Plan which is other than as
6  contained in this Disclosure Statement should not be relied upon by you in arriving at your
7  decision whether or not to object to the Plan

## II. DISCLAIMER

9  IN DRAFTING THIS DISCLOSURE STATEMENT, MR. ORMAN HAS USED
10 INFORMATION PROVIDED BY THE DEBTOR AND THEREFORE MR. ORMAN
11 CANNOT ASSURE THE ACCURACY OF ALL INFORMATION CONTAINED HEREIN.
12 RATHER, THIS DISCLOSURE STATEMENT REPRESENTS INFORMATION THAT THE
13 DEBTOR HAS REPRESENTED IS ACCURATE EITHER: (A) IN STATEMENTS TO THE
14 COURT, (B) IN PLEADINGS FILED IN THE CASE OR (C) IN WRITINGS SENT TO MR.
15 ORMAN. ACCORDINGLY, THE DISCLOSURE STATEMENT DOES NOT REFLECT
16 THE INDEPENDENT FACTUAL REPRESENTATIONS OF MR. ORMAN EXCEPT AS IT
17 RELATES TO MR. ORMAN'S DEBT AND CANNOT BE RELIED UPON AS
18 STATEMENTS MADE BY MR. ORMAN.
19 MR. ORMAN PROVIDES THIS DISCLOSURE STATEMENT TO ALL KNOWN
20 HOLDERS OF CLAIMS AGAINST THE DEBTOR TO DISCLOSE ADEQUATE
21 INFORMATION TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED
22 JUDGMENT IN EXERCISING THEIR RIGHT TO VOTE FOR THE ACCEPTANCE OR
23 REJECTION OF THE PLAN.
24 YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS
25 MADE TO SECURE ACCEPTANCES OR REJECTIONS OF THE PLAN WHICH ARE
26 OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT IN ARRIVING AT
27 A DECISION TO OBJECT OR NOT TO OBJECT TO THE PLAN. YOU SHOULD
28 REPORT ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS TO

THE ATTENTION OF COUNSEL FOR DEBTOR AND THE UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA IMMEDIATELY.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NOTHING CONTAINED HEREIN SHALL BE DEEMED CONCLUSIVE ADVICE ON THE LEGAL EFFECTS OF LIQUIDATION OF THE SALE ASSETS UPON THE HOLDERS OF CLAIMS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPLIED

MR. ORMAN HAS NOT CONDUCTED, AND HE IS NOT AWARE THAT ANYONE ELSE HAS CONDUCTED, AN INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

FINALLY, MR. ORMAN EXPRESSLY DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINTED HEREIN IS ACCURATE.

### III. **HISTORY OF THE DEBTOR**

**A.    Background**

Almost 40 years ago, when MGM filed its bankruptcy case, the Debtor's founder, Mary Frances Reynolds ("Ms. Reynolds"), began collecting Hollywood memorabilia with the intent of building a Hollywood motion picture museum. Later, when 20th Century Fox went out of business, Ms. Reynolds was the largest purchaser of film artifacts from the related sale of 20th Century Fox assets. Today, the collection of memorabilia controlled by Ms. Reynolds and her various entities, including the Debtor, numbers in excess of 3500 costumes and other items

from various motion pictures (hereinafter collectively referred to as the "Collection").[2] The portion of the Collection owned by the Debtor is referred to as the "Assets."

In 1993, Ms. Reynolds purchased a hotel in Las Vegas and decided to open a museum on the premises. Under the terms of the agreement between the hotel and the Debtor, the Debtor provided the Assets under a licensing agreement to a production company that produced a show incorporating the Collection, including the Assets. The Debtor received profits from this endeavor, which it used to restore more Assets.

In 1997, after the hotel commenced its own bankruptcy case, the hotel was sold in a bankruptcy sale to a third party and the museum closed. In 1998 in conjunction therewith, the Debtor moved substantially all of the Assets to a warehouse in Creston, California that was built specifically to maintain the memorabilia. The warehouse was built on a ranch owned by Todd Fisher, Ms. Reynolds' son. A portion of the Assets is also stored in a warehouse in North Hollywood, California. Mr. Fisher advises that he leases the warehouse to the Debtor, but the Debtor has not paid rent for a significant period of time.

In 2002, the Debtor attempted to develop a museum in Los Angeles, California at a retail complex known as Hollywood and Highland. In 2003, the Debtor defaulted on its lease obligations with the landlord, Trizec Hahn, and litigation ensued between the Debtor and the landlord. The Debtor defaulted on its lease obligations, in part, because it was not able to raise sufficient permanent financing to construct and operate a museum.

Later, the Debtor began working with the developers of a project called Belle Island, located in Pigeon Forge, Tennessee. In 2009, prior to the completion of a facility to showcase the Collection, the owner of the Belle Island development commenced a bankruptcy case. In that case, Region's Bank, the Debtor's secured lender, was granted relief from the automatic stay, foreclosed on the property, and took possession of it.

---

[2] The Collection is owned by three principal entities, including the Debtor, Selden Enterprises Limited Partnership (hereinafter "Selden") and the Hollywood Motion Picture Trust (hereinafter the "Trust"). The specific items of the Collection owned by the Debtor are enumerated in the Debtor's bankruptcy schedules.

4

After the Region's Bank foreclosure, the Debtor entered into discussions with parties potentially interested in acquiring Region's Bank's interest in the property but, to date, no agreement has been consummated, the project is uncompleted, and the Debtor has no facility to showcase the Collection.

**B.     The Secured Debt.**

On September 4, 2002, Mr. Orman loaned $1.1 million to the Debtor evidenced by a promissory note ("Note 1"). Of the loan amount, $1 million represented the actual cash advanced by Mr. Orman to the Debtor and $100,000.00 represented a loan origination fee that was capitalized as part of the loan transaction. Note 1's maturity date was February 28, 2003, but the Debtor had the right to extend the maturity date an additional 6 months by paying a $100,000.00 extension fee. Note 1 also contained a provision for 10% in annual interest and required Debtor to pay all costs and expenses associated with the loan transaction. Mr. Orman was also to receive a royalty interest in any attraction developed by the Debtor.

Rather than pay the $100,000.00 extension fee in cash, Mr. Orman and the Debtor amended and restated Note 1, extended the maturity date of Note 1 by capitalizing the $100,000.00 extension fee, and committed to advance an additional $1 million to the Debtor, all as evidenced by an Amended and Restated Promissory Note dated March 18, 2003 ("Note 2"). Note 2 contained the same basic terms as Note 1, including: (i) 10% annual interest charges, (ii) a 10% origination fee on the additional loan commitment, and (iii) a six month loan maturity. In addition, Note 2 provided an additional $1 million in loan commitments. Upon execution of Note 2, Mr. Orman immediately advanced $600,000.00 and later advanced an additional $400,000.00. Note 2 matured pursuant to its terms on September 15, 2003. Subsequent to the maturity of Note 2, Debtor paid to Secured Lender $407,178.08 in principal and interest. With the exception of that payment, no other payments have been made by the Debtor to Mr. Orman. The principal balance due and owing after the application of that sole payment was $2,020,000.00.

From September 15, 2003, to May, 2005, the Debtor and Mr. Orman discussed how the growing indebtedness would be repaid. On May 1, 2005, the Debtor and Mr. Orman entered

into a Forbearance Agreement. The terms of the Forbearance Agreement essentially restated and extended the financial terms of Note 1 and Note 2 with two primary exceptions: (i) instead of charging a 10% loan fee every 6 months and 10% annual interest, Mr. Orman's return was consolidated in the form of a 30% contract rate of interest rate, and (ii) Mr. Orman's royalty interest was eliminated. Under the terms of the Forbearance Agreement, Mr. Orman also agreed to forbear from pursuing his various remedies to collect the debt owing for a period of time. The Forbearance Agreement expired by its own terms on July 15, 2005.

The Debtor's obligations under Notes 1, 2 and the Forbearance Agreement were secured by two security agreements which granted Mr. Orman a first priority security interest in all of the Debtor's property then owned or thereafter acquired: (i) a Security Agreement dated September 4, 2002, ("Security Agreement 1") and an Amended and Restated Security Agreement dated March 18, 2003, ("Security Agreement 2"). Principally, the collateral under each security agreement was and is the Assets.

These security interests were properly perfected by the filing of UCC-1 financing statements, amendments and continuation statements with the California Secretary of the State as: (a) Document 0224160830, filed August 29, 2002, amended by Document 02252C0384, filed September 9, 2002, with the Secretary of State of the State of California and continued by Document 07-71067446 filed March 19, 2007, and (b) Document 03072C0021 filed March 12, 2003.

When Security Agreement 1 was executed, the Debtor represented that it owned the entire Collection. Prior to the execution of Note 2, the Debtor acknowledged that it did not own the entire Collection as had been represented in Security Agreement 1. Rather, the Debtor stated that portions of the Collection were owned by Selden and the Trust. As a result of these communications, and as further security for the obligations owed by Debtor, Security Agreements were executed by Selden ("Security Agreement 3") and the Trust ("Security Agreement 4") pledging their respective interests in the Collection to Mr. Orman to secure the Debtor's obligations. These additional grants of security interests were perfected and continued by the filing of a UCC-1 financing statement and continuation statement (i) as to

1  Selden, with the Nevada Secretary of State as Document 2003007203-5 on March 12, 2003,
2  and Document 2007030353-9 on September 17, 2007, and (ii) as to the Trust, with the
3  Secretary of State of the state of California, as Document 0307260003 on March 12, 2003, and
4  Document 07-71291623 on September 17, 2007.

5        The Debtor has been in default of its obligations under Note 1, Note 2, and the
6  Forbearance Agreement since September 15, 2003. As of March 17, 2010, there is due, owing
7  and unpaid the sum of $2,020,000.00 in principal and $3,862,891 in interest. Interest continues
8  to accrue at $1,660.27 per day. Under the terms of Note 1, Note 2, and the Forbearance
9  Agreement, Mr. Orman is also entitled to an award of reasonable attorney fees Secured Lender
10 has retained the firm of Farmer & Ready, the firm of Stinson Morrison Hecker LLP, and the
11 firm of Mustoe Carter, LP, as attorneys in order to assist it in enforcing the terms of Note 1,
12 Note 2, the Forbearance Agreement and the various security agreements.

13 **C.    Prebankruptcy Litigation**
14     1.    California Litigation
15       Years of discussion with the Debtor did not result in any repayment of the debt to Mr.
16 Orman; as a consequence, on June 27, 2007, Mr. Orman initiated litigation in the Superior
17 Court for the State of California, County of San Luis Obispo as action number CV070565.
18 Dismayed by the slow progress of that suit, Mr. Orman voluntarily dismissed that action on
19 December 15, 2008, with the intention of refilling in Kansas, the forum of choice in the various
20 loan documents.

21     2.    Kansas Litigation
22       Mr. Orman filed Case No. 08CV06262 in state court in Johnson County, Kansas, on
23 July 30, 2008, against the Debtor, Selden, and the Trust (collectively the "Defendants"). The
24 Debtor, the Trust and Selden filed a Motion to Dismiss for Lack of Personal Jurisdiction or, in
25 the Alternative, based on the Doctrine of Forum Non Conveniens which motion was denied by
26 the trial court who then set the case for a two-day trial beginning June 29, 2009. The trial was
27 delayed by the commencement of the Debtor's Bankruptcy Case.
28 / / /

In conjunction with the commencement of this Bankruptcy Case, the Debtor removed the state court action to the federal District Court for the District of Kansas, Case No. 09-CV-2333 and moved to transfer venue of the case to this Court. Mr. Orman opposed the removal and requested transfer, and on September 8, 2009, U.S. District Court Judge for the District of Kansas, John Lungstrum, ruled that removal of the claims against defendants Trust and Selden was improper and denied defendants' motion to transfer. The district court judge specifically relied on the contracts' forum selection clauses, all of which selected Kansas as the forum (and provided for Kansas choice of law). The district judge also remanded the case against the Debtor back to the trial court in Kansas, thought the action against the Debtor was stayed by the Debtor's bankruptcy filing.

Following argument on December 10, 2009, the trial court judge ruled that Kansas law applied and was prepared to try the cases against the Trust and Selden. The Trust and Selden sought leave to appeal the trial court's rulings and on February 16, 2010, the Kansas Court of Appeals (Appellate Case No. 10-103761-A) rejected the application for appeal. A new trial date was set for April 23, 2010, and, as a result, the Trust and Selden have now commenced their own Chapter 11 bankruptcy cases as referenced hereafter.

## IV. POST-FILING DEVELOPMENTS

Since the Commencement Date, the Debtor has complied with its obligations to the Office of the United States Trustee and made filings in accordance with the requirements of that Office; it sought and obtained approval for the employment of the firm of Michaelson, Susi & Michaelson, a Professional Corporation, as its counsel in this case.

Mr. Orman filed a Motion for Relief from Stay asking for permission to proceed with litigation against the Debtor and against Selden and the Trust in an action pending in state court in Kansas. Relief was denied. An effort to enjoin Mr. Orman's Kansas state action against Selden and Trust was rejected by this Bankruptcy Court. Mr. Orman proceeded with litigation against Selden and the Trust until Selden and Trust filed their own Chapter 11 bankruptcy proceedings as case numbers 9:10-BK-10864-RR and 9:10-BK-10865-RR, respectively, in the

///

Central District of California, Northern Division on February 24, 2010. As a result of those filings, Mr. Orman's state court action is stayed.

### V. CURRENT FINANCIAL INFORMATION

#### A. Description and Value of Significant Assets

The Assets owned by the Debtor are set forth in its Schedules and Statement of Financial Affairs filed with the Court. In the Schedules, the Debtor has attributed values to the Assets, which consist largely of that portion of the Collection owned by the Debtor, and while the Debtor has not had the Assets independently appraised, Mr. Orman does not dispute these values for purposes of the Plan.[3] Rather, because the Plan proposes to sell the Assets pursuant to the direction of an expert auctioneer, these values set forth in the Schedules are largely irrelevant because the marketplace will determine the true worth of the Assets to be sold under the Plan.

#### B. Other Assets

The Debtor owns no real property. Further the Debtor operates no business and as such is neither accruing new obligations (other than accrual of interest obligations) nor is it generating any income. As a consequence, Mr. Orman believes the Debtor has little or no cash. The Debtor has office equipment as identified in the original bankruptcy Schedules filed by the Debtor, but the Debtor has placed a value of only $10,000.00 on that equipment.

### VI. DISCUSSION OF CLAIMS, CLASSIFICATION AND IMPAIRMENT

The following discussion of the Claims against the Debtor, their classification under the Plan, and whether such classes are impaired is set forth in categories, representing different priorities of claims as established in the Bankruptcy Code.

///
///
///
///
///

---

[3] The Debtor has placed a value on the Assets of $10,793,803.00

9

### A. Administrative Claims and Priority Claims – Class 1 Claims

Administrative Claims consist of fees and expenses incurred by counsel for the Debtor in this Chapter 11 case and quarterly fees owed to the United States Trustee. The Debtor estimates that these expenses, as allowed, will be:

Debtor's Counsel:

| | |
|---|---|
| Michaelson, Susi & Michaelson, A Professional Corporation | $50,000.00 (estimated) |
| United States Trustee Fees | less than $500.00 |
| Total Administrative Claims | $50,500.00 (estimated) |

All professional fees and expenses are subject to bankruptcy court approval.

Mr. Orman does not believe there are any priority tax claims owing under 11 U.S.C. § 507(a)(8) of the Bankruptcy Code, and further does not believe that there are any other priority claims.

Certain priority claims that are referred to in 11 U.S.C. §§ 507(a) (3), (4), (5), and (6) of the Bankruptcy Code are required to be placed in classes. Mr. Orman is aware of only one priority claim that has been filed – by Todd Fisher – for wages he asserts are entitled to priority treatment under 11 U.S.C. § 507(a)(4) of the Bankruptcy Code, up to the statutory maximum of $10,950.00 (the "Fisher Priority Claim"). To the extent the Fisher Priority Claim becomes an Allowed Claim, it is entitled to be paid in full.

### B. The Allowed Orman Claim – Class 2 Claim

Mr. Orman believes that his is the only secured claim and is in the amount of $5,516,845.99, as of June 12, 2009 plus accruing interest and attorneys fees as discussed above. It is classified as the Class 2 Claim. Mr. Orman's rights are altered under the Plan and therefore, his claim is impaired.

///

///

### C. Unsecured Claims – Class 3 Claims

Unsecured claims of non-insiders creditors are classified as Class 3 claims. As set forth hereafter, the rights of Class 3 Claims are altered under the Plan and therefore such claims are impaired.

### D. Unsecured Claims of Insider Creditors – Class 4 Claims

Unsecured claims of insider creditors are classified as Class 4 claims. As set forth hereafter, the rights of class 4 Claims are altered under the Plan and therefore, such claims are impaired.

### E. Interest of the Debtor's owners – Class 5 Claims

The Debtor is a not-for-profit corporation and may or may not have actual owners. To the extent there are owners of the Debtor, they will retain their interests in the Debtor only if Class 3 Claims and those Class 4 Claims that elect to be paid, are paid in full. Otherwise, such ownership interests under the Plan are canceled. As a consequence, the rights of the holders of Class 5 interests, if any, are altered under the Plan and such interests are impaired.

## VII. THE PLAN SUMMARY

### A. Plan Overview

Under the Plan, Julien's Auctions (described below) will determine how many and which of the Assets should be auctioned off to pay creditors using its expertise to determine the best method to conduct the Auction such that the sale will yield the greatest recovery by the sale of the fewest Assets. The net proceeds will then be delivered to a Payment Agent[4] appointed upon confirmation of the Plan, and the Payment Agent will pay the Allowed Claims in the classes described above as soon as is practicable, provided however, that to the extent an Administrative Claim becomes an Allowed Administrative Claim, or the Fisher Priority Claim becomes an Allowed Claim, before the Payment Agent receives sufficient funds to pay such Allowed Claims, Mr. Orman will advance up to $80,000.00 to the Payment Agent to pay such claims as set forth below.

---

[4] The proposed Payment Agent is Farmer & Ready, and Mr. Orman shall be responsible for payment to the Payment Agent for services rendered.

11

If the net sale proceeds are insufficient to pay in full the Allowed Class 3 Claims and each Allowed Class 4 claim that has made an election to be paid, Julien's may identify additional assets to sell by a subsequent auction. If all of the Assets are sold and there is still insufficient proceeds to pay all Allowed Class 3 Claims and all Allowed Class 4 that have elected to be paid in full, then the Interests, if any, shall be cancelled and any such holders of Interest shall not receive or retain any property or anything else of value as a consequence of this Plan.

**B.    The Bar Date**

December 15, 2009, was fixed as the last day to file proofs of claim, including amendments thereto. Any proof of Claim or amendment thereto not timely filed shall be disallowed.

## VIII. MEANS OF EFFECTUATING THE PLAN

**A.    Auctioneer**

Mr. Orman believes that Julien's is uniquely qualified to conduct the Auction. From its website, Julien's describes itself, its expertise, and its experience in conducting auctions as follows:

"With expertise specializing in entertainment memorabilia and high profile estate auctions, Julien's has quickly established itself as the premier auction house in high-end celebrity estate and entertainment auctions. Julien's Auctions presents exciting, professionally managed and extremely successful auctions with full color high quality auction catalogs unlike any other auction company. Previous auctions include the collections of U2, Cher, Madonna, Barbra Streisand, Michael Jackson, Muhammad Ali, Debbie Reynolds, the estates of Marilyn Monroe, Bob Hope, Mary Pickford, and many more.

"Julien's Auctions has conducted co-branded auctions with Sotheby's and Christie's in addition to partnering with the most recognized and respected brands in the world. In 2004 Julien's Auctions partnered with Christie's auction house to create one of the most successful multi-consignor sales of entertainment memorabilia ever offered with a sale total of more than 2.1 million dollars. In the fall of 2006 Julien's Auctions partnered with Sotheby's auction

house to conduct property from the life and career of Cher with a sale total of over 3.5 million dollars. Julien's Auctions now includes the sale of jewelry, fine and decorative arts and other high end property in additional to memorabilia offering a full service to our celebrity clients. Julien's Auctions has conducted multiple sales with Gibson Guitar establishing the company as the premier venue for guitars and Rock "N" Roll ephemera. In the spring of 2007 Julien's conducted the largest multi-consignor sale to date for Rock "N" Roll memorabilia The total sale of 2.4 million dollars featured property consigned by The Edge and other band members of U2. One of the many highlights in the sale was the Jimi Hendrix' studio guitar for $480,000.00.

- Additional sale highlights for Julien's Auctions include:
- George Harrison's Gibson SG from 1966-1969: $560,000.00
- George Harrison's Rosewood Telecaster from the famous Apple rooftop performance: $460,000.00
- U2's The Edge's Gibson Les Paul: $288,000.00
- Bono's Trademark Green Gretch Guitar: $220,000.00
- U2's The Edge's Necklace Worn in "The Fly" Video: $27,000.00
- Bono's Sunglasses: $24,000.00
- U2's The Edge Video Worn "U2" Rings: $33,750.00
- U2's The Edge Stage Played Gibson Explorer: $150,000.00
- Bob Dylan's Concert Used Guitar: $192,000.00
- Elvis Presley's Gold Gun: $28,800.00
- Elvis Presley's Microphone from The Louisiana Hayride: $15,000.00
- John Lennon's Sunglasses: $36,000.00
- Kurt Cobain's Stage Worn Jacket: $87,000.00
- Nirvana's MTV Award: $40,800.00
- John Lennon's White Suit From Abbey Road: $117,600.00
- Jimi Hendrix Studio Used Guitar: $480,000.00
- Paul McCartney Hand Painted Gibson Epiphone: $81,800.00
- Sir Paul McCartney Signed Gibson Guitar Sculpture: $175,400.00

- Bill Clinton Signed Saxophone: $60,800.00
- Herb Ritts Original Camera: $190,000.00
- Elvis Presley's Country Gentleman Gretsch Guitar: $180,000.00
- David Gilmour Owned and Played Guitar: $72,000.00
- Beatles Four DA Millings Suits from Madame Tussaud's: $144,000.00
- Jerry Lee Lewis Baldwin Custom Flame Piano: $84,000.00
- Alfred Hitchcock's 1954 Original Passport: $19,200.00
- Marilyn Monroe's Umbrella from 1949 Andre de Dienes Photo Shoot: $42,000.00
- Marilyn Monroe's Personal Phonebook: $90,000.00
- Douglas Fairbanks Jr. Love Letters to Mary Pickford: $28,800.00
- Cher's Van Cleef & Arpels Platinum and Diamond Necklace: $90,000.00
- Cher's Scarisbrick Hall Gothic Pugin Bed: $84,000.00
- Jerry Seinfeld's Puffy Shirt: $16,500.00
- Julia Roberts Outfit from "Erin Brockovich": $18,500.00
- Dean Martin Stage Worn Tuxedo: $20,000.00
- Alfred Hitchcock's California Drivers License: $8,125.00
- Marilyn Monroe Signed Photograph: $15,625.00
- Marilyn Monroe High Heeled Black Pumps: $15,000.00
- Two 8 MM Reels of Behind the Scenes Footage of "The Misfits": $60,000.00
- Duke and Duchess of Windsor Inscribed Photograph: $27,500.00
- Bob Hope's Raised Panel Executive Desk: $19,200.00

"Julien's Auctions continues to present exciting televised auctions developing new markets around the world. Highlights tour Japan, London, Ireland, New York, Los Angeles, Santiago and many more cities exposing the collections being offered to a global platform. Julien's experience and expertise in this field has established the company as the worldwide leader and premiere venue for the sale of high end entertainment property and celebrity estates."

Reference is made to Julien's website for further information: *http://www.juliensauctions.com.*

B. **Auction Process**

In order to effectuate this Plan, there must be an auction of sufficient Assets to pay creditors (the "Sale Assets"). The Sale Assets shall be sold at the Auction to be held on or before October 31, 2010, (or such later date that is recommended by Julien's and agreed to by Mr. Orman) by Julien's on such terms and conditions as Julien's determines, in its expert opinion, are appropriate with the following guidelines:

1. Julien's shall sell the Sale Assets at the Auction. The Sale Assets shall be offered "as is and where is" with no representations as to condition.

2. Julien's shall utilize such marketing materials as it deems appropriate including a color brochure.

3. The Debtor, its owners, agents, landlord, representatives, insiders, and affiliates, shall make the Sale Assets available to Julien's for photography of such assets on the premises where they are located, and for subsequent transportation: (i) on a tour domestically and internationally to generate interest in the Sale Assets and then (ii) to the location of the Auction. The Debtor shall also cooperate with Julien's during the development of any Auction materials to ensure Julien's has the best possible and most accurate information about the Sale Assets.

4. Julien's shall purchase the Insurance Policy prior to transporting the Sale Assets pursuant to subparagraph (c) hereof.

5. The Auction shall be advertised, promoted, and conducted in a manner that Julien's determines meets the Best Yield Requirements. Julien's shall qualify bidders to be eligible to bid and shall make the Sale Assets available for inspection by potential bidders under such terms and conditions as Julien's determines meets the Best Yield Requirements.

6. The Auction shall be conducted in Los Angeles, California.

7. At the Auction, Mr. Orman may, but is not required to, credit bid all or a portion of his claim for any one or more of the Sale Assets pursuant to 11 U.S.C. § 363(k) of the

1 | Bankruptcy Code.

2 |     **8.**    Julien's shall submit a preliminary list of the Sale Assets that shall be filed by Mr. Orman with the Court within ten (10) days before the Confirmation Hearing Date, and a final list of the Sale Assets, that shall be filed by Mr. Orman with the Court within thirty (30) days after the Confirmation Hearing Date.

    **9.**    At the Auction, Julien's shall cease selling Sale Assets upon generating sufficient Net Sale Proceeds (as defined hereafter) to pay: (i) all Class 1 Claims in full, (ii) then the Class 2 Claim in full, (iii) then all Class 3 Claims in full, and (iv) then each Class 4 Claim that has made a Class 4 Election in full (collectively the "Sale Claims"). For purposes of this section, Julien's shall sell sufficient Sale Assets to pay all such Claims in full, whether such Claims are Allowed Claims or Undetermined Claims.

    **10.**    If, after the Auction, Julien's has not generated sufficient Net Sale Proceeds (as defined hereafter) to pay the Sale Claims, it shall submit an additional list of Assets to be sold at a subsequent Auction (the "Subsequent Auction"), which Subsequent Auction shall be conducted under the sale terms, conditions, and requirements as the Auction. Such additional assets shall be deemed to be Sale Assets for all purposes under this Plan.

    **11.**    From the Sale Proceeds, Julien's shall (i) first pay the costs of the Auction and its commission, and (ii) second deliver the remaining proceeds (the "Net Sale Proceeds") to the Payment Agent for distribution pursuant to Article V of the Plan.

**C.**    **Payment Agent and Payment of Claims**

At the time, and to the extent, that an Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to all distributions under this Plan and pursuant to the terms of any Final Order of the Court with respect to such claim or interest. Objections to Priority Claims and Classes 2-4 Claims must be filed within sixty (60) days of the entry of the Confirmation Order, unless such deadline is extended by order of the Court. All requests for the allowance of Administrative Claims must be filed within fourteen (14) days after entry of the Confirmation Order. All objections to such claims must be filed within thirty (30) days after the filing of a request for the allowance of such claims.