1

MICHAELSON, SUSI & MICHAELSON
(SPACE BELOW FOR FILING STAMP ONLY)

A Professional Corporation

2

ATTORNEYS AT LAW
SEVEN WEST FIGUEROA STREET, SECOND FLOOR
SANTA BARBARA, CALIFORNIA 93101-3191

3

Telephone: (805) 965-1011
Facsimile: (805) 965-7351

4

Peter Susi, Bar No. 62957

5

6

Attorneys for Debtor and Debtor-in-Possession

7

8

## UNITED STATES BANKRUPTCY COURT

9

## CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

10

11

In re                                    )   BK No. ND 09-12311-RR
                                         )
12

HOLLYWOOD MOTION PICTURE AND             )   Chapter 11
TELEVISION MUSEUM, a                     )
13

California Non-Profit                    )   Jointly Administered with:
Corporation, and                         )   Case No: 9:10-bk-10865-RR
                                         )
14

SELDEN ENTERPRISES LIMITED               )
15

PARTNERSHIP,                             )
                                         )   DEBTOR'S FIRST AMENDED
16

           Debtors.                      )   DISCLOSURE STATEMENT RE
                                         )   CHAPTER 11 PLAN OF
                                         )   REORGANIZATION
17

_____          )
                                         )   Date:   June 16, 2010
18

[ ] Affects both Debtors                 )   Time:   11:00 a.m.
                                         )   Place:  1415 State Street
19

[X] Applies only to Hollywood            )           Courtroom 201
Motion Picture and Television            )           Santa Barbara, CA
Museum                                   )
20

                                         )
[ ] Applies only to Selden               )   CONFIRMATION HEARING
21

Enterprises Limited                      )   Date:   September 8, 2010
Partnership                              )   Time:   10:00 a.m.
22

                                         )   Place:  1415 State Street
                                         )           Courtroom 201
23

                                         )           Santa Barbara, CA

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION .......................................... 1

  A. Purpose of This Document ............................ 2

  B. Deadlines for Voting and Objecting; Date of Plan
     Confirmation Hearing ................................ 4

     1. Time and Place of the Confirmation Hearing ........ 4
     2. Deadline For Voting For or Against the Plan ....... 4
     3. Deadline For Objecting to the
        Confirmation of the Plan ......................... 4
     4. Identity of Person to Contact for More Information
        Regarding the Plan ............................... 5
     5. Competing Plan ................................... 5

  C. Disclaimer ......................................... 5

II.  BACKGROUND .......................................... 6

  A. History of the Museum ............................... 6

  B. Orman's Loans to HMPM ............................... 11

     1. September 4, 2002:  The Note..................... 11
     2. March 18, 2003:  The Amended Note................ 11
     3. September 15, 2003:  Default under the Amended Note ... 12
     4. May 1, 2005:  Forebearance Agreement ............ 12

  C. Orman's California State Court Action ............... 12

  D. Orman's Kansas State Court Action, HMPM's
     Bankruptcy, and Judge Lungstrum's Order ............ 13

  E. Trust and Selden's Bankruptcy Filings .............. 14

  F. Management and Ownership of the Debtors ............ 14

i

III. SUMMARY OF THE PLAN OF REORGANIZATION ................... 15

  A. What Creditors and Interest Holders Will Receive Under the
     Plan ............................................... 15

  B. Unclassified Claims ................................. 15

    1.  Administrative Expenses ........................... 15

  C. Classified Claims and Interests ..................... 17

    1. Classes of Secured Claims ......................... 17
    2. Classes of Priority Unsecured Claims .............. 19
    3. Classes of General Unsecured Creditors ............ 20

  D. Means of Performing Under the Plan .................. 22
  E. Disbursing Agent .................................... 25

IV.  RISK FACTORS ........................................... 25

V. CONFIRMATION REQUIREMENTS AND PROCEDURES ................. 26

  A. Who May Vote or Object .............................. 26

    1. Who May Object to Confirmation of the Plan ........ 26
    2. Who May Vote to Accept/Reject the Plan ............ 26
    3. Who is Not Entitled to Vote ....................... 28
    4. Who Can Vote in More Than One Class ............... 29
    5. Votes Necessary to Confirm the Plan ............... 29
    6. Votes Necessary for a Class to Accept the Plan .... 29
    7. Treatment of Nonaccepting Classes ................. 29

  B. Liquidation Analysis ................................ 30
  C. Feasibility ......................................... 31

1

2

VI.   EFFECT OF CONFIRMATION OF PLAN ......................... 32

    A.  Discharge ......................................... 32
    B.  Revesting of Property in the Debtor ............... 32
    C.  Modification of Plan .............................. 33
    D.  Post-Confirmation Status Report ................... 33
    E.  Quarterly Fees .................................... 33
    F.  Post-Confirmation Conversion/Dismissal ............ 33
    G.  Final Decree ...................................... 34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*In re Entz-White Lumber & Supply, Inc.*
  850 F.2d 1338 (9th Cir. 1988) .........................14, 18

## Statutes

11 U.S.C. § 1112(b) ........................................33

11 U.S.C. § 1129(a)(8) .....................................30

11 U.S.C. § 1129(b) ........................................30

11 U.S.C. § 1141 ...........................................32

28 U.S.C. § 1930(a)(6) .....................................33

11 U.S.C. § 1124(2) ........................................14

11 U.S.C. § 507(a) .........................................20

11 U.S.C. §§ 507(a)(1), (a)(2), and (a)(8); ................28

11 U.S.C. §  503(b) ........................................15

11 U.S.C. §§ 507(a)(3), (4), (5), and (6) ..................19

## Rules

Bankruptcy Rule 3022 .......................................34

iv

# I.

## **INTRODUCTION**

Hollywood Motion Picture and Television Museum, (the "Museum" or "Debtor") and Selden Enterprises Limited Partnership ("Selden") are the debtors in two related Chapter 11 bankruptcy cases pending before this Court. Hollywood Motion Picture Trust ("Trust)  filed a Chapter 11 case which was dismissed on Debtor's motion by order entered June 22, 2010, on the grounds that Trust is not eligible to be a Chapter 11 debtor.

On June 12, 2009 the Museum commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code and on February 24, 2010 Selden and Trust commenced their bankruptcy cases by filing voluntary Chapter 11 petitions.  Museum and Selden have remained debtors in possession as authorized by Bankruptcy Code Section 1107 and 1108 since their cases were filed.Chapter 11 allows the debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  Museum and Selden have filed two substantively identical plans of reorganization in their related cases.  The Museum is the party proposing the plan in this Chapter 11 case (the "Plan"), which is attached hereto as Exhibit "A".  A Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE MUSEUM'S PLAN. This Plan provides two alternative scenarios for the payment of creditors:  (1) A reorganizing plan pursuant to

1  which creditors will be paid in full with post-filing interest

2  at the federal judgment rate through the establishment of a

3  museum at Belle Island Village in Pigeon Forge, Tennessee, or

4  (2) a liquidating plan pursuant to which creditors will be paid

5  in full with post-filing interest at the federal judgment rate

6  from the proceeds of an auction conducted by a nationally known

7  auction house of the  Memorabilia Collection, or a private sale

8  of the  Memorabilia Collection to a third party purchaser or

9  purchasers.  As set forth in greater detail in Section III

10  below, on or prior to July 31, 2010, Debtor must obtain a

11  commitment for $4 million cash, with funds to be on deposit

12  with Debtor no later than Confirmation Date, in order to

13  proceed with its reorganizing plan.  Otherwise, Debtor will

14  proceed with a liquidating plan.

15      As discussed in detail in this Disclosure Statement, under

16  either scenario, the Plan proposes to satisfy all of the

17  prepetition obligations of the Debtors.  The "Effective Date"

18  of the Plan is defined in the Plan and depends upon whether

19  Debtor liquidates or reorganizes.

20  **A.    Purpose of This Document**

21      This Disclosure Statement summarizes what is in the Plan,

22  and provides certain information relating to the Plan and the

23  process the Court follows in determining whether or not to

24  confirm the Plan.

25      **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

26  **KNOW ABOUT:**

27      (1)   WHO CAN VOTE OR OBJECT,

28

     (2)   WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

     (3)   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

     (4)   WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

     (5)   WHAT IS THE EFFECT OF CONFIRMATION, AND

     (6)   WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.  Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.  This Disclosure Statement uses some capitalized terms which are defined in the Definitions Section of the Plan and you should refer there for the meaning of the term.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

1   **B.**    **Deadlines for Voting and Objecting; Date of Plan**

2        **Confirmation Hearing**

3       THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

4 DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN

5 ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER

6 CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR

7 AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

8        **1.**    **Time and Place of the Confirmation Hearing**

9       The hearing to confirm the Plan will take place on

10 September 8, 2010, at 2:00 p.m., at the United States

11 Bankruptcy Court, 1415 State Street, Santa Barbara, California

12 93101.

13        **2.**    **Deadline For Voting For or Against the Plan**

14       If you are entitled to vote, it is in your best interest

15 to timely vote on the enclosed ballot and return the ballot in

16 the enclosed envelope to the Debtors' bankruptcy counsel, Peter

17 Susi, Michaelson, Susi & Michaelson at Seven West Figueroa

18 Street, Second Floor, Santa Barbara, California 93101.  Your

19 ballot must be received by August 23, 2010 at 4 p.m. (Pacific

20 Time) or it will not be counted.

21        **3.**    **Deadline For Objecting to the Confirmation of the**

22          **Plan**

23       Objections to the confirmation of the Plan must be filed

24 with the Court and served upon Debtor's bankruptcy counsel,

25 Peter Susi, Michaelson, Susi & Michaelson at Seven West

26 Figueroa Street, Second Floor, Santa Barbara, California 93101

27 August 23, 2010 at 4 p.m. (Pacific Time).

28

1      **4.**     **Identity of Person to Contact for More Information**

2          **Regarding the Plan**

3      Any interested party desiring further information about

4 the Plan should contact Peter Susi (peter@msmlaw.com) or

5 Jonathan Gura (jon@msmlaw.com) at Michaelson, Susi &

6 Michaelson, Seven West Figueroa Street, Second Floor, Santa

7 Barbara, California 93101, by email or telephone at (805) 965-

8 1011.

9      **5.**   **Competing Plan**

10      The Court will also consider a competing Plan of

11 Reorganization filed by creditor Gregory Orman ("the Orman

12 Plan") at the same time as the hearing on Debtor's Plan.  You

13 will soon receive, or perhaps already have received, a

14 Disclosure Statement providing information regarding the Orman

15 Plan.  Debtor and Orman differ on certain issues and in their

16 recollection of events and circumstances regarding the history

17 and treatment of the Orman claim.  The Bankruptcy Court has not

18 yet ruled on these issues, which may be resolved by the Court

19 at the Confirmation Hearing or otherwise as part of the Plan

20 Confirmation process.  You may review both parties' Disclosure

21 Statements for a fuller explanation of these differences.

22 **C.**  **Disclaimer**

23      Please carefully read this document, the Plan, and the

24 attached Exhibits.  These documents explain who may object to

25 confirmation of the Plan, who is entitled to vote to accept or

26 reject the Plan, and the treatment that creditors and interest

27 holders can expect to receive if the Court confirms the Plan.

28 The statements and information contained in the Plan and

1   Disclosure Statement, however, do not constitute financial or

2   legal advice.  You should therefore consult your own advisors

3   if you have questions about the impact of the Plan on your

4   claims or interests.

5        The financial data relied upon in formulating the Plan was

6   prepared by the Debtor from information in its books and

7   records.  The information contained in this Disclosure

8   Statement is provided by Todd Fisher, the President of the

9   Museum, the general partner of Selden, and trustee of Trust.

10  The Debtor represents that everything stated in the Disclosure

11  Statement is true to the Debtor's best knowledge.  The Debtor's

12  professionals have not independently verified this information.

13  The Court has not yet determined whether the Plan is

14  confirmable and makes no recommendation as to whether you

15  should support or oppose the Plan.

16  **You may not rely on the Plan and Disclosure Statement for**

17  **any purpose other than to determine whether to vote to accept**

18  **or reject the Plan.  Nothing contained in the Plan or**

19  **Disclosure Statement constitutes an admission of any fact or**

20  **liability by any party or may be deemed to constitute evidence**

21  **of the tax or other legal effects that the Debtor's**

22  **reorganization may have on entities holding claims or**

23  **interests.**

24                          **II.**

25                      **BACKGROUND**

26  **A.    History of the Museum**

27        In the early 1970s, Hollywood studios began auctioning off

28  their extensive collections of costumes and props, and actress

1   Debbie Reynolds ("Reynolds") was the largest purchaser.  In

2   1972, Reynolds established the Museum, a non-profit

3   corporation, and over time donated portions of her Hollywood

4   memorabilia to the Museum.

5       Later Reynolds formed two other entities, Trust and

6   Selden, to own the portion of her memorabilia collection that

7   had not been donated to the Museum.  Reynolds' entire

8   collection of memorabilia was stored together in her Los

9   Angeles studio until 1993, when she acquired a hotel and casino

10  in Las Vegas called the Paddlewheel Hotel.

11      Reynolds reopened the hotel as the Debbie Reynolds

12  Hollywood Hotel and Casino and added a 10,000 square foot

13  museum to the hotel to display her memorabilia collection.

14  While the museum was profitable, the hotel and casino ran into

15  financial trouble and went out of business in 1997.  In 1998,

16  the memorabilia collections were moved to a 10,000 square foot,

17  climate controlled, custom warehouse in Creston, California,

18  built and owned by the Museum's CEO and Reynolds' son, Todd

19  Fisher ("Fisher").  To this day the bulk of the collections of

20  all three entities remains in Fisher's warehouse in Creston.

21      Within a year of moving the collections to Creston, Fisher

22  began negotiating a lease for a new Hollywood memorabilia

23  museum in the Hollywood & Highland Center - the entertainment,

24  retail and hotel complex in the heart of Hollywood, California,

25  that is home to the Academy Awards.  The Museum signed a lease

26  for 20,000 square feet on the top floor of the Hollywood &

27  Highland Center and was scheduled to open in 2004.

28

1       The Hollywood & Highland Center was developed by Trizec

2   Properties with funds from the City of Los Angeles' Community

3   Redevelopment Agency (the "CRA").  As part of the agreement,

4   the Museum was to receive a loan from the CRA to build out and

5   start up the museum.  However, before a formal loan commitment

6   from the CRA could be obtained, the Museum had to provide

7   architectural plans and a feasibility study to the CRA.  To

8   fund this pre-development work, the Museum obtained a $1

9   million "bridge loan" from Gregory Orman in September 2002.

10  This bridge loan was to be paid off with the CRA financing.

11      The Hollywood & Highland Center, which opened in 2001,

12  turned out to be a financial debacle for Trizec Properties and

13  Trizec and the City of Los Angeles ended up in litigation over

14  the project.  As a result, the CRA reneged on its commitments

15  to provide further financing for the project - including the

16  Museum's financing.  Accordingly, the Museum was unable to

17  repay Orman's bridge loan.

18      As the Hollywood & Highland Center agreement was falling

19  apart, Fisher was approached by Glen Bilbo ("Bilbo"), the

20  developer of Belle Island Village, a 26-acre, $114 million

21  mixed-use destination resort with retail, hospitality and

22  entertainment venues in Pigeon Forge, Tennessee, near Dolly

23  Parton's famed "Dollywood."  Bilbo, through his company

24  Southern Venue Development, LLC ("SVD"), offered to build the

25  Museum a brand new, 36,000 square foot facility designed

26  specifically for Reynolds' memorabilia collection.  In

27  addition, Bilbo agreed to assist the Museum in obtaining

28  financing to pay off Orman's loan.

1    In 2004, Fisher and Bilbo formed a joint venture and

2  construction on the Museum facility began.  The Debbie Reynolds

3  Hollywood Motion Picture Museum was to be the anchor tenant for

4  the Belle Island Village project, and more than $10 million has

5  already been spent on construction of the museum.  The

6  building, which is 30,000 square feet and now approximately 85%

7  complete, was specifically designed to house Reynolds'

8  memorabilia collection.

9    Unfortunately, SVD's take-out lender, Countrywide

10  Financial, collapsed and was acquired by Bank of America.  Bank

11  of America cancelled Countrywide's commitment to provide

12  permanent financing for the project, which resulted in a

13  default under the construction loan.  The construction lender,

14  Regions Bank, foreclosed on the project in September 2009.

15    On January 27, 2010 Regions Bank entered into an agreement

16  to sell the project for $19,500,000 to Tennessee Investment

17  Partners, LLC ("TIP"), a company owned partially by the

18  Tennessee-based real estate investment firm Matisse Capital,

19  LLC ("Matisse") and partially by SVD.  The transaction has not

20  yet closed, but will be funded in part by approximately

21  $56_million of bonds to be issued in connection with the

22  project, along with additional municipal contributions of a $23

23  million parking lot plus $9 million of new equity and $9

24  million in the form of a USDA loan to the project.

25    As described in more detail in Section III.D below, TIP

26  intends to install the Debbie Reynolds Hollywood Motion Picture

27  Museum as the project's feature tenant.  As part of any

28  agreement with the Museum, TIP understands and has agreed to

- 9 -

1  advance the Museum the sum of $4 million to pay the Orman Claim

2  and other creditors as set forth in the Plan.

3      The portions of the Memorabilia Collection owned by

4  Museum, Selden and Trust, and their respective values according

5  to the Schedules filed with the Bankruptcy Court are as

6  follows:

| Owner | Value |
|-------|-------|
| Museum | $10,793,803 |
| Selden | $ 7,281,975 |
| Trust | $ 5,261,474 |

11  Many additional items holding substantial value (for which

12  current appraisals do not exist) are owned by Todd Fisher

13  (Todd), Debbie Reynolds (Debbie), and Carrie Fisher (Carrie).

14  These items were not pledged to secure the Orman claim.

15      In the event that a liquidation of the Memorabilia

16  Collection proceeds, it is the intention of Todd, Carrie and

17  Debbie to liquidate the entire collection in a series of

18  auctions, including items owned by Todd, Debbie, and Carrie,

19  and to apply the net proceeds, as may be necessary, to pay

20  Claims in this case.

21      Approximately 80% of the entire Memorabilia Collection is

22  currently stored in specially designed facilities at 4124 North

23  Ryan Road, Creston, California 93432, with the balance held at

24  6514 Lankershim Boulevard, North Hollywood, California 91606.

25  The Creston property is leased by Museum from a company

26  controlled by Todd at monthly rent of $7,500, which has gone

27  unpaid since before this case was filed.  The 6514 Lankershim

28

1  Boulevard property is owned by Selden, which has never charged

2  rent for storage.

3  **B.    Orman's Loans to HMPM**

4      **1.    September 4, 2002:   The Note**

5      To fund the predevelopment work needed in order to obtain

6  financing from the CRA, the Museum received a $1 million bridge

7  loan from Greg Orman in September 2002 pursuant to a Promissory

8  Note (the "Note") and Security Agreement dated September 4,

9  2002.

10     Orman charged the Museum a $100,000 "origination fee,"

11 which was added to the loan balance, resulting in a $1.1

12 million loan amount.  The non-default interest rate was 10% and

13 the default interest rate was 18%.  To secure the $1.1 million

14 loan, the Museum pledged its collection of costume memorabilia

15 worth more than $10.7 million.  The loan was due on February

16 28, 2003, but could be extended with the payment of another

17 $100,000 fee.

18     **2.    March 18, 2003:   The Amended Note**

19     On March 18, 2003 the parties entered into an Amended and

20 Restated Promissory Note (the "Amended Note") and an Amended

21 and Restated Security Agreement.  In connection with the

22 Amended Note, Orman loaned the Museum an additional $600,000,

23 bringing the total amount of loans from Orman to the Museum to

24 $1.6 million.  The face amount of the Amended Note reads

25 $2,373,764, the balance consisting of fees, default interest,

26 and a very short term $400,000 advance made at Orman's request

27 to help Orman with personal tax planning.  The $400,000 advance

28

1  was repaid immediately, leaving the total cash loaned to the

2  Museum at $1.6 million.

3      The non-default interest rate under the Amended Note is

4  10% and the default interest rate is 18%.  The Amended Note was

5  due on September 15, 2003.

6      To provide additional security for the Amended Note, the

7  Fisher-Reynolds family agreed to pledge the costume memorabilia

8  owned by Selden and Trust, valued at approximately $7.28

9  million and $5.26 million, respectively.  Trust and Selden each

10 executed a Security Agreement.  Neither Trust nor Selden signed

11 or guaranteed the Amended Note.

12     **3.   September 15, 2003:  Default under the Amended Note**

13     On September 15, 2003 the Amended Note became due and the

14 Museum failed to repay the Amended Note.

15     **4.   May 1, 2005:  Forebearance Agreement**

16     With the development of the Belle Island Village facility

17 underway, on May 1, 2005, Orman and Fisher executed a

18 Forebearance Agreement, extending the due date of the Amended

19 Note to July 15, 2005 and retroactively increasing the default

20 interest rate from 18% to 30%, beginning on the original

21 default date, September 16, 2003.

22 **C.   Orman's California State Court Action**

23     On June 27, 2007 Orman filed a collection action against

24 the Museum, Trust and Selden in Superior Court for the State of

25 California, County of San Luis Obispo ("California State

26 Court").  The defendants objected to the amount demanded on

27 grounds that the interest sought by Orman violated California's

28 usury laws.  Orman filed a summary judgment motion seeking an

1 order that Kansas law, which does not have a usury law,

2 governed the action.  The California State Court denied the

3 motion, finding there to be a triable issue of fact as to

4 whether California law or Kansas law applied.  The California

5 State Court set the matter for trial on December 15, 2008.

6 Orman then dismissed his California action.

7 **D.    Orman's Kansas State Court Action, the Museum's**

8 **       Bankruptcy, and Judge Lungstrum's Order**

9      On July 30, 2008 Orman filed a new complaint in the

10 District Court of Johnson County, Kansas, Civil Court Division

11 ("Kansas State Court") against the Museum, Selden and Trust

12 seeking $4,919,930.08.  On June 8, 2009, three weeks before

13 trial was to begin, Orman notified the defendants that he was

14 amending his petition to seek compounded interest, thereby

15 increasing his damages claim to $8,663,916.00.  A few days

16 after receiving the increased demand, the Museum filed

17 bankruptcy.

18      The Museum then removed the action to the United States

19 District Court for the District of Kansas and sought to

20 transfer the action to this Court.  United States District

21 Judge Lungstrum denied the transfer motion and remanded the

22 action to the Kansas State Court.

23      The Museum then filed an adversary complaint in the

24 Bankruptcy Court to enjoin Orman from proceeding against Selden

25 and Trust in Kansas State Court.  Orman responded by filing a

26 motion to dismiss the adversary complaint and a motion for

27 relief from the automatic stay to proceed against all three

28 defendants in Kansas State Court.

1      In pleadings filed in opposition to the motion to dismiss

2 and motion for relief from stay, the Museum informed Orman and

3 the Court of its intention to file a plan of reorganization

4 which will cure Orman's secured claim by paying principal and

5 interest at the non-default rate, plus compensation for any

6 actual damages incurred by reason of the default under

7 Bankruptcy Code Section 1124(2) and the Ninth Circuit's holding

8 in In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th

9 Cir. 1988).

10      At a hearing on the two motions held on December 3, 2009,

11 this Court denied Orman's motion for relief from stay and

12 granted Orman's motion to dismiss the adversary complaint.  The

13 rulings permitted Orman to proceed in Kansas against Selden and

14 Trust but prevented litigation in Kansas against the Museum.

15 **E.**     **Trust and Selden's Bankruptcy Filings**

16      Selden and Trust filed bankruptcy on February 24, 2010.

17 The Debtors' motions for joint administration of the three

18 cases were granted on March 31, 2010.  On June 22, 2010, the

19 Trust case was dismissed, leaving only Selden and Museum as

20 Chapter 11 Debtors.

21 **F.**     **Management and Ownership of the Debtors**

22      1.     The Museum is a California non-profit corporation.

23 The shareholders of the Museum are Debbie Reynolds and her

24 children, Todd Fisher and Carrie Fisher.  Todd Fisher is the

25 Museum's President.

26      2.     Selden is a Nevada limited partnership.  The general

27 partner of Selden is Kelly Properties, Inc.  The President of

28 Kelly Properties, Inc. is Todd Fisher and the sole shareholder

- 14 -

1  of Kelly Properties, Inc. is Debbie Reynolds.  The limited

2  partners of Selden are the Museum, the Debbie Reynolds Trust

3  dated February 11, 1989 (Trustee:  Debbie Reynolds), and the

4  Debbie Reynolds Children's Trust dated February 28, 1995

5  (Trustee:  Margaret Duncan).

## III.

### SUMMARY OF THE PLAN OF REORGANIZATION

**A.   What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**B.   Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have not placed the following claims in a class.

**1.   Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case, which are allowed under section 503(b) of the Bankruptcy Code.  All administrative claims will be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

1    The chart below lists all of the Debtors' known Section

2    503(b) administrative claims and their treatment under the

3    Plan.

4    **Claimant**                              <u>Estimated Claim</u>

5    Michaelson, Susi & Michaelson            To be fixed by Court.
                                              Balance at normal
6                                             hourly rates
                                              $26,139.18 at 6/25/10
7                                             after applying retainer

8

9    Clerk's Office Fees                      $500 or less

10   Office of U.S. Trustee Fees              $500 or less

11   Todd Fisher also asserts an administrative claim through

12   his wholly owned company, Freedom Farms, for unpaid rent and

13   utility charges incurred in storing and maintaining the

14   Memorabilia Collection at 4124 North Ryan Road, Creston,

15   California.  This claim is itemized below and is a claim in the

16   Selden and Museum cases:

17   Rent at $7,500/month 8/09 to 9/10      14 x 7,500 = $105,000

18   Utilities at approximately
     $2,000/month 8/09 to 9/10              14 x 2,000 =   28,000
19

20                                          Total       $133,000

21   The Fisher administrative claim is asserted only and has

22   not yet been allowed by the Court.  It will not be paid or

23   discharged under the Plan.

24        Court Approval of Fees Required:

25        For all fees except Clerk's Office fees and U.S. Trustee's

26   fees, the professional in question must file and serve a

27   properly noticed fee application and the Court must rule on the

28

- 16 -

1  application.   Only the amount of fees allowed by the Court will

2  be owed and required to be paid under this Plan.

3      The Debtor will pay the administrative claims listed above

4  on the Effective Date unless the claimant has agreed to be paid

5  later or the Court has not yet ruled on the claim.   As

6  described elsewhere in this Disclosure Statement, the Debtor is

7  working towards establishing a museum to display the

8  Memorabilia Collection.   Debtor anticipates receiving the

9  Museum Advance in connection with the establishment of the

10  museum that will enable Debtor to pay the administrative claims

11  in full on the Effective Date.

12      If Debtor does not receive the Museum Advance by the

13  Confirmation Date, Debtor will immediately thereafter initiate

14  the process of selling the Memorabilia Collection in order to

15  pay all Allowed Claims.

16  **C.   Classified Claims and Interests**

17      **1.   Classes of Secured Claims**

18      Secured claims are claims secured by liens on property of

19  the estate.   Below is a summary of the sole Secured Claim and

20  its treatment under the Plan.

21          **a.   Class #1:   Secured Claim of Gregory Orman**

22      ***Classification***:   Class 1 consists of the Orman Claim under

23  the Amended Note executed by the Museum and secured by a

24  portion of the Memorabilia Collection under the security

25  agreements executed by Debtor, Selden and Trust.   The value of

26  the Memorabilia Collection exceeds the Orman Claim and the

27  claim is deemed to be fully secured in an amount to be fixed by

28

1  the Court or agreed upon by Orman and Debtor with Court

2  approval.

3      The principal balance of the Orman claim under the Amended

4  Note is $1,973,764 after applying the immediate $400,000

5  repayment to principal.  The annual interest rate under the

6  Amended Note is 10 percent.  Interest began accruing under the

7  Amended Note at a rate of 10 percent per year on March 18,

8  2003.  The total amount of interest due as of December 31, 2009

9  was $1,339,996.49.  Interest continues to accrue at a rate of

10 10 percent per year until the Amended Note is fully satisfied.

11 In addition, Orman is entitled to recover damages actually

12 incurred by reason of Museum's default.  Orman disputes these

13 calculations and the amount which he is entitled to recover.

14     ***Treatment:***  The principal balance, interest at the non-

15 default rate, and all actual damages resulting from Debtor's

16 default, will be reinstated and paid in full on the Effective

17 Date.[1]

18     The Debtor believes that Section 1124(2) of the Bankruptcy

19 Code and the Ninth Circuit Court of Appeals ruling in Entz-

20 White, 850 F.2d 1338 (9th Cir. 1988) permit the Debtor to cure

21 Orman's secured claim by paying principal and interest at the

22 non-default rate, plus compensation for any actual damages

23 incurred by reason of the default.  Orman disputes Debtor's

24 right to do so, and this issue and the amount owed will be

25 decided by the Court.

26 ──────────────────────

27 [1] The Plans proposed by Museum and Selden each calls for the reinstatement
and payment in full of the Amended Note.  Notwithstanding the foregoing, the

28 Amended Note is a single obligation and will be satisfied only once.

1    Upon entry of the Confirmation Order, Debtor will waive

2  all defenses previously raised in the Kansas Litigation

3  including (a) the usurious interest charged by Orman under the

4  Amended Note and (b) the Debtor's lack of authority to enter

5  into the loan documents and incur additional debt to Orman.

6    If Debtor does not receive the Museum Advance by the

7  Confirmation Date, Debtor will sell the Memorabilia Collection,

8  either privately or by auction to take place no later than

9  December 15, 2010, as described in more detail below.  Orman

10  will receive all net sales proceeds from sales of the

11  Memorabilia Collection up to the full amount of the Orman

12  Claim.  Payments will first be applied to interest and the

13  allowable costs portions of the Orman Claim, and last to the

14  principal amount of the Orman Claim.

15    Debtor asserts that the Orman claim is unimpaired and does

16  not vote.  Orman disputes this conclusion.

17    **2.  Classes of Priority Unsecured Claims**

18    Certain priority claims that are referred to in Code

19  Sections 507(a)(3), (4), (5), and (6) are required to be

20  placed in classes.  These types of claims are entitled to

21  priority treatment as follows: the Code requires that each

22  holder of such a claim receive cash on the Effective Date equal

23  to the allowed amount of such claim.

24    As of the Petition Date, the Debtor's books and records

25  reflected a $662,400 wage claim owed by the Museum to Todd

26  Fisher.  The portion of this claim entitled to priority is

27  $10,950.  The balance of Todd Fisher's wage claim is an Insider

28  Unsecured Claim held by an Insider and classified as a Class 3

1 Claim.   The entire Fisher Claim, like all other insider claims,

2 will be unaffected by Plan Confirmation and will not be paid or

3 discharged under the Plan.

4     **3.   Classes of General Unsecured Creditors**

5     General unsecured claims are unsecured claims not entitled

6 to priority under Code Section 507(a).   The general unsecured

7 non-priority claims scheduled by Debtor as adjusted by

8 subsequent payments and shown on the "Amounts Currently Owed"

9 column of Exhibit "B" hereto total $211,603.92.   In addition,

10 filed claims which Debtor acknowledges and were not otherwise

11 Scheduled are an additional $20,361.64, making total general

12 unsecured claims $231,964.56. .   See Exhibit "B" for detailed

13 information about each non-priority, general unsecured claim.

14     **a.   Class #2:  Unsecured Claims (Non-Insiders)**

15     ***Classification***:   Class 2 consists of all non-priority,

16 general unsecured claims asserted against the Debtors that are

17 held by non-insiders.

18     ***Treatment***:   Unless the person holding an allowed Class 2

19 claim and the Debtors agree otherwise, the person holding the

20 claim will receive cash equal to the amount of the allowed

21 Class 2 claim, plus post-petition interest on the face amount

22 of the Allowed Claim at the federal judgment rate,until  paid.

23     ***Timing:***   In the event that Debtor receives the Museum

24 Advance, Class 2 creditors will receive an initial, *pro rata*,

25 distribution up to the full amount of their Class 2 Allowed

26 Claim from funds remaining after payment of the Orman Claim,

27 Administrative Expenses, and Priority Unsecured Claims.   Debtor

28 will make the initial *pro rata* payment to Allowed Class 2

1 | Claims from the Museum Advance 10 days following payment of the

2 | Orman Claim, Administrative, and Priority Unsecured Claims.

3 | The balance of Allowed Class 2 Claims will be paid quarterly

4 | over a period not to exceed one year from all net proceeds

5 | received by Debtor in connection with the Tennessee Museum

6 | after payment of the balance of the Orman Claim, Administrative

7 | Claims, and Priority Unsecured Claims, if any.

8 | In the event Debtor does not receive the Museum

9 | Advance, Class 2 Claims will be paid in full with interest from

10 | proceeds of sale of the Memorabilia Collection after payment of

11 | the Orman Claim, Administrative Claims, and Priority Unsecured

12 | Claims on the Effective Date and no later than December 31,

13 | 2010.

14 | Class 2 is an impaired class entitled to vote on the Plan.

15 | **b.    Class #3:    Unsecured Claims (Insiders)**

16 | ***Classification:*** Class 3 consists of all non-priority and

17 | general unsecured claims asserted against the Debtor that are

18 | held by insiders.  Insiders include Todd Fisher, Hollywood

19 | Motion Picture Experience LLC, Debbie Reynolds, and Freedom

20 | Farms.  These claims total $1,956,223.71 and can be itemized as

21 | follows:

22 | Fisher Wages                     $   662,000.00

23 | Fisher Loan                           39,193.77

24 | Hollywood Experience                 300,000.00

25 | Debbie Reynolds                      955,029.94

26 | ***Treatment:*** Class 3 claims will receive no distribution

27 | under the Plan, will be unaffected by Confirmation, and will

28 | remain as Claims against the reorganized Debtors.

**D.    Means of Performing Under the Plan**

The Debtor's Plan provides for the full payment of the Orman Claim from (a) an advance paid in connection with the establishment of the Tennessee Museum on or prior to the Confirmation Date, or (b) from the proceeds of an auction of the Memorabilia Collection or sale of the Memorabilia Collection directly to a third party purchaser or purchasers prior to December 31, 2010.  All other Claims will be paid from funds available to Debtor from the Museum Advance and subsequent royalty payments or from proceeds of sale of the Memorabilia Collection as set forth above.

As described in the "Background" section above, Regions Bank now owns Belle Island Village and has entered into an agreement to sell the project to TIP.  The Reynolds Hollywood Motion Picture Museum is intended to be the cornerstone and anchor tenant of the Belle Island Village project.  TIP and Fisher are currently negotiating a term sheet for the establishment of the museum, and TIP understands that a key, non-negotiable component of any agreement with the museum is an upfront payment of $4 million (the "Museum Advance").

If the Museum Advance is not received by the Confirmation Date, Debtor will immediately thereafter engage Christie's or such other nationally recognized auction house, to wit Julien's Auctions, Sotheby's, or Profiles in History, to conduct a series of auction sales of the Memorabilia Collection.  The identity of the auction house will be determined on or before the confirmation of the Plan.

1    The first auction will take place no later than December

2 15, 2010 and will include not less than $5 million in value of

3 the Memorabilia Collection as determined by the auction house

4 conducting the sale.  Subsequent auctions will occur at

5 intervals of not more than six months and include not less than

6 $5 million of remaining inventory of the Memorabilia Collection

7 as determined by the auction house.

8    All net proceeds of the sale of the Memorabilia Collection

9 will be paid first to Orman up to the full amount of the Orman

10 Claim.  All other proceeds will be used to pay Allowed Claims

11 in order of priority under the Code.

12    Notwithstanding the above, the Debtors may in their sole

13 and reasonable discretion at any time sell all or a portion of

14 the Memorabilia Collection directly to a third party purchaser

15 provided that the net proceeds of the sale of the Memorabilia

16 Collection are paid first to Orman up to the full amount of the

17 Orman Claim and, provided further that such sale shall be (1)

18 in an amount sufficient to pay all Allowed Claims, (2) at a

19 price equal to or greater than the appraised value of the items

20 being sold as set forth on Exhibit "1" to the Plan, or (3) by

21 stipulation of Orman and Debtor.

22    If Debtor fails to perform according to the terms of the

23 Plan, Orman may immediately thereafter proceed to schedule the

24 sale of the Memorabilia Collection in any commercially

25 reasonable manner.  In such an event, Debtor will cooperate

26 with Orman's efforts to sell the Memorabilia Collection and

27 Orman will account for any surplus funds generated from the

28 sales in excess of the Orman Claim, plus costs incurred, and

1  turn over to Debtor any sales proceeds in excess of his Claim

2  along with any remaining unsold memorabilia.

3       The total value of the Museum, Selden and Trust

4  collections is estimated to exceed $20 million.   The charts

5  below set forth an estimate of the total amount of claims to be

6  paid pursuant to the Plan.   The charts assume the Orman Claim

7  is paid off in full at the non-default rate of interest

8  according to the Plan at the specified dates.

9  **Confirmation Date (September 8, 2010)**

10 Administrative claims:                       $   150,000.00
   (excluding Fisher administrative claim)

12 Class 1 (Orman's Secured Claim):        $3,428,401.03

13 Class 2 (General Unsecured Claims):

14                                              $   231,964.56

15 Estimated Post-Petition Interest on
   Class 2 Claims                              $     5,800.00

16 **Total Amount of Claims:**                 **$3,816,165.59**

18       Class 2 Unsecured Claims scheduled as undisputed,

19 liquidated and non-contingent, and filed claims are listed on

20 Exhibit "B" hereto.   Some of the owed amounts listed differ

21 from amounts shown on Debtor's Schedules as the creditor has

22 been paid by co-obligors on the loan.

**December 15, 2010 — Auction Date**

| | |
|---|---|
| Administrative claims: | $  150,000.00 |
| Class 1 (Orman's Secured Claim): | $3,502,484.77 |
| Class 2 (General Unsecured Claims): | $  231,964.56 |
| Estimated Post-Petition Interest on Class 2 Claims | $    7,000.00 |
| **Total Amount of Claims:** | **$3,891,449.33** |

## E.   Disbursing Agent

The reorganized Debtor shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan.

The Disbursing Agent, unless otherwise specified, will make all distributions required under the Plan.  The reorganized Debtor, as Disbursing Agent, will be vested with full authority to take any action or execute and document relating to a conveyance or other transfer that the Debtor could have taken or executed.

## IV.

## RISK FACTORS

Class 2 Unsecured Creditors face the risk that the Memorabilia Collateral will decline in value, cannot be sold at or near the appraised values or that any such sales will be unduly delayed beyond December 31, 2010.  Should Debtor fail to perform according to the Plan, Orman will liquidate the Memorabilia Collection, perhaps leaving little or nothing for Unsecured Creditors.