1  MICHAELSON, SUSI & MICHAELSON          (SPACE BELOW FOR FILING STAMP ONLY)
       A Professional Corporation
2          ATTORNEYS AT LAW
   SEVEN WEST FIGUEROA STREET, SECOND FLOOR
3    SANTA BARBARA, CALIFORNIA 93101-3191
          Telephone:  (805) 965-1011
4         Facsimile:  (805) 965-7351

       Peter Susi, Bar No. 62957
5

6  Attorneys for Debtor and Debtor-in-Possession

7

8              UNITED STATES BANKRUPTCY COURT

9       CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

10

11  In re                         )  BK No. ND 10-10865-RR
                                   )
12  HOLLYWOOD MOTION PICTURE AND   )  Chapter 11
    TELEVISION MUSEUM, a           )
13  California Non-Profit          )  Jointly Administered with:
    Corporation, and              )  Case No.: 9:10-bk-10865-RR
14                                 )
    SELDEN ENTERPRISES LIMITED     )  DEBTOR'S FIRST AMENDED
15  PARTNERSHIP,                   )  DISCLOSURE STATEMENT RE
                                   )  CHAPTER 11 PLAN OF
16              Debtors.           )  REORGANIZATION
                                   )
17  [ ] Affects both Debtors       )
                                   )  Date:    June 16, 2010
18  [ ] Applies only to Hollywood  )  Time:    11:00 a.m.
    Motion Picture and Television  )  Place:   1415 State Street
19  Museum                         )           Courtroom 201
                                   )           Santa Barbara, CA
20  [X] Applies only to Selden     )
    Enterprises Limited            )  CONFIRMATION HEARING
21  Partnership                    )  Date:    September 8, 2010
                                   )  Time:    10:00 a.m.
22                                 )  Place:   1415 State Street
                                   )           Courtroom 201
23                                 )           Santa Barbara, CA
                                   )
24                                 )

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION .......................................... 1

   A.   Purpose of This Document ......................... 2

   B.   Deadlines for Voting and Objecting; Date of Plan
        Confirmation Hearing ............................. 4

      1.  Time and Place of the Confirmation Hearing........... 4
      2.  Deadline For Voting For or Against the Plan.......... 4
      3.  Deadline For Objecting to the
          Confirmation of the Plan........................... 4
      4.  Identity of Person to Contact for More Information
          Regarding the Plan................................ 5
      5.  Competing Plan . . . . . . . . . . . . . . . . . . . 5

   C.   Disclaimer ....................................... 5

II.   BACKGROUND ............................................ 6

   A.  History of the Museum . . . . . . . . . . . . . . . . 6

   B.  Orman's Loans to HMPM ............................. 11

      1.  September 4, 2002:  The Note......................... 11
      2.  March 18, 2003:  The Amended Note.................... 11
      3.  September 15, 2003:  Default under the Amended Note... 12
      4.  May 1, 2005:  Forebearance Agreement................. 12

   C.  Orman's California State Court Action ................. 13

   D.  Orman's Kansas State Court Action,
       HMPM's Bankruptcy, and Judge Lungstrum's Order ............. 13

   E.  Trust and Selden's Bankruptcy Filings ................. 14

   F.  Management and Ownership of the Debtors ............... 14

i

III.  SUMMARY OF THE PLAN OF REORGANIZATION ................... 15

  A.   What Creditors and Interest Holders Will
       Receive Under the Plan ............................. 15

  B.   Unclassified Claims ................................ 15

    1.  Administrative Expenses ............................ 15

  C.   Classified Claims and Interests ................... 17

    1.  Classes of Secured Claims ......................... 17
    2.  Classes of Priority Unsecured Claims .............. 20
    3.  Classes of General Unsecured Creditors ............ 20
    4.  Class of Interest Holders ......................... 21

  D.   Means of Performing Under the Plan ................ 22

  E.   Disbursing Agent .................................. 25

IV.  RISK FACTORS ........................................ 25

V.   CONFIRMATION REQUIREMENTS AND PROCEDURES ............... 26

  A.   Who May Vote or Object ............................ 26

    1.  Who May Object to Confirmation of the Plan ........ 26
    2.  Who May Vote to Accept/Reject the Plan ............ 27
    3.  Who is Not Entitled to Vote ....................... 28
    4.  Who Can Vote in More Than One Class ............... 29
    5.  Votes Necessary to Confirm the Plan ............... 29
    6.  Votes Necessary for a Class to Accept the Plan .... 29
    7.  Treatment of Nonaccepting Classes ................. 29

  B.   Liquidation Analysis .............................. 30

  C.   Feasibility ....................................... 31

1

2   VI.   EFFECT OF CONFIRMATION OF PLAN .......................... 32

3

    A.    Discharge ......................................... 32
4   B.    Revesting of Property in the Debtor ................... 32
    C.    Modification of the Plan . . . . . . . . . . . . . .  33
5   D.    Post-Confirmation Status Report ...................... 33
    E.    Quarterly Fees ...................................... 33
6   F.    Post-Confirmation Conversion/Dismissal ............... 33
    G.    Final Decree ........................................ 35
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3 **Cases**

4

*In re Entz-White Lunber & Supply, Inc.*

5    850 F.2d 1338 (9th Cir. 1988) .........................14, 18

6

7 **Statutes**

8

9  11 U.S.C. § 1112(b) ........................................33

10 11 U.S.C. § 1129(b) ........................................30

11 11 U.S.C. § 1141 ...........................................32

12 11 U.S.C. § 1129(a)(8) .....................................30

13

14 28 U.S.C. § 1930(a)(6) .....................................33

15 11 U.S.C. § 507(a) .........................................20

16 11 U.S.C §§ 507(a)(1), (a)(2), and (a)(7) ..................28

17 11 U.S.C §§ 507(a)(1), (a)(2), and (a)(8) ..................28

18 11 U.S.C §§ 507(a)(3), (4), (5), and (6) ...................20

19 11 U.S.C. § 1124(2) ........................................18

20 11 U.S.C. § 503(b) .........................................15

21

22

23 **Rules**

24 Bankruptcy Rule 3022 .......................................35

25

26

27

28

# I.

## INTRODUCTION

Hollywood Motion Picture and Television Museum, (the "Museum"), and Selden Enterprises Limited Partnership ("Selden" or "Debtor") are the debtors in two related Chapter 11 bankruptcy cases pending before this Court.  Hollywood Motion Picture Trust ("Trust") filed a Chapter 11 case which was dismissed on Debtor's motion by order entered June 22, 2010, on the grounds that Trust is not eligible to be a Chapter 11 debtor.

On June 12, 2009 the Museum commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code and on February 24, 2010 Selden and Trust commenced their bankruptcy cases by filing voluntary Chapter 11 petitions.  Museum and Selden have remained debtors in possession as authorized by Bankruptcy Code Section 1107 and 1108 since their cases were filed.

Chapter 11 allows the debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  Museum and Selden have filed two substantively identical plans of reorganization in their related cases.  The Trust is the party proposing the plan in this Chapter 11 case (the "Plan"), attached hereto as Exhibit "A."  A Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR SELDEN'S PLAN.  This Plan provides two alternative scenarios for the payment of creditors:  (1) A

1  reorganizing plan pursuant to which creditors will be paid in

2  full with post-filing interest at the federal judgment rate

3  through the establishment of a museum at Belle Island Village

4  in Pigeon Forge, Tennessee, or (2) a liquidating plan pursuant

5  to which creditors will be paid in full from the proceeds of an

6  auction conducted by a nationally known auction house of the

7  Debtors' Memorabilia Collection, or a private sale of the

8  Debtors' Memorabilia Collection to a third party purchaser or

9  purchasers.  As set forth in greater detail in Section III

10  below, on or prior to August 1, 2010, Debtor must obtain a

11  commitment for $4 million cash, with funds to be on deposit

12  with Debtor no later than Confirmation Date, in order to

13  proceed with its reorganizing plan.  Otherwise, Debtor will

14  proceed with a liquidating plan.As discussed in detail in this

15  Disclosure Statement, under either scenario, the Plan proposes

16  to satisfy all of the prepetition obligations of the Debtors.

17  The "Effective Date" of the Plan is defined in the Plan and

18  depends upon whether Debtor liquidates or reorganizes.

19  **A.    Purpose of This Document**

20       This Disclosure Statement summarizes what is in the Plan,

21  and provides certain information relating to the Plan and the

22  process the Court follows in determining whether or not to

23  confirm the Plan.

24       **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

25  **KNOW ABOUT:**

26       (1)   WHO CAN VOTE OR OBJECT,

27       (2)   WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your

28             claim will receive if the Plan is confirmed), AND HOW

- 2 -

1  THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD

2  RECEIVE IN LIQUIDATION,

3  (3)  THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS

4  DURING THE BANKRUPTCY,

5  (4)  WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER

6  OR NOT TO CONFIRM THE PLAN,

7  (5)  WHAT IS THE EFFECT OF CONFIRMATION, AND

8  (6)  WHETHER THIS PLAN IS FEASIBLE.

9  This Disclosure Statement cannot tell you everything about

10  your rights.  You should consider consulting your own lawyer to

11  obtain more specific advice on how this Plan will affect you

12  and what is the best course of action for you.  Be sure to read

13  the Plan as well as the Disclosure Statement.  If there are any

14  inconsistencies between the Plan and the Disclosure Statement,

15  the Plan provisions will govern.  This Disclosure Statement

16  uses some capitalized terms which are defined in the

17  Definitions Section of the Plan and you should refer there for

18  the meaning of the term.

19  The Code requires a Disclosure Statement to contain

20  "adequate information" concerning the Plan.  The Bankruptcy

21  Court ("Court") has approved this document as an adequate

22  Disclosure Statement, containing enough information to enable

23  parties affected by the Plan to make an informed judgment about

24  the Plan. Any party can now solicit votes for or against the

25  Plan.

26

27

28

1  **B.    Deadlines for Voting and Objecting; Date of Plan**

2  **Confirmation Hearing**

3  THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

4  DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN

5  ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER

6  CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR

7  AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

8  **1.    Time and Place of the Confirmation Hearing**

9  The hearing to confirm the Plan will take place on

10 September 8, 2010, at 2:00 p.m., at the United States

11 Bankruptcy Court, 1415 State Street, Santa Barbara, California

12 93101.

13 **2.    Deadline For Voting For or Against the Plan**

14 If you are entitled to vote, it is in your best interest

15 to timely vote on the enclosed ballot and return the ballot in

16 the enclosed envelope to the Debtors' bankruptcy counsel, Peter

17 Susi, Michaelson, Susi & Michaelson at Seven West Figueroa

18 Street, Second Floor, Santa Barbara, California 93101.  Your

19 ballot must be received by August 23, 2010 at 4 p.m. (Pacific

20 Time) or it will not be counted.

21 **3.    Deadline For Objecting to the Confirmation of the**

22 **Plan**

23 Objections to the confirmation of the Plan must be filed

24 with the Court and served upon Debtors' bankruptcy counsel,

25 Peter Susi, Michaelson, Susi & Michaelson at Seven West

26 Figueroa Street, Second Floor, Santa Barbara, California 93101

27 by August 23, 2010 at 4 p.m. (Pacific Time).

28

- 4 -

1    **4.    Identity of Person to Contact for More Information**

2    **Regarding the Plan**

3    Any interested party desiring further information about

4    the Plan should contact Peter Susi (peter@msmlaw.com) or

5    Jonathan Gura (jon@msmlaw.com) at Michaelson, Susi &

6    Michaelson, Seven West Figueroa Street, Second Floor, Santa

7    Barbara, California 93101, by email or telephone at (805) 965-

8    1011.

9    **5.    Competing Plan**

10   The Court will also consider a competing Plan of

11   Reorganization filed by creditor Gregory Orman ("the Orman

12   Plan") at the same time as the hearing on Debtor's Plan.   You

13   will soon receive, or perhaps already have received, a

14   Disclosure Statement providing information regarding the Orman

15   Plan.   Debtor and Orman differ on certain issues and in their

16   recollection of events and circumstances regarding the history

17   and treatment of the Orman claim.   The Bankruptcy Court has not

18   yet ruled on these issues, which may be resolved by the Court

19   at the Confirmation Hearing or otherwise as part of the Plan

20   Confirmation process.   You may review both parties' Disclosure

21   Statements for a fuller explanation of these differences.

22   **C.    Disclaimer**

23   Please carefully read this document, the Plan, and the

24   attached Exhibits.   These documents explain who may object to

25   confirmation of the Plan, who is entitled to vote to accept or

26   reject the Plan, and the treatment that creditors and interest

27   holders can expect to receive if the Court confirms the Plan.

28   The statements and information contained in the Plan and

- 5 -

1  Disclosure Statement, however, do not constitute financial or

2  legal advice.  You should therefore consult your own advisors

3  if you have questions about the impact of the Plan on your

4  claims or interests.

5      The financial data relied upon in formulating the Plan was

6  prepared by the Debtor from information in its books and

7  records.  The information contained in this Disclosure

8  Statement is provided by Todd Fisher, the President of the

9  Museum, the general partner of Selden, and trustee of Trust.

10  The Debtors represent that everything stated in the Disclosure

11  Statement is true to the Debtors' best knowledge.  The Debtor's

12  professionals have not independently verified this information.

13  The Court has not yet determined whether the Plan is

14  confirmable and makes no recommendation as to whether you

15  should support or oppose the Plan.

16      **You may not rely on the Plan and Disclosure Statement for**

17  **any purpose other than to determine whether to vote to accept**

18  **or reject the Plan.  Nothing contained in the Plan or**

19  **Disclosure Statement constitutes an admission of any fact or**

20  **liability by any party or may be deemed to constitute evidence**

21  **of the tax or other legal effects that the Debtor's**

22  **reorganization may have on entities holding claims or**

23  **interests.**

24                          **II.**

25                       **BACKGROUND**

26  **A.    History of the Museum**

27      In the early 1970s, Hollywood studios began auctioning off

28  their extensive collections of costumes and props, and actress

1  Debbie Reynolds ("Reynolds") was the largest purchaser.  In

2  1972, Reynolds established the Museum, a non-profit

3  corporation, and over time donated portions of her Hollywood

4  memorabilia to the Museum.

5      Later Reynolds formed two other entities, Trust and

6  Selden, to own the portion of her memorabilia collection that

7  had not been donated to the Museum.  Reynolds' entire

8  collection of memorabilia was stored together in her Los

9  Angeles studio until 1993, when she acquired a hotel and casino

10  in Las Vegas called the Paddlewheel Hotel.

11      Reynolds reopened the hotel as the Debbie Reynolds

12  Hollywood Hotel and Casino and added a 10,000 square foot

13  museum to the hotel to display her memorabilia collection.

14  While the museum was profitable, the hotel and casino ran into

15  financial trouble and went out of business in 1997.  In 1998,

16  the memorabilia collections were moved to a 10,000 square foot,

17  climate controlled, custom warehouse in Creston, California,

18  built and owned by the Museum's CEO and Reynolds' son, Todd

19  Fisher ("Fisher").  To this day the bulk of the collections of

20  all three entities remains in Fisher's warehouse in Creston.

21      Within a year of moving the collections to Creston, Fisher

22  began negotiating a lease for a new Hollywood memorabilia

23  museum in the Hollywood & Highland Center - the entertainment,

24  retail and hotel complex in the heart of Hollywood, California,

25  that is home to the Academy Awards.  The Museum signed a lease

26  for 20,000 square feet on the top floor of the Hollywood &

27  Highland Center and was scheduled to open in 2004.

28

1    The Hollywood & Highland Center was developed by Trizec

2  Properties with funds from the City of Los Angeles' Community

3  Redevelopment Agency (the "CRA").  As part of the agreement,

4  the Museum was to receive a loan from the CRA to build out and

5  start up the museum.  However, before a formal loan commitment

6  from the CRA could be obtained, the Museum had to provide

7  architectural plans and a feasibility study to the CRA.  To

8  fund this pre-development work, the Museum obtained a $1

9  million "bridge loan" from Gregory Orman in September 2002.

10  This bridge loan was to be paid off with the CRA financing.

11    The Hollywood & Highland Center, which opened in 2001,

12  turned out to be a financial debacle for Trizec Properties and

13  Trizec and the City of Los Angeles ended up in litigation over

14  the project.  As a result, the CRA reneged on its commitments

15  to provide further financing for the project – including the

16  Museum's financing.  Accordingly, the Museum was unable to

17  repay Orman's bridge loan.

18    As the Hollywood & Highland Center agreement was falling

19  apart, Fisher was approached by Glen Bilbo ("Bilbo"), the

20  developer of Belle Island Village, a 26-acre, $114 million

21  mixed-use destination resort with retail, hospitality and

22  entertainment venues in Pigeon Forge, Tennessee, near Dolly

23  Parton's famed "Dollywood."  Bilbo, through his company

24  Southern Venue Development, LLC ("SVD"), offered to build the

25  Museum a brand new, 36,000 square foot facility designed

26  specifically for Reynolds' memorabilia collection.  In

27  addition, Bilbo agreed to assist the Museum in obtaining

28  financing to pay off Orman's loan.

1    In 2004, Fisher and Bilbo formed a joint venture and

2  construction on the Museum facility began.  The Debbie Reynolds

3  Hollywood Motion Picture Museum was to be the anchor tenant for

4  the Belle Island Village project, and more than $10 million has

5  already been spent on construction of the museum.  The

6  building, which is 30,000 square feet and now approximately 85%

7  complete, was specifically designed to house Reynolds'

8  memorabilia collection.

9    Unfortunately, SVD's take-out lender, Countrywide

10  Financial, collapsed and was acquired by Bank of America.  Bank

11  of America cancelled Countrywide's commitment to provide

12  permanent financing for the project, which resulted in a

13  default under the construction loan.  The construction lender,

14  Regions Bank, foreclosed on the project in September 2009.

15    On January 27, 2010 Regions Bank entered into an agreement

16  to sell the project for $19,500,000 to Tennessee Investment

17  Partners, LLC ("TIP"), a company owned partially by the

18  Tennessee-based real estate investment firm Matisse Capital,

19  LLC ("Matisse") and partially by SVD.  The transaction has not

20  yet closed, but will be funded in part by approximately $56

21  million of bonds to be issued in connection with the project,

22  along with additional municipal contributions of a $23 million

23  parking lot plus $9 million of new equity and $9 million in the

24  form of a USDA loan to the project.

25    As described in more detail in Section III.D below, TIP

26  intends to install the Debbie Reynolds Hollywood Motion Picture

27  Museum as the project's feature tenant.  As part of any

28  agreement with the Museum, TIP understands and has agreed to

- 9 -

1 advance the Museum the sum of $4 million to pay the Orman Claim

2 and other creditors as set forth in the Plan.

3      The portions of the Memorabilia Collection owned by

4 Museum, Selden and Trust, and their respective values according

5 to the Schedules filed with the Bankruptcy Court are as

6 follows:

7      Owner                                    Value

8      Museum                                   $10,793,803

9      Selden                                   $ 7,281,975

10     Trust                                    $ 5,261,474

11 Many additional items holding substantial value (for which

12 current appraisals do not exist) are owned by Todd Fisher

13 (Todd), Debbie Reynolds (Debbie), and Carrie Fisher (Carrie).

14 These items were not pledged to secure the Orman claim.

15     In the event that a liquidation of the Memorabilia

16 Collection proceeds, it is the intention of Todd, Carrie and

17 Debbie to liquidate the entire collection in a series of

18 auctions, including items owned by Todd, Debbie, and Carrie,

19 and to apply the net proceeds, as may be necessary, to pay

20 Claims in this case.

21     Approximately 80% of the entire Memorabilia Collection is

22 currently stored in specially designed facilities at 4124 North

23 Ryan Road, Creston, California 93432, with the balance held at

24 6514 Lankershim Boulevard, North Hollywood, California 91606.

25 The Creston property is leased by Debbie from a company

26 controlled by Todd at monthly rent of $7,500, which has gone

27 unpaid since before this case was filed.  The 6514 Lankershim

28 Boulevard property is owned by Selden.

1  **B.     Orman's Loans to HMPM**

2        **1.   September 4, 2002:   The Note**

3        To fund the predevelopment work needed in order to obtain

4  financing from the CRA, the Museum received a $1 million bridge

5  loan from Greg Orman in September 2002 pursuant to a Promissory

6  Note (the "Note") and Security Agreement dated September 4,

7  2002.

8        Orman charged the Museum a $100,000 "origination fee,"

9  which was added to the loan balance, resulting in a $1.1

10 million loan amount.   The non-default interest rate was 10% and

11 the default interest rate was 18%.   To secure the $1.1 million

12 loan, the Museum pledged its collection of costume memorabilia

13 worth more than $10.7 million.   The loan was due on February

14 28, 2003, but could be extended with the payment of another

15 $100,000 fee.

16       **2.   March 18, 2003:   The Amended Note**

17       On March 18, 2003 the parties entered into an Amended and

18 Restated Promissory Note (the "Amended Note") and an Amended

19 and Restated Security Agreement.   In connection with the

20 Amended Note, Orman loaned the Museum an additional $600,000,

21 bringing the total amount of loans from Orman to the Museum to

22 $1.6 million.   The face amount of the Amended Note reads

23 $2,373,764, the balance consisting of fees, default interest,

24 and a very short term $400,000 advance made at Orman's request

25 to help Orman with personal tax planning.   The $400,000 advance

26 was repaid immediately, leaving the total cash loaned to the

27 Museum at $1.6 million.

28

1   The non-default interest rate under the Amended Note is

2   10% and the default interest rate is 18%.  The Amended Note was

3   due on September 15, 2003.

4       To provide additional security for the Amended Note, the

5   Fisher-Reynolds family agreed to pledge the costume memorabilia

6   owned by Selden and Trust, valued at approximately $7.28

7   million and $5.26 million, respectively.  Trust and Selden each

8   executed a Security Agreement.  Neither Trust nor Selden signed

9   or guaranteed the Amended Note.

10      **3.    September 15, 2003:  Default under the Amended Note**

11      On September 15, 2003 the Amended Note became due and the

12  Museum failed to repay the Amended Note.

13      **4.    May 1, 2005:  Forebearance Agreement**

14      With the development of the Belle Island Village facility

15  underway, on May 1, 2005, Orman and Fisher executed a

16  Forebearance Agreement, extending the due date of the Amended

17  Note to July 15, 2005 and retroactively increasing the default

18  interest rate from 18% to 30%, beginning on the original

19  default date, September 16, 2003.

20  **C.    Orman's California State Court Action**

21      On June 27, 2007 Orman filed a collection action against

22  the Museum, Trust and Selden in Superior Court for the State of

23  California, County of San Luis Obispo ("California State

24  Court").  The defendants objected to the amount demanded on

25  grounds that the interest sought by Orman violated California's

26  usury laws.  Orman filed a summary judgment motion seeking an

27  order that Kansas law, which does not have a usury law,

28  governed the action.  The California State Court denied the

1  motion, finding there to be a triable issue of fact as to

2  whether California law or Kansas law applied.  The California

3  State Court set the matter for trial on December 15, 2008.

4  Orman then dismissed his California action.

5  **D.    Orman's Kansas State Court Action, the Museum's**

6  **Bankruptcy, and Judge Lungstrum's Order**

7      On July 30, 2008 Orman filed a new complaint in the

8  District Court of Johnson County, Kansas, Civil Court Division

9  ("Kansas State Court") against the Museum, Selden and Trust

10  seeking $4,919,930.08.  On June 8, 2009, three weeks before

11  trial was to begin, Orman notified the defendants that he was

12  amending his petition to seek compounded interest, thereby

13  increasing his damages claim to $8,663,916.00.  A few days

14  after receiving the increased demand, the Museum filed

15  bankruptcy.

16      The Museum then removed the action to the United States

17  District Court for the District of Kansas and sought to

18  transfer the action to this Court.  United States District

19  Judge Lungstrum denied the transfer motion and remanded the

20  action to the Kansas State Court.

21      The Museum then filed an adversary complaint in the

22  Bankruptcy Court to enjoin Orman from proceeding against Selden

23  and Trust in Kansas State Court.  Orman responded by filing a

24  motion to dismiss the adversary complaint and a motion for

25  relief from the automatic stay to proceed against all three

26  defendants in Kansas State Court.

27      In pleadings filed in opposition to the motion to dismiss

28  and motion for relief from stay, the Museum informed Orman and

1   the Court of its intention to file a plan of reorganization

2   which will cure Orman's secured claim by paying principal and

3   interest at the non-default rate, plus compensation for any

4   actual damages incurred by reason of the default under

5   Bankruptcy Code Section 1124(2) and the Ninth Circuit's holding

6   in In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338 (9th

7   Cir. 1988).

8        At a hearing on the two motions held on December 3, 2009,

9   this Court denied Orman's motion for relief from stay and

10  granted Orman's motion to dismiss the adversary complaint.  The

11  rulings permitted Orman to proceed in Kansas against Selden and

12  Trust but prevented litigation in Kansas against the Museum.

13  **E.    Trust and Museum's Bankruptcy Filings**

14       Museum filed bankruptcy on June 12, 2009, and Trust filed

15  bankruptcy on February 24, 2010.  The Debtors' motions for

16  joint administration of the three cases were granted on March

17  31, 2010.  On June 22, 2010, the Trust case was dismissed,

18  leaving only Selden and Museum as Chapter 11 debtors.

19  **F.    Management and Ownership of the Debtors**

20       1.    The Museum is a California non-profit corporation.

21  The shareholders of the Museum are Debbie Reynolds and her

22  children, Todd Fisher and Carrie Fisher.  Todd Fisher is the

23  Museum's President.

24       2.    Selden is a Nevada limited partnership.  The general

25  partner of Selden is Kelly Properties, Inc.  The President of

26  Kelly Properties, Inc. is Todd Fisher and the sole shareholder

27  of Kelly Properties, Inc. is Debbie Reynolds.  The limited

28  partners of Selden are the Museum, the Debbie Reynolds Trust

1  dated February 11, 1989 (Trustee:  Debbie Reynolds), and the

2  Debbie Reynolds Children's Trust dated February 28, 1995

3  (Trustee:  Margaret Duncan).

4                           **III.**

5         **SUMMARY OF THE PLAN OF REORGANIZATION**

6  **A.    What Creditors and Interest Holders Will Receive Under the**

7        **Plan**

8         As required by the Bankruptcy Code, the Plan classifies

9  claims and interests in various classes according to their

10  right to priority.  The Plan states whether each class of

11  claims or interests is impaired or unimpaired.  The Plan

12  provides the treatment each class will receive.

13  **B.    Unclassified Claims**

14        Certain types of claims are not placed into voting

15  classes; instead they are unclassified.  They are not

16  considered impaired and they do not vote on the Plan because

17  they are automatically entitled to specific treatment provided

18  for them in the Bankruptcy Code.  As such, the Debtors have not

19  placed the following claims in a class.

20        **1.    Administrative Expenses**

21        Administrative expenses are claims for costs or expenses

22  of administering the Debtor's Chapter 11 case, which are

23  allowed under section 503(b) of the Bankruptcy Code.  All

24  administrative claims will be paid on the Effective Date of the

25  Plan, unless a particular claimant agrees to a different

26  treatment.

27

28

The chart below lists all of the Debtors' known Section 503(b) administrative claims and their treatment under the Plan.

| Claimant | Estimated Claim |
|---|---|
| Michaelson, Susi & Michaelson | To be fixed by Court. Balance at normal hourly rates $26,139.18 at 6/25/10 after applying retainer. |
| Clerk's Office Fees | $500 or less |
| Office of U.S. Trustee Fees | $500 or less |

Todd Fisher also holds an administrative claim through his wholly owned company, Freedom Farms, for unpaid rent and utility charges incurred in storing and maintaining the Memorabilia Collection at 4124 North Ryan Road, Creston, California.  This claim is itemized below and is a claim in the Selden and Museum cases:

| | |
|---|---|
| Rent at $7,500/month 8/09 to 9/10 | 14 x 7,500 = $105,000 |
| Utilities at approximately $2,000/month 8/09 to 9/10 | 14 x 2,000 =  28,000 |
| | Total        $133,000 |

The Fisher administrative claim is asserted only and has not yet been allowed by the Court.  It will not be paid or discharged under the Plan.

Court Approval of Fees Required:

For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the

1  application.   Only the amount of fees allowed by the Court will

2  be owed and required to be paid under this Plan.

3      The Debtor will pay the administrative claims listed above

4  on the Effective Date unless the claimant has agreed to be paid

5  later or the Court has not yet ruled on the claim.   As

6  described elsewhere in this Disclosure Statement, the Debtor is

7  working towards establishing a museum to display the

8  Memorabilia Collection.   Debtor anticipates receiving the

9  Museum Advance in connection with the establishment of the

10  museum that will enable Debtor to pay the administrative claims

11  in full on the Effective Date.

12      If Debtor does not receive the Museum Advance by the

13  Confirmation Date, Debtor will immediately thereafter initiate

14  the process of selling the Memorabilia Collection in order to

15  pay all Allowed Claims.

16  **C.    Classified Claims and Interests**

17      **1.    Classes of Secured Claims**

18      Secured claims are claims secured by liens on property of

19  the estate.   Below is a summary of the Secured Claims and their

20  treatment under the Plan.

21          **a.    Class #1:   Secured Claim of Gregory Orman**

22      ***Classification:***   Class 1 consists of the Orman Claim under

23  the Amended Note executed by the Museum and secured by a

24  portion of the Memorabilia Collection under the security

25  agreements executed by Debtor, Museum and Trust.   The value of

26  the Memorabilia Collection exceeds the Orman Claim and the

27  claim is deemed to be fully secured in an amount to be fixed by

28

1  the Court or agreed upon by Orman and Debtor with Court

2  approval.

3       The principal balance of the Orman claim under the Amended

4  Note is $1,973,764 after applying the immediate $400,000

5  repayment to principal.  The annual interest rate under the

6  Amended Note is 10 percent.  Interest began accruing under the

7  Amended Note at a rate of 10 percent per year on March 18,

8  2003.  The total amount of interest due as of December 31, 2009

9  was $1,339,996.49.  Interest continues to accrue at a rate of

10 10 percent per year until the Amended Note is fully satisfied.

11 In addition, Orman is entitled to recover damages actually

12 incurred by reason of Museum's default.  Orman disputes these

13 calculations and the amount which he is entitled to recover.

14      ***Treatment:***  The principal balance, interest at the non-

15 default rate, and all actual damages resulting from Debtor's

16 default, will be reinstated and paid in full on the Effective

17 Date.[1]

18      The Debtors believe that Section 1124(2) of the Bankruptcy

19 Code and the Ninth Circuit Court of Appeals ruling in Entz-

20 White, 850 F.2d 1338 (9th Cir. 1988) permit the Debtor to cure

21 Orman's secured claim by paying principal and interest at the

22 non-default rate, plus compensation for any actual damages

23 incurred by reason of the default.  Orman disputes Debtor's

24 right to do so, and this issue and the amount owed will be

25 decided by the Court.

26  _____

27 [1] The Plans proposed by Museum and Selden each calls for the reinstatement
and payment in full of the Amended Note.  Notwithstanding the foregoing, the
28 Amended Note is a single obligation and will be satisfied only once.

1    Upon entry of the Confirmation Order, Debtor will waive

2 all defenses previously raised in the Kansas Litigation

3 including (a) the usurious interest charged by Orman under the

4 Amended Note and (b) the Debtor's lack of authority to enter

5 into the loan documents and incur additional debt to Orman.

6    If Debtor does not receive the Museum Advance by the

7 Confirmation Date, Debtor will sell the Memorabilia Collection,

8 either privately or by auction to take place no later than

9 December 15, 2010, as described in more detail below.  Orman

10 will receive all net sales proceeds from sales of the

11 Memorabilia Collection up to the full amount of the Orman

12 Claim.  Payments will first be applied to interest and the

13 allowable costs portions of the Orman Claim, and last to the

14 principal amount of the Orman Claim.

15    Debtor asserts that the Orman claim is unimpaired and does

16 not vote.  Orman disputes this conclusion.

17    b.   **Class #2:  Secured Claim of Pacific Premier Bank**

18    ***Classification:***  Class #2 consists of the secured claim

19 held by Pacific Premier Bank (the "Bank") in the amount of

20 $870,797.61 (the "Bank Debt") secured by the real property

21 located at 6514 Lankershim Boulevard, North Hollywood,

22 California (the "Property").

23    ***Treatment:***  Selden is current on all payments under the

24 Bank Debt and will continue to make payments under the terms of

25 the loan agreement.  The Bank will retain its prepetition lien

26 on the Property.  Class 2 is unimpaired and does not vote on

27 the Plan.

28

## 2.   Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), and (6) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  There are no Priority Claims in this case.

## 3.   Classes of General Unsecured Creditors

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a).  There is only one general unsecured non-priority claim filed by a non-insider, that of Debtor's attorneys, Norton Hubbard, in the amount of $42,289.48, which is owed.

### a.   Class #3:   Unsecured Claims (Non-Insiders)

*Classification*:  Class 3 consists of all non-priority, general unsecured claims asserted against the Debtors that are held by non-insiders.

*Treatment*:  Unless the person holding an allowed Class 3 claim and the Debtors agree otherwise, the person holding the claim will receive cash equal to the amount of the allowed Class 3 claim, plus post-petition interest on the face amount of the Allowed Claim at the federal judgment rate until paid.

*Timing*:  In the event that Debtor receives the Museum Advance, Class 3 creditors will receive an initial, *pro rata*, distribution up to the full amount of their Class 3 Allowed Claim from funds remaining after payment of the Orman Claim, Administrative Expenses, and Priority Unsecured Claims.  Debtor

1  will make the initial *pro rata* payment to Allowed Class 3

2  Claims from the Museum Advance 10 days follwing payment of the

3  Orman Claim, Administrative, and Priority Unsecured Claims.

4  The balance of Allowed Class 3 Claims will be paid quarterly

5  over a period not to exceed one year from all net proceeds

6  received by Debtor in connection with the Tennessee Museum

7  after payment of the balance of the Orman Claim, Administrative

8  Claims, and Priority Unsecured Claims, if any.

9          In the event Debtor does not receive the Museum

10  Advance, Class 3 Claims will be paid in full with interest from

11  proceeds of sale of the Memorabilia Collection after payment of

12  the Orman Claim, Administrative Claims, and Priority Unsecured

13  Claims on the Effective Date and no later than December 31,

14  2010.

15      Class 3 is an impaired class entitled to vote on the Plan.

16          **b.    Class #4:   Unsecured Claims (Insiders)**

17      ***Classification:***  Class 4 consists of all non-priority,

18  unsecured claims asserted against the Debtor that are held by

19  insiders.   Insiders include Todd Fisher, Hollywood Motion

20  Picture Experience LLC, Debbie Reynolds, and Freedom Farms.

21      ***Treatment:***  Class 4 claims will receive no distribution

22  under the Plan, will be unaffected by Confirmation, and will

23  remain as Claims against the reorganized Debtors.

24          **4.   Class of Interest Holders**

25      Interest holders are the parties who hold ownership

26  interest (i.e., equity interest) in the debtor.   If the debtor

27  is a corporation, entities holding preferred or common stock in

28  the debtors are interest holders.   If the debtor is a

- 21 -

1  partnership, the interest holders include both general and

2  limited partners.  If the debtor is an individual, debtor is

3  the interest holder.  The following section identifies the

4  Plan's treatment of the class of interest holders.

5            **a.    Class #5 (Selden Partnership Interests)**

6       ***Classification***: Class 5 consists of the Debtor's existing

7  legal and beneficial partnership interests.

8  ***Treatment***: Allowed Class 5 interests will be reinstated under

9  the Plan.  Class 5 is unimpaired and does not vote on the Plan.

10 **D.  Means of Performing Under the Plan**

11      The Debtor's Plan provides for the full payment of the

12 Orman Claim from (a) an advance paid in connection with the

13 establishment of the Tennessee Museum on or prior to the

14 Confirmation Date, or (b) from the proceeds of an auction of

15 the Memorabilia Collection or sale of the Memorabilia

16 Collection directly to a third party purchaser or purchasers

17 prior to December 31, 2010.  All other Claims will be paid from

18 funds available to Debtor from the Museum Advance and

19 subsequent royalty payments or from proceeds of sale of the

20 Memorabilia Collection as set forth above.

21      As described in the "Background" section above, Regions

22 Bank now owns Belle Island Village and has entered into an

23 agreement to sell the project to TIP.  The Reynolds Hollywood

24 Motion Picture Museum is intended to be the cornerstone and

25 anchor tenant of the Belle Island Village project.  TIP and

26 Fisher are currently negotiating a term sheet for the

27 establishment of the museum, and TIP understands that a key,

28

1  non-negotiable component of any agreement with the museum is an

2  upfront payment of $4 million (the "Museum Advance").

3      If the Museum Advance is not received by the Confirmation

4  Date, Debtor will immediately thereafter engage Christie's or

5  such other nationally recognized auction house, to wit Julien's

6  Auctions, Sotheby's, or Profiles in History, to conduct a

7  series of auction sales of the Memorabilia Collection.  The

8  identity of the auction house will be determined on or before

9  the confirmation of the Plan.

10     The first auction will take place no later than December

11 15, 2010 and will include not less than $5 million in value of

12 the Memorabilia Collection as determined by the auction house

13 conducting the sale.  Subsequent auctions will occur at

14 intervals of not more than six months and include not less than

15 $5 million of remaining inventory of the Memorabilia Collection

16 as determined by the auction house.

17     All net proceeds of the sale of the Memorabilia Collection

18 will be paid first to Orman up to the full amount of the Orman

19 Claim.  All other proceeds will be used to pay Allowed Claims

20 in order of priority under the Code.

21     Notwithstanding the above, the Debtors may in their sole

22 and reasonable discretion at anytime sell all or a portion of

23 the Memorabilia Collection directly to a third party purchaser

24 provided that the net proceeds of the sale of the Memorabilia

25 Collection are paid first to Orman up to the full amount of the

26 Orman Claim and, provided further that such sale shall be (1)

27 in an amount sufficient to pay all Allowed Claims, (2) at a

28 price equal to or greater than the appraised value of the items

1  being sold as set forth on Exhibit "1" to the Plan, or (3) by

2  stipulation of Orman and Debtor.

3      If Debtor fails to perform according to the terms of the

4  Plan, Orman may immediately thereafter proceed to schedule the

5  sale of the Memorabilia Collection in any commercially

6  reasonable manner.  In such an event, Debtor will cooperate

7  with Orman's efforts to sell the Memorabilia Collection and

8  Orman will account for any surplus funds generated from the

9  sales in excess of the Orman Claim, plus costs incurred, and

10  turn over to Debtor any sales proceeds in excess of his Claim

11  along with any remaining unsold memorabilia.

12      The total value of the Museum, Selden and Trust

13  collections is estimated to exceed $20 million.  The charts

14  below set forth an estimate of the total amount of claims to be

15  paid pursuant to the Plan.  The charts assume the Orman Claim

16  is paid off in full at the non-default rate of interest

17  according to the Plan at the specified dates.

18

19

20

21

22

23

24

25

26

27

28

**Confirmation Date (September 8, 2010)**

| | |
|---|---|
| Administrative claims:<br>(excluding Fisher administrative claim) | $  26,139.18 |
| Class 1 (Orman's Secured Claim): | $3,428,401.03 |
| Class 3 (General Unsecured Claims): | $  42,289.48 |
| **Total Amount of Claims** | **$3,496,829.69** |

**December 15, 2010 – Auction Date #1**

| | |
|---|---|
| Administrative claims: | $  26,139.18 |
| Class 1 (Oman's Secured Claim): | $3,502,484.77 |
| Class 3 (General Unsecured Claims): | $  42,289.48 |
| Estimated Post-Petition Interest on<br>Class 3 Claims | $      650.00 |
| **Total Amount of Claims:** | **$3,571,563.43** |

### E.    Disbursing Agent

The reorganized Debtor shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan.

The Disbursing Agent, unless otherwise specified, will make all distributions required under the Plan.  The reorganized Debtor, as Disbursing Agent, will be vested with full authority to take any action or execute and document relating to a conveyance or other transfer that the Debtor could have taken or executed.

### IV.

### RISK FACTORS

Class 3 Unsecured Creditors face the risk that the Memorabilia Collateral will decline in value, cannot be sold at