David Y. Farmer
State Bar No. 47764
**FARMER & READY**
A LAW CORPORATION
1254 Marsh Street
Post Office Box 1443
San Luis Obispo, CA 93406
Telephone: (805) 541-1626
Facsimile: (805) 541-0769

Mark A. Shaiken
Pro hac vice admission
**STINSON MORRISON HECKER LLP**
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-3204
Facsimile: (816) 691-3495

Attorneys for Creditor,
Gregory J. Orman

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>HOLLYWOOD MOTION PICTURE AND TELEVISION MUSEUM, a California Non-Profit Corporation,<br><br>HOLLYWOOD MOTION PICTURE TRUST, and<br><br>SELDEN ENTERPRISES LIMITED PARTNERSHIP,<br><br>          Debtors. | Case No. 9:09-bk-12311-RR<br>Chapter 11<br><br>Jointly Administered with:<br>Case No: 9:10-bk-10864-RR and<br>Case No: 9:10-bk-10865-RR<br><br>**DISCLOSURE STATEMENT WITH RESPECT TO CREDITOR'S FIRST AMENDED PLAN OF LIQUIDATION (JULY 1, 2010)** |
| [ ]    Affects all Debtors<br><br>[X]    Applies only to Hollywood Motion Picture and Television Museum<br><br>[ ]    Applies only to Hollywood Motion Picture Trust<br><br>[ ]    Applies only to Selden Enterprises Limited Partnership | Confirmation Hearing:<br>Date:    September 8, 2010<br>Time:   10:00 a.m.<br>Place:   1415 State Street<br>         Room 201<br>         Santa Barbara, CA |

# **Table of Contents**

I. INTRODUCTION .................................................................................................. 1

II. DISCLAIMER .................................................................................................... 2

III. HISTORY OF THE DEBTOR ........................................................................... 3

     A.    Background ................................................................................................ 3

     B.    The Secured Debt ..................................................................................... 5

     C.    Prebankruptcy Litigation ......................................................................... 7

          1.    California Litigation ..................................................................... 7

          2.    Kansas Litigation ......................................................................... 7

IV. POST-FILING DEVELOPMENTS ................................................................... 8

V. CURRENT FINANCIAL INFORMATION ........................................................ 9

     A.    Description and Value of Significant Assets ............................................ 9

     B.    Other Assets .............................................................................................. 9

VI. DISCUSSION OF CLAIMS, CLASSIFICATION AND IMPAIRMENT ......... 10

     A.    Administrative Claims and Priority Claims – Class 1 Claims ................ 10

     B.    The Allowed Orman Claim – Class 2 Claim .......................................... 10

     C.    Unsecured Claims – Class 3 Claims ....................................................... 11

     D.    Unsecured Claims of Insider Creditors – Class 4 Claims ...................... 11

     E.    Interest of the Debtor's owners – Class 5 Claims .................................. 11

VII. THE PLAN SUMMARY ................................................................................. 11

     A.    Plan Overview ......................................................................................... 11

     B.    The Bar Date ........................................................................................... 12

VIII. MEANS OF EFFECTUATING THE PLAN ................................................... 12

     A.    Auctioneer ............................................................................................... 12

     B.    Auction Process ....................................................................................... 15

     C.    Payment Agent and Payment of Claims ................................................. 16

IX. EXECUTORY CONTRACTS .......................................................................... 18

X. CASH REQUIREMENTS AND ADMINISTRATIVE EXPENSES ........................ 19

XI. CHAPTER 7 LIQUIDATION ANALYSIS ................................................... 19

XII. INSIDER AND AFFILIATE CLAIMS .................................................... 20

XIII. INSIDER COMPENSATION ............................................................ 20

XIV. ACCEPTANCE OF THE PLAN ......................................................... 20

XV. MISCELLANEOUS PLAN PROVISIONS AND EFFECT ........................... 21

XVI. TAX CONSEQUENCES ................................................................ 22

XVII. CAUSES OF ACTION ................................................................ 23

# Table of Authorities

Statutes

11 U.S.C. § 1124 .......................................................................20

11 U.S.C. § 1125(b) .....................................................................1

11 U.S.C. § 1126(f) ....................................................................20

11 U.S.C. § 1129(b) ....................................................................20

11 U.S.C. § 1129(b)(2)(B) ..........................................................20

11 U.S.C. § 1141 .......................................................................21

11 U.S.C. § 365 .........................................................................19

11 U.S.C. § 507(a)(4) .................................................................10

11 U.S.C. § 507(a)(8) .................................................................10

11 U.S.C. § 524(f) .....................................................................21

11 U.S.C. §§ 507(a) (3), (4), (5), and (6) ....................................10

1    Gregory J. Orman, a creditor in this case, hereby submits this Disclosure Statement with

2    respect to his First Amended Plan of Liquidation (July 1, 2010).

3    ## I.  INTRODUCTION

4    Gregory J. Orman has prepared this Disclosure Statement[1] (the "Disclosure Statement")

5    pursuant to the terms of the United States Bankruptcy Code to distribute to Creditors and other

6    parties in interest in order to disclose what Mr. Orman believes is relevant for Creditors to

7    make an informed judgment in exercising their right to vote on the Creditor's First Amended

8    Plan of Liquidation Dated July 1, 2010, (the "Plan") filed in conjunction herewith, and attached

9    hereto as Exhibit "A".  The definitions contained in the Plan apply to this Disclosure

10    Statement.  The reader should thoroughly review the Plan before reading this Disclosure

11    Statement.

12    Pursuant to 11 U.S.C. § 1125(b) of the Bankruptcy Code, the Bankruptcy Court has

13    approved this Disclosure Statement, after notice and a hearing.  The Court's approval of the

14    Disclosure Statement does not constitute an endorsement or recommendation of the Plan.

15    The Bankruptcy Court has set September 8, 2010 at 10:00 a.m. Pacific Time, before the

16    Honorable Robin Riblet, United States Bankruptcy Judge, Courtroom 201, 1415 State Street,

17    Santa Barbara, California, for a hearing on confirmation of the Plan.  If you are entitled to vote,

18    it is in your best interest to timely vote by completing the enclosed ballot and returning the

19    ballot in the enclosed envelope to David Y. Farmer, Farmer & Ready, P.O. Box 1443, San Luis

20    Obispo, CA 93406.  Your ballot must be received by August 23, 2010, at 4:00 p.m., Pacific

21    Time to be counted.  Additionally, you may object to the Plan if you choose to do so.

22    Any party in interest wishing to object to confirmation of the Plan shall file their written

23    objections with the Court by the electronic court filing system, and shall serve a copy thereof

24    on David Y. Farmer of Farmer & Ready at the address set forth above on or before August 23,

25    2010.  Objections not properly and timely filed, and timely served may be deemed waived.  Mr.

26

27    _____

28    [1]  Capitalized terms set forth herein that are not otherwise defined shall have the same
meaning as set forth in the Plan.  To the extent of any discrepancies between this Disclosure
Statement and the Plan, the Plan shall govern.

1  Orman's response to any objections to confirmation and a confirmation memorandum must be

2  filed and served on or before August 30, 2010.

3      No representations concerning the Debtor and the Plan other than as set forth in this

4  Disclosure Statement are authorized or approved by the Court.   Any representation or

5  inducement made to secure your acceptance or rejection of the Plan which is other than as

6  contained in this Disclosure Statement should not be relied upon by you in arriving at your

7  decision whether or not to object to the Plan.

8  **II. <u>DISCLAIMER</u>**

9      IN DRAFTING THIS DISCLOSURE STATEMENT, MR. ORMAN HAS USED

10 INFORMATION PROVIDED BY THE DEBTOR AND THEREFORE MR. ORMAN

11 CANNOT ASSURE THE ACCURACY OF ALL INFORMATION CONTAINED HEREIN.

12 RATHER, THIS DISCLOSURE STATEMENT REPRESENTS INFORMATION THAT THE

13 DEBTOR HAS REPRESENTED IS ACCURATE EITHER: (A) IN STATEMENTS TO THE

14 COURT, (B) IN PLEADINGS FILED IN THE CASE OR (C) IN WRITINGS SENT TO MR.

15 ORMAN.   ACCORDINGLY, THE DISCLOSURE STATEMENT DOES NOT REFLECT

16 THE INDEPENDENT FACTUAL REPRESENTATIONS OF MR. ORMAN EXCEPT AS IT

17 RELATES TO MR. ORMAN'S DEBT AND CANNOT BE RELIED UPON AS

18 STATEMENTS MADE BY MR. ORMAN.

19     MR. ORMAN PROVIDES THIS DISCLOSURE STATEMENT TO ALL KNOWN

20 HOLDERS OF CLAIMS AGAINST THE DEBTOR TO DISCLOSE ADEQUATE

21 INFORMATION TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED

22 JUDGMENT IN EXERCISING THEIR RIGHT TO VOTE FOR THE ACCEPTANCE OR

23 REJECTION OF THE PLAN.

24     YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS

25 MADE TO SECURE ACCEPTANCES OR REJECTIONS OF THE PLAN WHICH ARE

26 OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT IN ARRIVING AT

27 A DECISION TO OBJECT OR NOT TO OBJECT TO THE PLAN.   YOU SHOULD

28 REPORT ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS TO

1    THE ATTENTION OF COUNSEL FOR DEBTOR AND THE UNITED STATES
2    BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA
3    IMMEDIATELY.

4    THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY
5    PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.
6    NOTHING CONTAINED HEREIN SHALL BE DEEMED CONCLUSIVE ADVICE ON THE
7    LEGAL EFFECTS OF LIQUIDATION OF THE SALE ASSETS UPON THE HOLDERS OF
8    CLAIMS.

9    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE
10    MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN,
11    AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY
12    STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION
13    THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE
14    THE DATE THE DISCLOSURE STATEMENT WAS COMPLIED.

15    MR. ORMAN HAS NOT CONDUCTED, AND HE IS NOT AWARE THAT
16    ANYONE ELSE HAS CONDUCTED, AN INDEPENDENT AUDIT OF THE FINANCIAL
17    INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

18    FINALLY, MR. ORMAN EXPRESSLY DOES NOT WARRANT OR REPRESENT
19    THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE.

20    ### III. HISTORY OF THE DEBTOR[2]

21    **A.    Background**

22    Almost 40 years ago, when MGM filed its bankruptcy case, the Debtor's founder, Mary
23    Frances Reynolds ("Ms. Reynolds"), began collecting Hollywood memorabilia with the intent
24    of building a Hollywood motion picture museum. Later, when 20th Century Fox went out of
25    business, Ms. Reynolds was the largest purchaser of film artifacts from the related sale of 20th
26    Century Fox assets. Today, the collection of memorabilia controlled by Ms. Reynolds and her

27
28    _____
     [2]    Reference should be made to the Debtor's disclosure statement filed in the Case for a
     discussion of the Debtor's view and contentions regarding its background and the history,
     nature, and extent of Mr. Orman's Claim.

1    various entities, including the Debtor, numbers in excess of 3500 costumes and other items

2    from various motion pictures (hereinafter collectively referred to as the "Collection") [3]    The

3    portion of the Collection owned by the Debtor is referred to as the "Assets."

4        In 1993, Ms. Reynolds purchased a hotel in Las Vegas and decided to open a museum

5    on the premises.    Under the terms of the agreement between the hotel and the Debtor, the

6    Debtor provided the Assets under a licensing agreement to a production company that produced

7    a show incorporating the Collection, including the Assets.    The Debtor received profits from

8    this endeavor, which it used to restore more Assets.

9        In 1997, after the hotel commenced its own bankruptcy case, the hotel was sold in a

10   bankruptcy sale to a third party and the museum closed.    In 1998 in conjunction therewith, the

11   Debtor moved substantially all of the Assets to a warehouse in Creston, California that was

12   built specifically to maintain the memorabilia.    The warehouse was built on a ranch owned by

13   Todd Fisher, Ms. Reynolds' son.    A portion of the Assets is also stored in a warehouse in North

14   Hollywood, California    Mr. Fisher advises that he leases the warehouse to the Debtor, but the

15   Debtor has not paid rent for a significant period of time.

16       In 2002, the Debtor attempted to develop a museum in Los Angeles, California at a

17   retail complex known as Hollywood and Highland    In 2003, the Debtor defaulted on its lease

18   obligations with the landlord, Trizec Hahn, and litigation ensued between the Debtor and the

19   landlord. The Debtor defaulted on its lease obligations, in part, because it was not able to raise

20   sufficient permanent financing to construct and operate a museum.

21       Later, the Debtor began working with the developers of a project called Belle Island,

22   located in Pigeon Forge, Tennessee.    In 2009, prior to the completion of a facility to showcase

23   the Collection, the owner of the Belle Island development commenced a bankruptcy case    In

24   that case, Region's Bank, the Debtor's secured lender, was granted relief from the automatic

25   stay, foreclosed on the property, and took possession of it.

26

27   [3]  The Collection is owned by three principal entities, including the Debtor, Selden Enterprises
     Limited Partnership (hereinafter "Selden") and the Hollywood Motion Picture Trust (hereinafter
28   the "Trust").    The specific items of the Collection owned by the Debtor are enumerated in the
     Debtor's bankruptcy schedules

1   After the Region's Bank foreclosure, the Debtor entered into discussions with parties

2   potentially interested in acquiring Region's Bank's interest in the property but, to date, no

3   agreement has been consummated, the project is uncompleted, and the Debtor has no facility to

4   showcase the Collection.

5   **B.    The Secured Debt.**

6   On September 4, 2002, Mr. Orman loaned $1.1 million to the Debtor evidenced by a

7   promissory note ("Note 1"). Of the loan amount, $1 million represented the actual cash

8   advanced by Mr. Orman to the Debtor and $100,000.00 represented a loan origination fee that

9   was capitalized as part of the loan transaction. Note 1's maturity date was February 28, 2003,

10  but the Debtor had the right to extend the maturity date an additional 6 months by paying a

11  $100,000.00 extension fee. Note 1 also contained a provision for 10% in annual interest and

12  required Debtor to pay all costs and expenses associated with the loan transaction. Mr. Orman

13  was also to receive a royalty interest in any attraction developed by the Debtor.

14  Rather than pay the $100,000.00 extension fee in cash, Mr. Orman and the Debtor

15  amended and restated Note 1, extended the maturity date of Note 1 by capitalizing the

16  $100,000.00 extension fee, and committed to advance an additional $1 million to the Debtor,

17  all as evidenced by an Amended and Restated Promissory Note dated March 18, 2003 ("Note

18  2"). Note 2 contained the same basic terms as Note 1, including: (i) 10% annual interest

19  charges, (ii) a 10% origination fee on the additional loan commitment, and (iii) a six month

20  loan maturity. In addition, Note 2 provided an additional $1 million in loan commitments.

21  Upon execution of Note 2, Mr. Orman immediately advanced $600,000.00 and later advanced

22  an additional $400,000.00. Note 2 matured pursuant to its terms on September 15, 2003.

23  Subsequent to the maturity of Note 2, Debtor paid to Secured Lender $407,178.08 in principal

24  and interest. With the exception of that payment, no other payments have been made by the

25  Debtor to Mr. Orman. The principal balance due and owing after the application of that sole

26  payment was $2,020,000.00.

27  From September 15, 2003, to May, 2005, the Debtor and Mr. Orman discussed how the

28  growing indebtedness would be repaid. On May 1, 2005, the Debtor and Mr. Orman entered

1    into a Forbearance Agreement. The terms of the Forbearance Agreement essentially restated

2    and extended the financial terms of Note 1 and Note 2 with two primary exceptions: (i) instead

3    of charging a 10% loan fee every 6 months and 10% annual interest, Mr. Orman's return was

4    consolidated in the form of a 30% contract rate of interest rate, and (ii) Mr. Orman's royalty

5    interest was eliminated. Under the terms of the Forbearance Agreement, Mr. Orman also

6    agreed to forbear from pursuing his various remedies to collect the debt owing for a period of

7    time. The Forbearance Agreement expired by its own terms on July 15, 2005. After the

8    Forbearance Agreement expired, interest on the outstanding obligation did not rise, but rather

9    continued at the 30% rate provided for in the Forbearance Agreement and the return to Mr.

10   Orman continued at the same pre forbearance rate of 30%.

11        The Debtor's obligations under Notes 1, 2 and the Forbearance Agreement were

12   secured by two security agreements which granted Mr. Orman a first priority security interest in

13   all of the Debtor's property then owned or thereafter acquired: (i) a Security Agreement dated

14   September 4, 2002, ("Security Agreement 1") and an Amended and Restated Security

15   Agreement dated March 18, 2003, ("Security Agreement 2") Principally, the collateral under

16   each security agreement was and is the Assets.

17        These security interests were properly perfected by the filing of UCC-1 financing

18   statements, amendments and continuation statements with the California Secretary of the State

19   as: (a) Document 0224160830, filed August 29, 2002, amended by Document 02252C0384,

20   filed September 9, 2002, with the Secretary of State of the State of California and continued by

21   Document 07-71067446 filed March 19, 2007, and (b) Document 03072C0021 filed March 12,

22   2003.

23        When Security Agreement 1 was executed, the Debtor represented that it owned the

24   entire Collection. Prior to the execution of Note 2, the Debtor acknowledged that it did not

25   own the entire Collection as had been represented in Security Agreement 1. Rather, the Debtor

26   stated that portions of the Collection were owned by Selden and the Trust. As a result of these

27   communications, and as further security for the obligations owed by Debtor, Security

28   Agreements were executed by Selden ("Security Agreement 3") and the Trust ("Security

Agreement 4") pledging their respective interests in the Collection to Mr. Orman to secure the Debtor's obligations. These additional grants of security interests were perfected and continued by the filing of a UCC-1 financing statement and continuation statement (i) as to Selden, with the Nevada Secretary of State as Document 2003007203-5 on March 12, 2003, and Document 2007030353-9 on September 17, 2007, and (ii) as to the Trust, with the Secretary of State of the state of California, as Document 0307260003 on March 12, 2003, and Document 07-71291623 on September 17, 2007.

The Debtor has been in default of its obligations under Note 1, Note 2, and the Forbearance Agreement since September 15, 2003. As of March 17, 2010, there is due, owing and unpaid the sum of $2,020,000.00 in principal and $3,862,891.00 in interest. Interest continues to accrue at $1,660.27 per day. Under the terms of Note 1, Note 2, and the Forbearance Agreement, Mr. Orman is also entitled to an award of reasonable attorney fees Secured Lender has retained the firm of Farmer & Ready, the firm of Stinson Morrison Hecker LLP, and the firm of Mustoe Carter, LP, as attorneys in order to assist it in enforcing the terms of Note 1, Note 2, the Forbearance Agreement and the various security agreements.

**C.    Prebankruptcy Litigation**

1    California Litigation

Years of discussion with the Debtor did not result in any repayment of the debt to Mr. Orman; as a consequence, on June 27, 2007, Mr. Orman initiated litigation in the Superior Court for the State of California, County of San Luis Obispo as action number CV070565. Dismayed by the slow progress of that suit, Mr. Orman voluntarily dismissed that action on December 15, 2008 and refiled the action in Kansas, the forum of choice in the various loan documents.

2.    Kansas Litigation

Mr. Orman filed Case No. 08CV06262 in state court in Johnson County, Kansas, on July 30, 2008, against the Debtor, Selden, and the Trust (collectively the "Defendants"). The Debtor, the Trust and Selden filed a Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, based on the Doctrine of Forum Non Conveniens which motion was denied by

1    the trial court who then set the case for a two-day trial beginning June 29, 2009  The trial was

2    delayed by the commencement of the Debtor's Bankruptcy Case.

3         In conjunction with the commencement of this Bankruptcy Case, the Debtor removed

4    the state court action to the federal District Court for the District of Kansas, Case No. 09-CV-

5    2333 and moved to transfer venue of the case to this Court  Mr Orman opposed the removal

6    and requested transfer, and on September 8, 2009, U.S. District Court Judge for the District of

7    Kansas, John Lungstrum, ruled that removal of the claims against defendants Trust and Selden

8    was improper and denied defendants' motion to transfer.  The district court judge specifically

9    relied on the contracts' forum selection clauses, all of which selected Kansas as the forum (and

10   provided for Kansas choice of law).  The district judge also remanded the case against the

11   Debtor back to the trial court in Kansas, thought the action against the Debtor was stayed by the

12   Debtor's bankruptcy filing.

13        Following argument on December 10, 2009, the trial court judge ruled that Kansas law

14   applied and was prepared to try the cases against the Trust and Selden  The Trust and Selden

15   sought leave to appeal the trial court's rulings and on February 16, 2010, the Kansas Court of

16   Appeals (Appellate Case No. 10-103761-A) rejected the application for appeal  A new trial

17   date was set for April 23, 2010, and, as a result, the Trust and Selden commenced their own

18   Chapter 11 bankruptcy cases as referenced hereafter.  On June 22, 2010, the Trust voluntarily

19   dismissed its bankruptcy case, conceding it was not an eligible debtor under the Bankruptcy

20   Code.

21                          **IV. POST-FILING DEVELOPMENTS**

22        Since the Commencement Date, the Debtor has complied with its obligations to the

23   Office of the United States Trustee and made filings in accordance with the requirements of

24   that Office; it sought and obtained approval for the employment of the firm of Michaelson, Susi

25   & Michaelson, a Professional Corporation, as its counsel in this case

26        Mr Orman filed a Motion for Relief from Stay asking for permission to proceed with

27   litigation against the Debtor and against Selden and the Trust in an action pending in state court

28   in Kansas. Relief was denied.  An effort to enjoin Mr. Orman's Kansas state action against

1    Selden and Trust was rejected by this Bankruptcy Court. Mr. Orman proceeded with litigation

2    against Selden and the Trust until Selden and Trust filed their own Chapter 11 bankruptcy

3    proceedings as case numbers 9:10-BK-10864-RR and 9:10-BK-10865-RR, respectively, in the

4    Central District of California, Northern Division on February 24, 2010. As a result of those

5    filings, Mr. Orman's state court action is stayed. As set forth above, the Trust has now

6    dismissed its bankruptcy case. As a consequence Mr. Orman intends to proceed to trial against

7    the Trust in Kansas. In the Kansas Action against the Trust, Mr. Orman will seek a ruling that

8    the Trust's assets secure the full amount of the debt set forth in his proof of claim, not a lesser

9    amount that may be paid by the Debtor to Mr. Orman in the Bankruptcy Case.

10                       **V.  CURRENT FINANCIAL INFORMATION**

11   **A.     Description and Value of Significant Assets**

12          The Assets owned by the Debtor are set forth in its Schedules and Statement of

13   Financial Affairs filed with the Court. In the Schedules, the Debtor has attributed values to the

14   Assets, which consist largely of that portion of the Collection owned by the Debtor, and while

15   the Debtor has not had the Assets independently appraised, Mr. Orman does not dispute these

16   values for purposes of the Plan.[4] Rather, because the Plan proposes to sell the Assets pursuant

17   to the direction of an expert auctioneer, these values set forth in the Schedules are largely

18   irrelevant because the marketplace will determine the true worth of the Assets to be sold under

19   the Plan.

20   **B.     Other Assets**

21          The Debtor owns no real property. Further the Debtor operates no business and as such

22   is neither accruing new obligations (other than accrual of interest obligations) nor is it

23   generating any income. As a consequence, Mr. Orman believes the Debtor has little or no cash.

24          The Debtor has office equipment as identified in the original bankruptcy Schedules

25   filed by the Debtor, but the Debtor has placed a value of only $10,000.00 on that equipment.

26   / / /

27   / / /

28   _____

[4]  The Debtor has placed a value on the Assets of $10,793,803.00.

## VI. DISCUSSION OF CLAIMS, CLASSIFICATION AND IMPAIRMENT

The following discussion of the Claims against the Debtor, their classification under the Plan, and whether such classes are impaired is set forth in categories, representing different priorities of claims as established in the Bankruptcy Code.

### A.    Administrative Claims and Priority Claims – Class 1 Claims

Administrative Claims consist of fees and expenses incurred by counsel for the Debtor in this Chapter 11 case and quarterly fees owed to the United States Trustee.  The Debtor estimates that these expenses, as allowed, will be:

Debtor's Counsel:

Michaelson, Susi & Michaelson,

| | |
|---|---|
| A Professional Corporation | $250,000 (estimated) |
| United States Trustee Fees | less than $500.00 |
| Total Administrative Claims | $250,500.00 (estimated) |

All professional fees and expenses are subject to bankruptcy court approval.

Mr. Orman does not believe there are any priority tax claims owing under 11 U.S.C. § 507(a)(8) of the Bankruptcy Code, and further does not believe that there are any other priority claims.

Certain priority claims that are referred to in 11 U.S.C. §§ 507(a) (3), (4), (5), and (6) of the Bankruptcy Code are required to be placed in classes.  Mr. Orman is aware of only one priority claim that has been filed – by Todd Fisher – for wages he asserts are entitled to priority treatment under 11 U.S.C. § 507(a)(4) of the Bankruptcy Code, up to the statutory maximum of $10,950.00 (the "Fisher Priority Claim").  To the extent the Fisher Priority Claim becomes an Allowed Claim, it is entitled to be paid in full.

### B.    The Allowed Orman Claim – Class 2 Claim

Mr. Orman believes that his is the only secured claim and is in the amount of $5,516,845.99, as of June 12, 2009 plus accruing interest and attorneys fees as discussed above.  It is classified as the Class 2 Claim.  Mr. Orman's rights are altered under the Plan and therefore, his claim is impaired.

**C.      Unsecured Claims – Class 3 Claims**

Unsecured claims of non-insiders creditors are classified as Class 3 claims. As set forth hereafter, the rights of Class 3 Claims are altered under the Plan and therefore such claims are impaired.

**D.      Unsecured Claims of Insider Creditors – Class 4 Claims**

Unsecured claims of insider creditors are classified as Class 4 claims. As set forth hereafter, the rights of class 4 Claims are altered under the Plan and therefore, such claims are impaired.

**E.      Interest of the Debtor's owners – Class 5 Claims**

The Debtor is a not-for-profit corporation and may or may not have actual owners. To the extent there are owners of the Debtor, they will retain their interests in the Debtor only if Class 3 Claims and those Class 4 Claims that elect to be paid, are paid in full. Otherwise, such ownership interests under the Plan are canceled. As a consequence, the rights of the holders of Class 5 interests, if any, are altered under the Plan and such interests are impaired.

## VII. THE PLAN SUMMARY

**A.      Plan Overview**

Under the Plan, Julien's Auctions (described below) will determine how many and which of the Assets should be auctioned off to pay creditors (and the Beneficial Owners of the Debtor if they so choose) using its expertise to determine the best method to conduct the Auction such that the sale will yield the greatest recovery by the sale of the fewest Assets. The net proceeds will then be delivered to a Payment Agent[5] appointed upon confirmation of the Plan, and the Payment Agent will pay the Allowed Claims in the classes described above as soon as is practicable, provided however, that to the extent an Administrative Claim becomes an Allowed Administrative Claim, or the Fisher Priority Claim becomes an Allowed Claim, before the Payment Agent receives sufficient funds to pay such Allowed Claims, Mr. Orman

---

[5]  The proposed Payment Agent is Farmer & Ready, and Mr. Orman shall be responsible for payment to the Payment Agent for services rendered.

1    will advance sufficient funds to the Payment Agent to pay such claims as they become Allowed

2    Claims as set forth below.

3        If the net sale proceeds are insufficient to pay in full the Allowed Class 3 Claims and

4    each Allowed Class 4 claim that has made an election to be paid, Julien's may identify

5    additional assets to sell by a subsequent auction. If all of the Assets are sold and there is still

6    insufficient proceeds to pay all Allowed Class 3 Claims and all Allowed Class 4 that have

7    elected to be paid in full, then the Interests, if any, shall be cancelled and any such holders of

8    Interest shall not receive or retain any property or anything else of value as a consequence of

9    this Plan.

10   **B.**    **The Bar Date**

11       December 15, 2009, was fixed as the last day to file proofs of claim, including

12   amendments thereto.    Any proof of Claim or amendment thereto not timely filed shall be

13   disallowed.

14   ## VIII. MEANS OF EFFECTUATING THE PLAN

15   **A.**    **Auctioneer**

16       Mr. Orman believes that Julien's is uniquely qualified to conduct the Auction. From its

17   website, Julien's describes itself, its expertise, and its experience in conducting auctions as

18   follows:

19       "With expertise specializing in entertainment memorabilia and high profile estate

20   auctions, Julien's has quickly established itself as the premier auction house in high-end

21   celebrity estate and entertainment auctions. Julien's Auctions presents exciting, professionally

22   managed and extremely successful auctions with full color high quality auction catalogs unlike

23   any other auction company. Previous auctions include the collections of U2, Cher, Madonna,

24   Barbra Streisand, Michael Jackson, Muhammad Ali, Debbie Reynolds, the estates of Marilyn

25   Monroe, Bob Hope, Mary Pickford, and many more.

26       "Julien's Auctions has conducted co-branded auctions with Sotheby's and Christie's in

27   addition to partnering with the most recognized and respected brands in the world. In 2004

28   Julien's Auctions partnered with Christie's auction house to create one of the most successful

multi-consignor sales of entertainment memorabilia ever offered with a sale total of more than 2.1 million dollars. In the fall of 2006 Julien's Auctions partnered with Sotheby's auction house to conduct property from the life and career of Cher with a sale total of over 3.5 million dollars. Julien's Auctions now includes the sale of jewelry, fine and decorative arts and other high end property in additional to memorabilia offering a full service to our celebrity clients. Julien's Auctions has conducted multiple sales with Gibson Guitar establishing the company as the premier venue for guitars and Rock "N" Roll ephemera. In the spring of 2007 Julien's conducted the largest multi-consignor sale to date for Rock "N" Roll memorabilia. The total sale of 2.4 million dollars featured property consigned by The Edge and other band members of U2. One of the many highlights in the sale was the Jimi Hendrix' studio guitar for $480,000.00

- Additional sale highlights for Julien's Auctions include:
- George Harrison's Gibson SG from 1966-1969: $560,000.00
- George Harrison's Rosewood Telecaster from the famous Apple rooftop performance: $460,000.00
- U2's The Edge's Gibson Les Paul: $288,000.00
- Bono's Trademark Green Gretch Guitar: $220,000.00
- U2's The Edge's Necklace Worn in "The Fly" Video: $27,000.00
- Bono's Sunglasses: $24,000.00
- U2's The Edge Video Worn "U2" Rings: $33,750.00
- U2's The Edge Stage Played Gibson Explorer: $150,000.00
- Bob Dylan's Concert Used Guitar: $192,000.00
- Elvis Presley's Gold Gun: $28,800.00
- Elvis Presley's Microphone from The Louisiana Hayride: $15,000.00
- John Lennon's Sunglasses: $36,000.00
- Kurt Cobain's Stage Worn Jacket: $87,000.00
- Nirvana's MTV Award: $40,800.00
- John Lennon's White Suit From Abbey Road: $117,600.00
- Jimi Hendrix Studio Used Guitar: $480,000.00

1

- Paul McCartney Hand Painted Gibson Epiphone: $81,800.00

2

- Sir Paul McCartney Signed Gibson Guitar Sculpture: $175,400.00

3

- Bill Clinton Signed Saxophone: $60,800.00

4

- Herb Ritts Original Camera: $190,000.00

5

- Elvis Presley's Country Gentleman Gretsch Guitar: $180,000.00

6

- David Gilmour Owned and Played Guitar: $72,000.00

7

- Beatles Four DA Millings Suits from Madame Tussaud's: $144,000.00

8

- Jerry Lee Lewis Baldwin Custom Flame Piano: $84,000.00

9

- Alfred Hitchcock's 1954 Original Passport: $19,200.00

10

- Marilyn Monroe's Umbrella from 1949 Andre de Dienes Photo Shoot:

11

$42,000.00

12

- Marilyn Monroe's Personal Phonebook: $90,000.00

13

- Douglas Fairbanks Jr. Love Letters to Mary Pickford: $28,800.00

14

- Cher's Van Cleef & Arpels Platinum and Diamond Necklace: $90,000.00

15

- Cher's Scarisbrick Hall Gothic Pugin Bed: $84,000.00

16

- Jerry Seinfeld's Puffy Shirt: $16,500.00

17

- Julia Roberts Outfit from "Erin Brockovich": $18,500.00

18

- Dean Martin Stage Worn Tuxedo: $20,000.00

19

- Alfred Hitchcock's California Drivers License: $8,125.00

20

- Marilyn Monroe Signed Photograph: $15,625.00

21

- Marilyn Monroe High Heeled Black Pumps: $15,000.00

22

- Two 8 MM Reels of Behind the Scenes Footage of "The Misfits": $60,000.00

23

- Duke and Duchess of Windsor Inscribed Photograph: $27,500.00

24

- Bob Hope's Raised Panel Executive Desk: $19,200.00

25    "Julien's Auctions continues to present exciting televised auctions developing new

26    markets around the world. Highlights tour Japan, London, Ireland, New York, Los Angeles,

27    Santiago and many more cities exposing the collections being offered to a global platform

28    Julien's experience and expertise in this field has established the company as the worldwide

1  leader and premiere venue for the sale of high end entertainment property and celebrity

2  estates."

3          Reference    is    made    to    Julien's    website    for    further    information:

4  *http.//www.juliensauctions.com*.

5  **B.        Auction Process**

6          In order to effectuate this Plan, there must be an auction of sufficient Assets to pay

7  creditors, insiders if they so elect, and the Beneficial Owners of the Debtor if they so choose

8  (the "Sale Assets") by Julien's on such terms and conditions as Julien's determines, in its

9  expert opinion, are appropriate to meet the Best Yield Requirements with the following general

10  guidelines:

11          1.    Julien's shall sell the Sale Assets at the Auction.  The Sale Assets shall be

12  offered "as is and where is" with no representations as to condition.

13          2.    Julien's shall utilize such marketing materials as it deems appropriate including

14  a color brochure.

15          3.    The Debtor, its owners, agents, landlord, representatives, insiders, and affiliates,

16  shall make the Sale Assets available to Julien's for photography of such assets on the premises

17  where they are located, and for subsequent transportation:  (i) on a tour domestically and

18  internationally to generate interest in the Sale Assets and then (ii) to the location of the

19  Auction.  The Debtor shall also cooperate with Julien's during the development of any Auction

20  materials to ensure Julien's has the best possible and most accurate information about the Sale

21  Assets.

22          4.    Julien's shall purchase an Insurance Policy before transporting the Sale Assets

23  pursuant to the Plan.

24          5.    The Auction shall be advertised, promoted, and conducted in a manner that

25  Julien's determines meets the Best Yield Requirements.  Julien's shall qualify bidders to be

26  eligible to bid and shall make the Sale Assets available for inspection by potential bidders

27  under such terms and conditions as Julien's determines meets the Best Yield Requirements.

28  ///

6.    The Auction shall be conducted in such city or cities as Julien's deems appropriate to meet the Best Yield Requirements.

7.    At the Auction, Mr. Orman shall be deemed to have waived his right to credit bid all or a portion of his claim for any one or more of the Sale Assets.

8    Julien's shall submit a preliminary list of the Sale Assets that shall be filed by Mr. Orman with the Court within ten (10) days before the Confirmation Hearing Date, and a final list of the Sale Assets, that shall be filed by Mr. Orman with the Court within thirty (30) days after the Confirmation Hearing Date.

9.    At the Auction, Julien's shall cease selling Sale Assets upon generating sufficient Net Sale Proceeds (as defined in the Plan) to pay:    (i) all Class 1 Claims in full, (ii) then the Class 2 Claim in full, (iii) then all Class 3 Claims in full, (iv) then each Class 4 Claim that has made a Class 4 Election in full, and (v) then the Beneficial Owners of the Debtor is they so choose (collectively the "Sale Claims")   For purposes of this section, Julien's shall sell sufficient Sale Assets to pay all such Claims in full, whether such Claims are Allowed Claims or Undetermined Claims and upon request of the Class 4 members, Julien's may continue to sell the Sale Assets at the Auction for the benefit of the Beneficial Owners of the Debtor after the Sale Claims have been paid in full.

10.   If, after the Auction, Julien's has not generated sufficient Net Sale Proceeds (as defined hereafter) to pay the Sale Claims, it shall submit an additional list of Assets to be sold at a subsequent Auction (the "Subsequent Auction"), which Subsequent Auction shall be conducted under the sale terms, conditions, and requirements as the Auction.   Such additional assets shall be deemed to be Sale Assets for all purposes under the Plan.

11    From the Sale Proceeds, Julien's shall (i) first pay the costs of the Auction and its commission, and (ii) second deliver the remaining proceeds (the "Net Sale Proceeds") to the Payment Agent for distribution pursuant to Article V of the Plan

**C.    Payment Agent and Payment of Claims**

At the time, and to the extent, that an Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to all distributions under this Plan and pursuant to the

terms of any Final Order of the Court with respect to such claim or interest. Objections to Priority Claims and Classes 2-4 Claims must be filed within sixty (60) days of the entry of the Confirmation Order, unless such deadline is extended by order of the Court. All requests for the allowance of Administrative Claims must be filed within fourteen (14) days after entry of the Confirmation Order. All objections to such claims must be filed within thirty (30) days after the filing of a request for the allowance of such claims.

As of the Effective Date, the Debtor shall deliver all Cash on Hand to the Payment Agent. The Payment Agent shall take such steps as he deems appropriate to assure that the Cash on Hand is good, collected funds.

Allowed Administrative Expense Claims and the Allowed Fisher Priority Claim shall be paid by the Payment Agent on the later of the Effective Date and the entry of a Final Order determining the allowed amount of such Claims. To the extent that an Administrative Claim becomes an Allowed Administrative Claim, or the Fisher Priority Claim becomes an Allowed Claim, before sufficient Net Sale Proceeds and Cash on Hand are delivered to the Payment Agent to pay such Allowed Claims, Mr. Orman shall advance the Payment Agent the funds sufficient to pay such Allowed Claims and the allowed Allowed Orman Claim shall be increased by the amount of such an advance, and shall be treated as part of the principal portion of the Mr. Orman's indebtedness as set forth in his proof of claim 3-1 filed in the Case.

Allowed Class 2 and 3 Claims, and the Allowed Class 4 Claims that have made the Class 4 Election shall be paid by the Payment Agent as soon as practicable after the completion of the Auction and the delivery of the Net Sale Proceeds to the Payment Agent. In payment of the Allowed Claims, the Payment Agent shall have the absolute right to rely on the Debtor's schedules and filed proofs of claims, and the provisions of this Plan related thereto, and shall incur no liability whatsoever for payment of Claims in accordance with the schedules and proofs of claims as filed.

To the extent a proof of claim is not filed as of the earlier of any bar date and 8:00 a.m. Pacific Time on the Confirmation Hearing Date, it shall not be eligible for distributions under this Plan.

1    The Payment Agent shall hold all funds prior to distribution in a federally insured
2    interest bearing account or certificate of deposit, and, as applicable, shall either: (i) pay such
3    Claim when it becomes an Allowed Claim under the terms of this Plan; or (ii) to the extent the
4    Undetermined Claim is not an Allowed Claim, use such funds to pay other Allowed Claims
5    under this Plan that have not been paid in full or if all Allowed Claims have been paid in full,
6    then pay such funds to the Debtor.

7    If there are insufficient Net Sale Proceeds to pay the Allowed Class 3 Claims in full,
8    then from the funds to be distributed to the Allowed Orman Claim, the Payment Agent shall
9    pay the Allowed Class 3 Claims the lesser of (a) $90,000.00 and (b) the shortfall in payment in
10   full of the Allowed Class 3 Claims. To the extent there is insufficient cash to pay all Allowed
11   Claims of a particular class, available cash shall be paid to each holder of an Allowed Claim in
12   such class on a Pro Rata basis, subject to any agreements governing distribution and/or
13   subordination.

14   If the Net Sales Proceeds are insufficient to pay in full the Allowed Class 3 Claims and
15   each Allowed Class 4 Claim that has made a Class 4 Election, then the Interests shall be
16   canceled and the holders of interests shall not receive or retain any property or anything else of
17   value as a consequence of this Plan.

18   Finally, for purposes of the Plan, an Allowed Claim is "paid in full" as follows: (a)
19   with respect to the Allowed Orman Claim, when it has been paid the amount set forth in the
20   proof of claim no. 3-1 filed by Mr. Orman pursuant to, and calculated as set forth in, the terms
21   of the loan documents described therein and the definition of "Allowed Orman Claim" in this
22   Plan; and (b) with respect to the Allowed Class 3 Claims, and the Allowed Class 4 Claims that
23   have made a Class 4 Election, the amount of such claims as of the Commencement Date plus
24   interest at the rate of 10% per annum from the Effective Date to the date of payment.

25   ## IX. EXECUTORY CONTRACTS

26   Within ten days after the entry of an order approving the Disclosure Statement, the
27   Debtor shall file a list of executory contracts and unexpired leases it wishes to assume
28   (collectively the "Assumed Executory Contracts"). Upon entry of the Confirmation Order, the

Debtor shall be deemed to have assumed the Assumed Executory Contracts and shall be solely responsible for any cure obligations owing and performance due thereunder, and any other requirements imposed for assumption of executory contracts and unexpired leases as set forth in 11 U.S.C. § 365 of the Bankruptcy Code. Any cure payments and payments related to performance of the Assumed Executory Contracts shall not be made from the Sale Assets and the Net Sale Proceeds. Upon assumption of the Assumed Executory Contracts, the Debtor shall not be discharged from any obligations owing thereunder. To the extent the Debtor does not assume an executory contract or unexpired lease, such contract or lease shall be deemed rejected as of the entry of the Confirmation Order (the "Rejected Contract"). Any party to a Rejected Contract that wishes to file a proof of claim must do so within thirty (30) days after the entry of the Confirmation Order (the "Rejected Contract Claims"). Rejected Contract Claims of insiders of the Debtor shall be treated as Class 4 Claims; Rejected Contract Claims of parties who are not insiders of the Debtor shall be treated as Class 3 Claims.

## X.  CASH REQUIREMENTS AND ADMINISTRATIVE EXPENSES

Mr. Orman believes that before the completion of the Auction, the Debtor will have insufficient cash reserves to pay Administrative Claims and the Fisher Priority Claim on the later of the Effective Date and the date such claims become Allowed Claims. Consequently, Mr. Orman has agreed to advance sufficient funds to pay Administrative Claims and the Fisher Priority Claim if and to the extent such claims become Allowed Claims before the Payment Agent receives sufficient Net Cash Proceeds to make distributions on those claims.

## XI.  CHAPTER 7 LIQUIDATION ANALYSIS

Mr. Orman believes that the Plan provides a result for creditors and interest holders that is superior to a Chapter 7 liquidation. First, the expense of a Chapter 7 trustee and the trustee's fees will be avoided by conducting the auction in the context of a Chapter 11 plan. Second, Mr. Orman has already identified Julien's as an auctioneer and has received a commitment from Julien's to serve as the auctioneer in a prompt and efficient manner. Third, in a Chapter 7 case, the liquidation of assets would occur much more slowly, without a greater return, and possibly at a lower return. Fourth, in a Chapter 7 case, the trustee might decide that he or she

1   could not sell the Assets in a manner that would generate funds to pay any creditors other than

2   Mr. Orman, resulting in little or no distribution to unsecured creditors. Finally, a Chapter 7

3   trustee would need to complete his final report and accounting before creditors other than the

4   Orman claim could be paid and thus there would be a delay in payment. Mr. Orman believes

5   that the Plan will pay holders of Allowed Claims at least as much as they would receive in a

6   Chapter 7 liquidation case.

7   ## XII. INSIDER AND AFFILIATE CLAIMS

8   It has been the expressed desire of the insiders of the Debtor to avoid selling the Assets,

9   or at least minimize the amount of the Assets that are to be sold. As a consequence, to address

10   this concern of the insiders, the Plan gives insiders the opportunity to file a Class 4 election to

11   be paid from asset sale proceeds. If such an election is timely made, additional assets will be

12   sold to pay such insider claims. If such an election is not timely made, additional assets will

13   not be sold, the Debtor will retain those assets, and the insiders will be deemed to have waived

14   any objections to the Plan under 11 U.S.C. § 1129(b)(2)(B) of the Bankruptcy Code.

15   ## XIII. INSIDER COMPENSATION

16   There has been no insider compensation paid during the course of this case.

17   ## XIV. ACCEPTANCE OF THE PLAN

18   Pursuant to 11 U.S.C. § 1126(f) of the Bankruptcy Code, holders of Claims which are

19   not impaired by the Plan are conclusively presumed to have accepted the Plan and need not

20   vote on the Plan. Class 1 claims are unimpaired by the Plan and, therefore, holders of such

21   Claims are presumed to have accepted the Plan and need not vote on the Plan.

22   Claims which are impaired under the Plan as defined in 11 U.S.C. § 1124 of the

23   Bankruptcy Code shall be entitled to vote on the Plan. An impaired Class shall have accepted

24   the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims

25   of the Class actually voting have accepted the Plan.

26   A Plan may be confirmed over the objection of an impaired Class pursuant to the

27   provisions of 11 U.S.C. § 1129(b) of the Bankruptcy Code if at least one impaired Class has

28   accepted the Plan.

## XV.  MISCELLANEOUS PLAN PROVISIONS AND EFFECT

The rights afforded in this Plan and the treatment of all Claims shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever against the Debtor.  Except as otherwise set forth in the Plan or the Order confirming the Plan, on the Effective Date the Debtor shall be deemed discharged and released to the full extent permitted by 11 U.S.C. § 1141 of the Bankruptcy Code from all Claims subject to 11 U.S.C. § 524(f) of the Bankruptcy Code.

Except to the extent that the Code or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed under, and enforced in accordance with the laws of the State of California, except that issues respecting:  (a) the Allowed Orman Claim shall be governed by the laws of the State of Kansas, and (b) any Undetermined Claim shall be governed by the non bankruptcy law applicable to such claim.

Since it is anticipated, based on the Debtor's values of the Assets, that unsecured creditors will be paid in full hereunder, Causes of Action shall not be prosecuted.

All unpaid United States Trustee fees shall be paid in conjunction with the distribution of the Net Sale Proceeds by the Payment Agent and the Confirmation Order shall so provide.

Applications for the allowance of Administrative Claims must be filed on or before the Confirmation Hearing Date or such claims shall be deemed barred.

Nothing contained in the Plan or the Confirmation Order shall in any way be deemed to be a waiver of any rights and remedies that Mr. Orman may have against persons (as defined in the Bankruptcy Code) other than the Debtor with respect to payment of the Allowed Orman Claim.  All such rights and remedies are expressly reserved.

Under the Plan, the Court shall retain jurisdiction of these proceedings for the following purposes: (a) to determine any and all objections to the allowance of Claims and Interests and to render judgments and orders; (b) to determine any and all applications for allowance of compensation of professionals; (c) to determine any and all applications pending on the date of the entry of the Confirmation Order for the rejection or assumption and assignment of executory contracts and the allowance of any Claim resulting therefrom; (d) to

21

1    determine any and all controversies and disputes arising under, or in connection with, the Plan

2    and such other matters as may be provided for in the Confirmation Order; (e) to determine any

3    and all applications, adversary proceedings and litigated matters pending on the Effective Date;

4    (f) to effectuate payments under, and performance of, the provisions of the Plan; (g) to

5    determine such other matters and for such other purposes as may be provided for in the

6    Confirmation Order; (h) to determine any issues with respect to the Auction and the Sale

7    Orders; (i) to enforce the provisions of this Plan and any order entered relating hereto or

8    contemplated hereby; (j) to correct any defect, cure any omission, or reconcile any

9    inconsistency in the Plan, or the Confirmation Order as may be necessary to carry out the

10   purposes and intent of the Plan; and (k) to enforce all orders, judgments, injunctions and

11   rulings entered in connection with the Case and this Plan.

12                              **XVI. TAX CONSEQUENCES**

13          Mr. Orman has made no independent investigation of the tax consequences of the sale

14   of the Assets through the Plan. Mr. Orman believes, however, that because the Debtor is a not-

15   for-profit organization, it will suffer no adverse tax consequences under the Plan. Mr. Orman

16   expresses no opinion as to the individual tax consequences to any creditor of the Plan.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

## XVII. CAUSES OF ACTION

On the Effective Date, the Debtor shall be deemed to have transferred to the Payment Agent all Causes of Action related to, and necessary to assure that the Cash on Hand is good, collectible funds, including the right to bring an action to collect any accounts receivable of the Debtor.

Respectfully Submitted.

Dated: July 15 , 2010

FARMER & READY
-and-
STINSON MORRISON HECKER LLP

By: _____

David Y. Farmer, Esq.
Attorneys for Creditor,
Gregory J. Orman