MICHAELSON, SUSI & MICHAELSON
A Professional Corporation
ATTORNEYS AT LAW
SEVEN WEST FIGUEROA STREET, SECOND FLOOR
SANTA BARBARA, CALIFORNIA 93101-3191
Telephone:  (805) 965-1011
Facsimile:   (805) 965-7351

Peter Susi, Bar No. 62957

(SPACE BELOW FOR FILING STAMP ONLY)

Attorneys for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

| | |
|---|---|
| In re | BK No. ND 09-12311-RR |
| HOLLYWOOD MOTION PICTURE AND TELEVISION MUSEUM, a California Non-Profit Corporation, and | Chapter 11 |
| | Jointly Administered with: Case No: 9:10-bk-10865-RR |
| SELDEN ENTERPRISES LIMITED PARTNERSHIP, | |
| Debtors. | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONFIRMATION OF AMENDED CHAPTER 11 PLANS OF REORGANIZATION |
| [X] Affects all Debtors | |
| [ ] Applies only to Hollywood Motion Picture and Television Museum | **Confirmation Hearing:** |
| [ ] Applies only to Selden Enterprises Limited Partnership | Date:    September 8, 2010 Time:    10:00 a.m. Place:   1415 State Street Courtroom 201 Santa Barbara, CA |

1

# **TABLE OF CONTENTS**

2

3   I.   HISTORY OF THIS CASE ..................................... 1

4   II. IF DEBTOR PROCEEDS WITH A MUSEUM, DEBTOR WILL PAY ALL
5   CLAIMS IN CASH FROM FUNDS ON DEPOSIT AT CONFIRMATION ......... 2

6   III. CHRISTIE'S IS THE BETTER CHOICE FOR AUCTIONEER
    OF THE DEBTORS' MEMORABILIA COLLECTION ...................... 3
7

8   IV.  APPLICATION OF SECTION 1124(2) AND ENTZ-WHITE
    TO ORMAN'S CLAIM ........................................... 4

9
    A.    The Interest Sought By Orman Is Default Interest ....... 7
10   B.    Entz-White Requires Payment On The Effective Date,
          Not Confirmation .................................... 9
11

12   V.  UPON PAYMENT BY THE DEBTOR OF THE ORMAN CLAIM
    THE ORMAN CLAIM SHOULD BE DEEMED FULLY PAID AND SATISFIED .... 10

13
    A.    Section 524(e) Is Inapplicable Because Orman's Debt Is
14         Not Discharged Under The Plan; Rather, The Claim Is Fully
          Satisfied ........................................... 10
15
    B.    Trust Is Not A Guarantor, It Merely Pledged Assets To
16         Secure Repayment Of Museum's Debt ................... 13

17   VI.  BURDEN OF PROOF AS TO CONFIRMATION STANDARDS AND
18   THE COURT'S ROLE IN THE CONFIRMATION PROCESS ................ 16

19   VII.  THE PLAN MEETS THE CONFIRMATION STANDARDS OF
    11 U.S.C. § 1129 .......................................... 17
20
    VIII.  CONCLUSION ........................................... 17
21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
   787 F.2d 1352, 1358-59 (9th Cir. 1986) ................... 17

*Advanced Ribbon & Office Products, Inc. v. U.S. Interstate
   Distributing, Inc. (In re Advanced Ribbons & Office Products,
   Inc.*,
   125 B.R. 259 (9th Cir. BAP 1991) ......................... 16

*Barakat v. The Life Insurance Company of Virginia (In re
   Barakat)*,
   99 F.3d 1520, 1526 (9th Cir. 1996).  ..................... 18

*Barnes v. Whelan (In the Matter of Montano)*,
   689 F.2d 193, 201 (D.C. Cir. 1982) ....................... 17

*In re AOV Industries*,
   792 F.2d 1140, 1150 (D.C. Cir. 1986) ..................... 17

*In re Entz-White Lumber and Supply, Inc.*,
   850 F.2d 1338 (9th Cir. 1988) .......................... passim

*In re Future Energy Corp.*,
   83 B.R. 470, 481 (Bankr. S.D. Ohio 1988) ................. 17

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2nd Cir. 2005) ............................. 15

*In re Sylmar Plaza, L.P.*,
   314 F.3d 1070 (9th Cir. 2002) ............................ 21

*In re Trans World Airlines, Inc.*,
   185 B.R. 302, 313 (Bankr. E.D. Mo. 1995) ................. 20

*In re Tri-Growth Centre City, Ltd.*,
   136 B.R. 848, 852 (Bkrtcy.S.D.Cal. 1992) .................. 9

*In re Tri-Growth Centre City, Ltd.*,

136 B.R. 848, 852 (Bkrtcy.S.D.Cal. 1992) .................. 6

*J & B Investments, LLC v. Surti,*
258 S.W. 3d 127 (Tenn. Ct. App. 2007) ................. 12

*John P. Mills Organization v. Unger,*
215 Cal. 308 (1932) ..................................... 11

*Sandy Ridge Development Corp.,*
77 B.R. 69 (Bankr. M.D. La. 1987) ..................... 11

*Souza v. Westlands Water District,*
135 Cal. App. 4th 879, 900 (2006) ..................... 11

*In re Zamani,*
390 B.R. 680, 685 (Bankr.N.D.Cal. 2008) ................ 4

**Statutes**

11 U.S.C. § 1123(a)(1) ................................... 18
11 U.S.C. § 1123(a)(2) ................................... 19
11 U.S.C. § 1123(a)(3) ................................... 19
11 U.S.C. § 1123(a)(4) ................................... 19
11 U.S.C. § 1123(a)(5) ................................... 19
11 U.S.C. § 1123(a)(6) ................................... 19
11 U.S.C. § 1123(a)(7) ................................... 19
11 U.S.C. § 1124(2)(A) .................................... 5
11 U.S.C. § 1125 ........................................ 20
11 U.S.C. §§ 1122 and 1123 .............................. 17
11 U.S.C. §§ 507(a)(1), (a)(2) ...................... 19, 24
11 U.S.C. §§ 507(a)(1), 507(a)(2) ....................... 18
11 U.S.C. § 1122 ........................................ 17
11 U.S.C. § 1129(a)(1) .......................... 17, 21, 25
11 U.S.C. § 1129(a)(11) ................................. 24
11 U.S.C. § 1129(a)(12) ................................. 24
11 U.S.C. § 1129(a)(13) ................................. 25
11 U.S.C. § 1129(a)(2) .................................. 20
11 U.S.C. § 1129(a)(3) .................................. 20
11 U.S.C. § 1129(a)(4) .................................. 21
11 U.S.C. § 1129(a)(5) .................................. 21
11 U.S.C. § 1129(a)(6) .................................. 21
11 U.S.C. § 1129(a)(7) .................................. 22
11 U.S.C. § 1129(a)(8) .................................. 22
11 U.S.C. § 1129(a)(9) .................................. 24

iii

11 U.S.C. § 507(a)(8) ........................................... 18
California Civil Code § 2787 ................................... 10
California Civil Code § 2809 ................................... 11
California Civil Code § 2847 ................................... 15
California Commercial Code § 9513 ............................. 15
11 U.S.C.§ 365(b)(2) .......................................... 4
11 U.S.C.§ 1124(2) ...................................... passim
11 U.S.C.§ 524(e) ............................................ 10

**Other Authorities**

23 Williston on Contracts
 (4th ed. 2002) §61:11, p. 39. .............................. 11

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ....... 20

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) .......... 20

**Treatises**

5 Collier on Bankruptcy ¶ 1129.02[2] (15th Ed. 1988) ......... 20

1  TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES BANKRUPTCY

2  JUDGE:

3      Hollywood Motion Picture and Television Museum (the

4  "Museum") and Selden Enterprises Limited Partnership ("Selden,"

5  and collectively, the "Debtors"), the debtors and debtors-in-

6  possession in the above-captioned jointly administered chapter

7  11 cases, submit this Memorandum of Points and Authorities in

8  Support of Confirmation of the first amended chapter 11 plans

9  of reorganization filed by each of the Debtors in their chapter

10  11 cases.   The Debtors plans are referred to herein as the

11  "Plan" or the "Debtors' Plan."   In support of confirmation of

12  the Plan, the Debtors rely on the Plan, the first amended

13  disclosure statements filed by each of the Debtors in their

14  chapter 11 cases (together, the "DS" or the "Debtors' DS"),

15  this Memorandum of Points and Authorities, and the Declarations

16  of Peter Susi, Todd Fisher, Debbie Reynolds, Cathy Elkies, and

17  Fred Wood.

18                              **I.**

19                    **HISTORY OF THIS CASE**

20      The history of this case has been well documented in

21  numerous pleadings filed in this case, including the DS and the

22  disclosure statement filed by Gregory Orman ("Orman").   Orman's

23  amended disclosure statement will be referred to as "Orman's

24  DS."

## II.

### If Debtor Proceeds With A Museum, Debtor Will
### Pay All Claims In Cash From Funds On Deposit
### At Confirmation

The Plan contemplates two scenarios:  the museum scenario and the auction scenario.  The Plan provides that under the museum scenario, Orman's claim will be paid in full at the non-default rate of interest from a $4 million deposit to be posted by the Museum at confirmation, and that non-insider priority and general unsecured creditors will be paid from the balance of the deposit and subsequent royalty payments generated by the museum over a period not to exceed one year.

As more fully explained in Section VI(H) of this brief describing balloting by non-insider general unsecured creditors, whether or not the Debtors have obtained the requisite consent from that class to confirm a plan providing payments over time is subject to debate.  Rather than enter into that debate, or ask the court to further delay the confirmation hearing to allow objections to late filed claims or improper votes, as part of any museum project the Museum will post a deposit sufficient to pay all non-insider claims in full at confirmation, thus eliminating the need to make royalty payments to the general unsecured creditors following confirmation.  The Debtors' best estimate of the amount required is set forth in Peter Susi's declaration.  As of August 30, 2010, the Museum has not received funds from the museum project that would allow it to make the necessary payments and will proceed with its liquidation plan unless all

- 2 -

1  necessary funds are available at or prior to the confirmation

2  hearing.  If and when such funds become available, the Museum

3  will immediately file and serve written notice.

4        In short, the Museum will either come to the confirmation

5  hearing with funds sufficient to pay in full the Orman claim

6  and non-insider priority and general unsecured claims, and ask

7  the court to approve plans for proceeding with a museum in

8  Tennessee, or, alternatively, will request that the court

9  approve the liquidation procedure proposed by the Debtors.

10       Under either scenario, as discussed below, all claims will

11  be paid in full and unimpaired.

12                            **III.**

13      **Christie's Is The Better Choice For Auctioneer**

14        **Of The Debtors' Memorabilia Collection**

15       If there is to be a liquidation of the collection, the

16  Debtors' Plan is superior for all of the reasons set forth in

17  the the Debtors' objection to the Orman plan and the

18  declarations of Debbie Reynolds and Todd Fisher in support

19  thereof, which were filed on August 23, 2010 and are

20  incorporated herein by reference, as well as the reasons set

21  forth in the declarations of Todd Fisher and Cathy Elkies filed

22  in support of this plan confirmation memorandum.  Further,

23  Christie's has now agreed to waive its seller's commission and

24  rely solely on a buyer's premium for compensation, whereas

25  Julien's is charging both a seller's commission of 15% and a

26  buyer's commission, according to Orman.[1]

27  _____

28  [1] Christie's will be compensated by way of a buyer's premium of 25% on the
first $50,000, 20% in excess of $50,000 up to $1 million, and 12% in excess
of $1 million.

1   Christie's has set forth a timetable for an auction sale

2   to occur in March 2011, which is later than the December date

3   the Museum originally proposed, but would be the earliest date

4   that either Christie's or Julien's could reasonably proceed

5   with a sale.  In her declaration, Cathy Elkie, a senior vice

6   president at Christie's, indicates that a June 2011 date would

7   produce optimal results, but that Christie's is able and

8   willing to proceed in March if that is the order of court.

9   **IV.**

10   **Application of Section 1124(2) &**

11   **Entz-White To Orman's Claim**

12   The heart of this case is the treatment of Orman's claim

13   under Section 1124(2) and the Ninth Circuit's ruling in In re

14   Entz-White Lumber and Supply, Inc., 850 F.2d 1338 (9th Cir.

15   1988).  Under Bankruptcy Code Section 1124(2), a claim based on

16   a monetary default leading to acceleration of a promissory note

17   will be unimpaired if a debtor's plan of reorganization

18   provides for deceleration of the note and a cure of the payment

19   defaults.  In re Zamani, 390 B.R. 680, 685 (Bankr.N.D.Cal.

20   2008).  To accomplish this goal, the debtor's plan must:

21   1. Cure any default that occurred before or after the

22   commencement of the bankruptcy case, other than a

23   default of the kind specified in Code § 365(b)(2) or a

24   kind that § 365(b)(2) expressly does not require to be

25   cured;

26   2. Reinstate the maturity of such claim or interest as such

27   maturity existed before such default;

28

- 4 -

1      3. Compensate the holder of such claim or interest for any

2         damages incurred as a result of any reasonable reliance

3         on the acceleration provision;

4      4. Not otherwise alter the legal, equitable, or contractual

5         rights to which the claim holder is entitled.

6   Id.

7      While the Code does not address what rate of interest the

8   debtor must pay to affect a cure within the meaning of §

9   1124(2)(A), the Ninth Circuit, in Entz-White, held that a

10  debtor need not pay any contractual default rate of interest

11  where a debtor's plan cures all payment defaults and provides

12  for the payment of the principal balance of the debt.   Entz-

13  White Lumber, 850 F.2d 1338.

14     In Entz-White, as in our case, the debtor did not pay off

15  a promissory note when the note became due and then filed

16  chapter 11 bankruptcy.   The debtor's plan provided for the

17  repayment of the full principal balance of the note along with

18  interest at the non-default rate.   Id. at 1339.   The bankruptcy

19  court confirmed the debtor's plan, and two months later the

20  debtor made the payment.   Id.   The lender had filed a proof of

21  claim for the principal balance plus interest at the default

22  rate.   Id.   The debtor objected to the claim and the bankruptcy

23  court granted summary judgment in the debtor's favor.   Id.   The

24  lender appealed and the Ninth Circuit denied the appeal.   The

25  Circuit held that the debtor's plan of reorganization may cure

26  the default under § 1124(2) by providing for the full payment

27  of the principal and interest at the non-default rate by the

28  effective date.   Id. at 1342.   See also In re Tri-Growth Centre

1  City, Ltd., 136 B.R. 848, 852 (Bkrtcy.S.D.Cal. 1992)(implicit

2  in the holding of Entz-White is the fact that "the cure

3  required by § 1124(2) must be completed by the effective date

4  of the plan if the default rate of interest is annulled.")

5      In this case, under either the museum scenario or the

6  liquidation scenario, the Debtor will repay the principal and

7  interest at the non-default rate on or before the effective

8  date of the Plan.  Under the museum scenario, the Debtor will

9  make the required payment from the deposit that will be on hand

10  at the confirmation hearing.  Under the liquidation scenario,

11  the Debtor will make the required payment from proceeds of the

12  first auction of its collection and the date for the receipt

13  and disbursement of those proceeds, to occur not later than a

14  date fixed by this court at the confirmation hearing, will be

15  the effective date of the Debtor's Plan.

16      Because Entz-White squarely applies to the facts of this

17  case, the Debtor may cure Orman's claim under the Plan,

18  rendering Orman unimpaired under Section 1124(2).  As discussed

19  in Section IV.H. below, classes of claims left unimpaired under

20  the Plan are deemed to have accepted the Plan and are not

21  entitled to vote.

22      Orman makes two arguments that Entz-White is

23  distinguishable: (A) that the 30% interest rate sought by Orman

24  is not default interest, and (B) that Entz-White requires full

25  payment on the confirmation date.  Neither argument bears

26  scrutiny.

27

28

1   **A.   The Interest Sought By Orman Is Default Interest**

2       Orman contends the 30% he seeks under the forebearance

3   agreement is not default interest.   This argument simply isn't

4   supported by the documents (or common sense).   The original

5   note, attached to Todd Fisher's declaration as Exhibit "A," is

6   dated September 4, 2002, was amended and restated by the

7   amended note, dated March 18, 2003.   The amended note is the

8   operative loan document at issue in this case and is attached

9   to Todd Fisher's declaration as Exhibit "B."   The principal

10  face amount of the amended note reads $2,373,764.   However, the

11  amended note provides that $400,000 of the principal balance

12  will not be advanced until certain conditions are satisfied.

13  Accordingly, the original loan amount under the amended note

14  was actually $1,963,764.   In March 2004 Orman wired the Museum

15  an additional $400,000 to allow the Museum to make good on

16  checks written to Orman in late December 2003, which he was

17  holding and contemporaneously deposited, created what was

18  essentially a wash transaction.   The non-default rate under the

19  amended note is 10% and the default rate is 18%.   The amended

20  note was due on September 15, 2003.

21      On May 1, 2005, Orman and Todd Fisher executed the

22  forebearance agreement, which modified the terms of, but left

23  in place, the amended note.   The forebearance agreement, which

24  is attached to Todd Fisher's declaration as Exhibit "D,"

25  extended the due date of the amended note for a brief period,

26  to July 15, 2005, and retroactively increased the interest rate

27  from 18% to 30%.   Significantly, under the forebearance

28  agreement, the date the new interest rate became effective was

1   September 16, 2003 — the day after repayment of the amended

2   note was due and the Debtor went into default.  In short, the

3   Debtor defaulted on the amended note on September 15, 2003, and

4   beginning on September 16, 2003, the interest rate jumped to

5   30%.

6       Moreover, the forebearance agreement makes clear that it

7   is a modification of the amended note:  "Except as expressly

8   provided herein, the [amended note] and the Security Documents

9   shall remain in full force and effect in accordance with their

10  respective terms."  See page 3, § 5 of the Forebearance

11  Agreement.

12      These facts clearly establish that (a) the amended note

13  was and still is the operative agreement, and the non-default

14  rate under the agreement is 10%, and (b) the 30% rate provided

15  for in the forebearance agreement and sought by Orman is a

16  default rate.

17      The application of § 1124(2) and Entz-White enables the

18  Debtor to cure the breach under the amended note pursuant to

19  the Plan by paying the non-default rate, which is 10%.

20      Attached to Exhibit "2" of Peter Susi's declaration are

21  copies of the proofs of claim filed by Orman in these cases and

22  the Museum's computation of the amount of Orman's claim if

23  Entz-White is applied.  The Museum has used the same starting

24  principal figure as Orman, but bases its interest calculation

25  on the $1,963,764 figure from the March 18, 2003 date of the

26  amended note and thereafter on the $2,020,000 figure stated in

27  the forebearance agreement.

28

1    The Museum has not filed an objection to the Orman claim

2  because the principal issue is not the validity of the claim,

3  but treatment of the claim under a plan.   The Museum's

4  computation of the amount necessary to reserve for payment of

5  Orman's claim, attached to the Peter Susi declaration, starts

6  with the figures in Orman's proof of claim and calculates the

7  amount to be paid based upon the contract rate of interest

8  rather than the default rate.   The claim also asserts

9  $70,607.37 in attorney fees, which will presumably increase and

10  may become the subject of a later claim objection hearing if

11  not determined at the confirmation hearing.

12    **B.**    **Entz-White Requires Payment On The Effective Date,**

13        **Not Confirmation**

14    Orman contends that Entz-White requires that the cure

15  payment be made on the confirmation date.   This argument is not

16  supported by the facts of Entz-White.   In Entz-White, the

17  debtor made the cure payment two months after the court

18  confirmed the debtor's plan.   Subsequent courts have

19  interpreted Entz-White to require that payment be made on the

20  effective date, not the confirmation date.   See In re Tri-

21  Growth Centre City, Ltd., 136 B.R. 848, 852 (Bkrtcy.S.D.Cal.

22  1992)(implicit in the holding of Entz-White is the fact that

23  "the cure required by § 1124(2) must be completed by the

24  effective date of the plan if the default rate of interest is

25  annulled")(emphasis added).   In the event of a liquidation, the

26  auction will take place at the soonest practicable date to be

27  established by the court, and the "effective date" will follow

28  shortly thereafter, at which time Orman will be paid in full.

1

**V.**

2    **Upon Payment By The Debtor Of The Orman Claim,**

3    **The Orman Claim Should Be Deemed Fully Paid And Satisfied**

4        Under the Plan, upon payment of the full amount of Orman's

5    claim pursuant to 1124(2) and <u>Entz-White</u> as described above,

6    Orman's claim shall be deemed fully paid and satisfied and may

7    not be asserted further against assets pledged to secure

8    Orman's claim by the Debtor, Selden or Trust otherwise against

9    the Debtor, Selden or Trust.  Orman's objection to this aspect

10   of the Plan relies on Section 524(e) of the Code and California

11   Civil Code § 2787.

12       **A.    Section 524(e) Is Inapplicable Because Orman's Debt**

13            **Is Not Discharged Under The Plan; Rather, The Claim**

14            **Is Fully Satisfied**

15       Orman cites § 524(e), which provides that "… discharge of

16   a debt of the debtor does not affect the liability of any other

17   entity on, or the property of any other entity for, such debt,"

18   to support his contention that the repayment of Orman's debt by

19   Museum under the Plan should not affect Trust's liability.

20   This argument misses the mark because Orman's claim is not

21   being "discharged" under the Plan.  Rather, Orman's claim is

22   being fully paid under the Plan.

23       While Section 524(e) addresses the discharge of debt,

24   Section 1124(2) addresses the cure and full satisfaction of

25   debt.  If a plan of reorganization provides for the full

26   satisfaction of the debt, the contract of guaranty might not be

27   altered but the guaranty is extinguished since the debt is

28

1  judicially determined to be paid.  Sandy Ridge Development

2  Corp., 77 B.R. 69 (Bankr. M.D. La. 1987).

3      It is a general principal of contract law that a creditor

4  is only entitled to one performance.  And if the creditor

5  receives that by payment or other satisfaction, the guarantor

6  is discharged.  Souza v. Westlands Water District, 135 Cal.

7  App. 4th 879, 900 (2006)(citing 23 Williston on Contracts (4th

8  ed. 2002) §61:11, p. 39.)  This principal was applied by the

9  California Supreme Court in John P. Mills Organization v.

10 Unger, 215 Cal. 308 (1932).

11     In Unger, the seller of land provided the buyer with

12 carry-back financing.  The buyer provided the seller with a

13 surety bond and then defaulted.  Id. at 309.  The seller/lender

14 foreclosed on the land and bid in the full amount of its debt

15 at the foreclosure sale.  Id. at 310.  Then the seller/lender

16 sued the surety to recover on the bond.  Id.  The California

17 Supreme Court held that the trustee's sale satisfied the

18 purchaser's obligations in full.  Id. at 310-11.  As a result,

19 there was no debt left for the seller to recover and the surety

20 was discharged.  Id.  This situation is analogous to Trust's.

21 If the Museum satisfies Orman's debt in full pursuant to a

22 confirmed plan of reorganization, there is no debt left for

23 Trust's assets to secure.

24     Moreover, under California law, the obligation of a

25 guarantor cannot be greater than that of the principal.

26 California Civil Code § 2809.  Therefore, Trust's obligation

27 can be no greater than the Museum's obligation under the

28 amended note.  It follows that if the Museum may cure the Orman

1  debt by paying $3.5 million, Trust cannot be asked to pay a

2  dollar more than $3.5 million.

3       Orman relies on J & B Investments, LLC v. Surti, 258 S.W.

4  3d 127 (Tenn. Ct. App. 2007), a Tennessee state court case, for

5  his argument that a cure by a debtor under § 1124(2) at the

6  non-fault rate does not relieve a third party guarantor of its

7  obligation to pay the default interest.  Aside from the fact

8  that this is a Tennessee state court, not a federal or

9  California state court, this case is easily distinguishable

10  from the facts of our case.

11       First, in Surti, the plaintiff obtained a judgment against

12  the third party guarantors before the reorganization plan was

13  confirmed.  Id. at 130.  In our case, Orman has not obtained a

14  judgment in Kansas state court against Trust.

15       Second, in Surti, the judgment was entered against

16  guarantors who had signed guarantees obligating themselves to

17  independently satisfy the loan obligation.  Id. at 129.  In our

18  case, Trust has not signed such a guaranty, but has merely

19  pledged assets to secure the Museum's obligation.

20       Third, in Surti, the plan of reorganization made no

21  mention of the guarantors or the guaranty agreements.  In fact,

22  the court of appeals specifically stated that "[t]he Plan made

23  no mention of the Guaranty Agreements at issue here, nor did

24  the Plan contain any provision releasing any of the Guarantors

25  from their respective obligations under the Guaranty

26  Agreements.  Id. at 130.  In our case, the Plans specifically

27  provide that "[u]pon payment of the full amount of the Allowed

28  Orman Claim, the Orman Claim shall be deemed fully paid and

1    satisfied and may not be asserted further against assets

2    pledged to secure the Orman Claim Debtor, Selden or Trust or

3    otherwise against Debtor, Selden or Trust."

4       **B.    Trust Is Not A Guarantor, It Merely Pledged Assets To**

5            **Secure Repayment Of Museum's Debt**

6        The above analysis presupposes that Trust is a guarantor

7    or surety of the Museum's debt.  In fact, Trust merely pledged

8    collateral to secure the repayment of the amended note.  Trust

9    did not sign the amended note and did not guaranty repayment of

10   the debt.  The amended note, which is attached to Todd Fisher's

11   declaration as Exhibit "B," was executed by the Museum – not

12   Trust.  Trust signed a security agreement whereby it pledged

13   assets to secure the Museum's repayment of the amended note.

14   The security agreement is attached to Todd Fisher's declaration

15   as Exhibit "C."

16       The operative clause in the security agreement provides:

17   "[Trust] hereby grants to [Orman], to secure the payment and

18   performance in full of all of the Obligations, a first priority

19   security interest in" Trust assets.

20       The term "Obligations" is defined as "(a) all

21   indebtedness, obligations and liabilities … of [the Museum] to

22   [Orman] … now existing or hereafter arising, including, but not

23   limited to, the indebtedness evidenced by the [amended note];

24   and (b) all indebtedness, obligations and liabilities of

25   [Trust] [to] [Orman], … now existing or hereinafter arising,

26   including, but not limited to, the indebtedness evidenced by

27   this Agreement."

28

1    These two passages in the security agreement tell us the

2  following:

3         1. The security agreement is simply a devise whereby

4            Trust pledged assets to secure the Museum's debt.

5         2. This is supported by clause (a) of the "Obligations"

6            definition, which only references the Museum when

7            describing the obligations due under the amended

8            note.

9         3. Clause (b) of the "Obligations" definition states

10           that the term includes the indebtedness of Trust

11           under the security agreement, but nowhere in the

12           security agreement does it state that Trust has

13           incurred any independent debts, only that it is

14           required to insure and protect the collateral, etc.

15    In fact, in connection with the preparation and execution

16  of the amended loan documents and security agreements, the

17  parties specifically discussed the issue of whether Trust and

18  Selden were guarantying the amended note, or merely pledging

19  assets to secure repayment.  On March 5, 2003, the attorney

20  representing the Museum, Trust, and Selden wrote a letter to

21  Orman's attorney stating as follows:

22       The documents refer to a guaranty of the loan by corporate
         entities [Trust and Selden].  It is suspected that Mr.
23       Orman was under the belief that there were corporations
         owning a portion of the Hollywood memorabilia making up
24       the collateral for this loan.

25       …

26       Perhaps the most important issue is in regard to the
         guaranties.  The way the paperwork is presently drafted,
27       the entities which own part of the collateral are
         themselves guaranteeing the loan.  This is not the
28       intention of my clients.  Rather, Hollywood Motion Picture

                              - 14 -

1    Trust and Selden Enterprises agree to pledge the Hollywood
     memorabilia which each of them own.
2

3    The March 5, 2003 letter is attached to Fred Wood's

4    declaration.

5        All of these documents clearly establish that Trust merely

6    pledged assets to secure the repayment of the Museum's debt.

7    As discussed below, once the debt is repaid, Orman must release

8    the collateral.

9        Under the California Commercial Code, collateral for a

10   debt shall be released when the underlying obligation is

11   satisfied.  California Commercial Code § 9513.  Once the Museum

12   satisfies the debt, Orman is obligated to release the security,

13   and all claims against Trust disappear.

14       Even if payment of the Museum's debt did not exonerate

15   Trust's pledge, which it does, bankruptcy courts have often

16   enjoined suits against non-debtor, third party defendants where

17   establishment of liability in the state court against the third

18   party would result in the debtor having to indemnify the third

19   party defendants.  See In re Metromedia Fiber Network, Inc.,

20   416 F.3d 136 (2nd Cir. 2005).  Under California law, if a surety

21   satisfies an obligation, the principal is bound to reimburse

22   what the surety has disbursed.  California Civil Code § 2847.[2]

23   To prevent Trust from having a reimbursement claim against the

24   _____

25   [2] Orman's objection to the plan contains a lengthy section arguing that
     Kansas law should apply on the issue of usury.  The Debtors are not
     litigating the usury issue.  With respect to the issue of whether the
26   Museum's satisfaction of its obligation to Orman also exonerates the
     pledgors, the only cases cited by Orman are rely on Tennessee and California
27   law.  The commercial code section referenced above is also adopted in Kansas
     under the uniform code and Debtor was unable to find any Kansas authority on
28   the other points argued, which are persuasive if not binding.

1  Museum for the default interest, the bankruptcy court should

2  permanently enjoin the state court action against Trust.

3      Finally, Orman cites Advanced Ribbon & Office Products,

4  Inc. v. U.S. Interstate Distributing, Inc. (In re Advanced

5  Ribbons & Office Products, Inc., 125 B.R. 259 (9th Cir. BAP

6  1991) to support his contention that Trust is a guarantor and

7  is liable for the default interest notwithstanding the

8  application of Section 1124 and Entz-White.  Advanced Ribbon

9  dealt with whether the automatic stay applies to prevent a

10 creditor from enforcing a debt against property pledged by a

11 non-debtor.  That issue is not before this court.  The issue

12 before the court is the effect the satisfaction of the debt has

13 on the pledgor.  The Advanced Ribbon court would have had no

14 problem entering an order preventing the creditor from pursuing

15 the principal's stock or enforcing the secured claim against

16 the pledgor's stock once the debt was satisfied, which is

17 exactly what the Debtors' propose to do under the Plan.

18                              **VI.**

19         **BURDEN OF PROOF AS TO CONFIRMATION STANDARDS**

20         **AND THE COURT'S ROLE IN THE CONFIRMATION PROCESS**

21     At a June 16, 2010 hearing on the original disclosure

22 statements filed by the Debtor and Orman, the Court set certain

23 dates relating to confirmation of and voting on the Debtor's

24 Plan and Orman's plan of liquidation ("Orman's Plan").  On July

25 16, 2010, the Debtor filed the DS and Plan, and on July 16,

26 2010, the Debtor served all parties in interest with the DS,

27 Plan, and ballots.  Objections to the Plan were filed by Orman

28 and LaSalle Development Group ("LaSalle").

1     The Debtor bears the burden of demonstrating that the Plan

2   complies with applicable provisions of the Bankruptcy Code.  In

3   re Future Energy Corp., 83 B.R. 470, 481 (Bankr. S.D. Ohio

4   1988).  In determining whether the confirmation requirements

5   are satisfied, the court may consider not only evidence

6   presented at the confirmation hearing, but also evidence

7   presented at prior evidentiary hearings.  See Acequia, Inc. v.

8   Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1358-59 (9th Cir.

9   1986).

10                              **VII.**

11   **THE PLAN MEETS THE CONFIRMATION STANDARDS OF 11 U.S.C. § 1129**

12        A.    11 U.S.C. § 1129(a)(1) -- Plan Compliance with Code

13   Requirements:  The court must find that the Plan complies with

14   the applicable provisions of the Bankruptcy Code.  Those

15   provisions include §§ 1122 and 1123, which require that claims

16   and interests be classified and specify mandatory and

17   permissive plan provisions.  In re AOV Industries, 792 F.2d

18   1140, 1150 (D.C. Cir. 1986).

19         1.    11 U.S.C. § 1122 -- Classification of Claims: 11

20   U.S.C. § 1122 requires that claims and interests be placed into

21   classes only with claims and interests that are substantially

22   similar.  Barnes v. Whelan (In the Matter of Montano), 689 F.2d

23   193, 201 (D.C. Cir. 1982).  The Plan meets this requirement in

24   that each class contains only claims or interests that are

25   substantially similar, and no substantially similar claims are

26   separately classified for an improper purpose or without a

27   reasonable, legitimate business justification that is

28   nondiscriminatory.  See Barakat v. The Life Insurance Company

1  of Virginia (In re Barakat), 99 F.3d 1520, 1526 (9th Cir.

2  1996).

3  The Museum's Plan

4       Class 1 consists of the secured claim of Orman, secured by

5  a lien on the Debtor's Hollywood memorabilia collection.

6       Class 2 consists of the general unsecured claims held by

7  non-insiders.

8       Class 3 consists of the general unsecured claims held by

9  insiders.

10  Selden's Plan

11       Class 1 consists of the secured claim of Orman, secured by

12  a lien on the Debtor's Hollywood memorabilia collection.

13       Class 2 consists of the secured claim held by Pacific

14  Premier Bank in the amount of $870,797.61 secured by the real

15  property located at 6514 Lankershim Boulevard, North Hollywood,

16  California.

17       Class 3 consists of the general unsecured claims held by

18  non-insiders.

19       Class 4 consists of the general unsecured claims held by

20  insiders.

21       Class 5 consists of Selden's existing partnership

22  interests.

23            2.    11 U.S.C. § 1123 -- Mandatory Contents of Plan:

24            a.    § 1123(a)(1):  A plan must designate

25  classes of claims and interests, other than claims of a kind

26  specified in §§ 507(a)(1), 507(a)(2) and 507(a)(8).  As set

27  forth in Section III above, the Plan classifies all claims

28

1   (other than claims specified in §§ 507(a)(1), (a)(2) and

2   507(a)(8)) and interests.

3                    b.    § 1123(a)(2):  A plan must specify any

4   class that is not impaired under the plan.  The Plan provides

5   that all claims will be paid in full, in cash, on or before the

6   effective date.  Therefore, all claims will be unimpaired under

7   the Plan.

8                    c.    § 1123(a)(3):  A plan must specify the

9   treatment of impaired classes of claims or interests.  There

10  are no impaired classes under the Plan.

11                   d.    § 1123(a)(4):  A plan must provide the same

12  treatment of each claim or interest in a particular class,

13  unless the holder agrees to a lesser treatment.  Under the

14  Plan, all claimants are treated the same as others in their

15  class.

16                   e.    § 1123(a)(5):  A plan must provide means for the

17  plan's implementation.  The Plan provides that the Debtor will

18  either have funds sufficient to pay all claims in these cases

19  at confirmation or will liquidate the Reynolds/Fisher

20  memorabilia collection.  In either event, the Plan has

21  demonstrated the means by which claims will be paid in full on

22  or before the effective date of the plan.

23                   f.    § 1123(a)(6):  A plan must prohibit the issuance

24  of nonvoting equity securities for a debtor or a successor.

25  The Plan does not call for the issuance of any equity

26  securities.

27                   g.    § 1123(a)(7):  A plan must contain only

28  provisions that are consistent with the interests of creditors

1  and equity security holders and with public policy with respect

2  to the manner of selection of any officer, director or trustee

3  under the Plan and any successor to such officer, director or

4  trustee.   There are no such provisions in the Plan.

5      B.   11 U.S.C. § 1129(a)(2) - Proponent Compliance with

6  Code:   Section 1129(a)(2) provides that the court find that the

7  proponent of a plan has complied with the applicable provisions

8  of the Bankruptcy Code.   This requirement is intended to

9  require compliance with § 1125 regarding disclosure.  See In re

10  Trans World Airlines, Inc., 185 B.R. 302, 313 (Bankr. E.D. Mo.

11  1995); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977);

12  S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); 5 Collier

13  on Bankruptcy ¶ 1129.02[2] (15th Ed. 1988).   At a hearing

14  before this court on June 16, 2010, the court considered the

15  contents of the Debtors' original disclosure statement and,

16  having found that the contents were sufficient, set a hearing

17  on confirmation of the Plan.   The Debtors have complied with §

18  1125 with respect to transmittal of the Plan, DS and related

19  materials to the creditors and parties in interest, with

20  respect to solicitation of acceptances of the Plan and with

21  respect to all other requirements of § 1125.

22      C.   11 U.S.C. § 1129(a)(3) - Plan Proposed in Good Faith:

23  Section 1129(a)(3) provides that the court must find that the

24  Plan has been proposed in good faith and not by any means

25  forbidden by law.   Orman argues the Debtors' use of Entz-White

26  is not fair and equitable and the Plan is not proposed in good

27  faith because the Museum is a solvent debtor, and the benefit

28  to the cure at the non-default rate falls to the debtor and its

- 20 -

1 principals, and not the creditors.  This argument was squarely

2 addressed and rejected by the Ninth Circuit in In re Sylmar

3 Plaza, L.P., 314 F.3d 1070 (9th Cir. 2002).

4       In Sylmar, the bankruptcy court confirmed a plan that

5 cured a default under secured debt at the non-default rate.

6 The secured creditor appealed the confirmation order up to the

7 Ninth Circuit on grounds that the plan lacked good faith

8 because the plan leaves the debtor solvent while permitting it

9 to avoid paying post petition interest at the default interest

10 rate.  The Ninth Circuit rejected this argument, finding that

11 "insolvency is not a prerequisite to a finding of good faith

12 under § 1129(a)."    Id. at 1074-75.

13      D.    11 U.S.C. § 1129(a)(4) - Disclosure and Approval of

14 Payments:  Any payment by Debtor for services or for costs and

15 expenses in connection with the Chapter 11 case must be subject

16 to court approval as reasonable.  All such payments are and

17 will be subject to approval of the court.

18      E.    11 U.S.C. § 1129(a)(5) - Disclosure of Identity of

19 Control Persons and Insider Employees:  The Debtor has

20 disclosed that the Debtor is a non-profit corporation.  The

21 shareholders of the Debtor are Debbie Reynolds and her

22 children, Carrie Fisher and Todd Fisher.  Todd Fisher is the

23 Debtor's president.

24      F.    11 U.S.C. § 1129(a)(6) - Governmental Regulation: No

25 governmental regulatory commission has jurisdiction over the

26 rates and charges of Debtor and, therefore, § 1129(a)(6) is not

27 applicable in this case.

28

1       G.    11 U.S.C. § 1129(a)(7) - Impaired Classes:  Each

2 holder of a claim or interest in an impaired class must either

3 accept the Plan or receive, as of the Effective Date of the

4 Plan, property of a value that is not less than the amount that

5 such holder would receive if the Debtor were liquidated under

6 Chapter 7 of the Bankruptcy Code.  Here, as stated in Section

7 II above, there are no impaired classes.

8       H.    11 U.S.C. § 1129(a)(8) - Acceptance of Plan:  Section

9 1129(a)(8) provides that, with respect to each class of claims

10 or interests, such class has accepted the plan or such class is

11 not impaired under the plan.

12       The Debtor filed a ballot summary herewith.  As discussed

13 below, there were a number of ballots cast in this case which

14 create ambiguity as to whether the class of non-insider,

15 unsecured creditors accepted the Plan.

16       First, the Debtor scheduled Diana Wong as a general

17 unsecured creditor with a $46,030.12 claim.  Ms. Wong did not

18 file a proof of claim, but submitted a ballot for $119,121.88

19 and attached to her ballot the contract with the Debtor along

20 with an accounting which appears to support the $119,121.88 as

21 being the amount owed, largely because of unpaid interest due

22 under the contract, subject to reduction for interest charged

23 after the Chapter 11 filing.

24       Second, the Debtor scheduled Singer Lewak LLP as a general

25 unsecured creditor with a $14,317 claim.  Singer Lewak LLP did

26 not file a proof of claim, but submitted a ballot which states

27 that it is owed $7,158.50, which appears to be correct.

28

1    Third, Michael A. Brenesell, formerly associated with

2    Berkeley Investors an affiliate of BrandStyle Marketing

3    International, LLC ("Berkeley") filed ballots in the Museum

4    case and in the Selden case voting against the Debtors' plans.

5    However, Berkeley was not scheduled by the Debtors, and did not

6    file a proof of claim in either case until August 20, 2010,

7    when it filed its claim against the Museum only.  Attached to

8    Berkeley's ballots is a memorandum which appears to acknowledge

9    that it was to be paid only if it obtained funding for the

10   Museum, which it never did.

11       Fourth, LaSalle, represented by Orman's attorney, filed a

12   claim in the Museum's case for $78,257.52 and submitted a

13   ballot voting against the Museum's Plan.  It is the Debtor's

14   contention that the Debtor owes LaSalle nothing.

15       Fifth and finally, there is a late filed consent by

16   Margolis & Associates Consulting Corp., which is scheduled for

17   $10,248.50.

18       Rather than rely on consents from the non-insider general

19   unsecured creditors in Museum and Selden, the Debtor has

20   concluded that the best approach is to abandon the payment over

21   time element of its plan and deposit sufficient funds with the

22   court at the confirmation hearing to pay all non-insider

23   general unsecured claims in both cases in full, in cash, if the

24   Debtor is going to pursue the museum alternative.  Therefore,

25   each class is not impaired under the Plan and the Debtor need

26   not rely on the votes of the general unsecured creditors to

27   confirm the Plan.

28

1   I.   11 U.S.C. § 1129(a)(9) - Treatment of Priority

2   Claims:   Section 1129(a)(9) provides for treatment of certain

3   priority claims.   The Plan provides for payment of claims of

4   the type specified in Code § 507(a)(2) (Administrative Claims).

5   The Debtor will pay administrative claims on the Effective Date

6   of the Plan or within thirty (30) days of allowance if allowed

7   by the court after the Effective Date, or at such later time as

8   the Debtor and claimant may agree.

9   The only other priority claim in the Debtor's case is the

10  priority wage claim of Todd Fisher.   The Plan provides that all

11  of Todd Fisher's claims, including any portion that is entitled

12  to priority under Section 507(a)(4), will be unaffected by plan

13  confirmation and will not be paid or discharged under the Plan.

14  J.   11 U.S.C. § 1129(a)(11) - Feasibility:   Section

15  1129(a)(11) requires the court to find that:

16      Confirmation of the Plan is not likely to be followed
        by the liquidation, or the need for further financial
17      reorganization, of the debtor or any successor to the
        debtor under the plan, unless such liquidation or
18      reorganization is proposed in the plan.

19

20  The Plan is feasible if the Debtor is able to demonstrate

21  that it will have sufficient cash to make the Plan payments.

22  As stated above, under either scenario contemplated by the

23  Plan, the Debtor will have enough cash to pay all claims in

24  full, in cash, by the Effective Date.

25  K.   11 U.S.C. § 1129(a)(12) - Payment of Fees:   All fees

26  payable pursuant to 28 U.S.C. § 1930 have been paid or, in the

27  case of the United States Trustee's fees, the Plan provides

28  that such fees will be paid on the Effective Date and shall be

paid post-confirmation until a final decree has been entered.

- 24 -

1  The Debtor will pay all Clerk's Special Charges on or before

2  the Effective Date.

3       L.    11 U.S.C. § 1129(a)(13) - Payment of Retirement

4  Benefits:   11 U.S.C. § 1129(a)(13) is not applicable to this

5  Plan.

**VIII.**

**CONCLUSION**

8       As demonstrated above, Debtor has met all of the

9  requirements of 11 U.S.C. § 1129(a), and based thereon,

10  respectfully requests that the Plan be confirmed and for all

11  other proper orders.

12       DATED:   August 20, 2010.

                              MICHAELSON, SUSI & MICHAELSON
                              A Professional Corporation

                              By
                                 PETER SUSI, Attorneys
                                 for Debtor and Debtor-in-
                                 Possession

| In re:  HOLLYWOOD MOTION PICTURE AND TELEVISION MUSEUM, a Non-Profit Corporation,<br><br>Debtor(s). | CHAPTER  11<br><br>CASE NUMBER   9:09-bk-12311<br>[Jointly Administered with Case No. 9:10-bk-10865-RR] |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 7 West Figueroa Street, Second Floor, Santa Barbara, California 93101.

The foregoing document described _____MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONFIRMATION OF AMENDED CHAPTER 11 PLANS OF REORGANIZATION_____will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On ____August 30, 2010_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____August 30, 2010_____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____August 30, 2010_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Via Personal Delivery
The Honorable Robin Riblet
U.S. Bankruptcy Court
1415 State Street
Santa Barbara, CA  93101

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 30, 2010 | Cheryl Niccoli | *Cheryl Niccoli* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

**Hollywood Motion Picture and Television Museum**
**BK NO. ND 09-12311-RR**
**Jointly Administered with BK NO. 10-10865**

### SERVED ELECTRONICALLY

David Y. Farmer   cacie@farmerandready.com
Brian D. Fittipaldi   brian.fittipaldi@usdoj.gov
Jonathan G. Gura   jon@msmlaw.com
Brian T. Harvey   bharvey@buchalter.com, IFS_filing@buchalter.com
Mark Shaiken   mshaiken@stinson.com
Peter W. Lianides   plianides@winthropcouchot.com, pj@winthropcouchot.com
Randye B. Soref   rsoref@buchalter.com, IFS_filing@buchalter.com
Peter Susi   cheryl@msmlaw.com, peter@msmlaw.com
United States Trustee   ustpregion16.nd.ecf@usdoj.gov

### SERVED BY U.S. MAIL

Gregory J Orman
26733 W. 109th Street
Olathe, KS 66061-7499